# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES MARTIN, Individually and on Behalf of All Others Similarly Situated, | : : : | Case No. 2:15-cv-01522-NBF |
| | : | **CLASS ACTION** |
| Plaintiff, | : : | |
| | : | **AMENDED CLASS ACTION** |
| v. | : : | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES** |
| GNC HOLDINGS, INC., JOSEPH M. FORTUNATO, MICHAEL M. NUZZO, ANDREW S. DREXLER, MICHAEL G. ARCHBOLD, TRICIA K. TOLIVAR, and PATRICK A. FORTUNE, | : : : : : | **LAWS** |
| | : | **Jury Trial Demanded** |
| | : : | |
| Defendants. | : | |

# TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................2

II.    JURISDICTION AND VENUE .......................................................................6

III.   PARTIES ...........................................................................................................7

    A.   Lead Plaintiff ............................................................................................7

    B.   Defendants ................................................................................................7

        1.   The Company ...................................................................................7

        2.   The Individual Defendants .............................................................8

IV.    BACKGROUND AND THE NATURE OF THE FRAUD .............................10

    A.   Background Regarding the Company ......................................................10

    B.   GNC Worked Closely with Its Vendors Yet Employed a Business Model
        that Allowed It to Evade Product Liability for Third-party Products ...................13

    C.   The Threat of Increased Regulation of the Supplement Industry Was a
        Significant Risk to GNC's Continued Success ......................................16

    D.   GNC Falsely Reassures Investors that It Will Withstand Increased Federal
        Regulatory Scrutiny ................................................................................18

    E.   GNC Secretly and Illegally Substitutes BMPEA and Picamilon for DMAA
        and Falsely Represents to Investors that Any Related Risk Is Behind the
        Company ..................................................................................................20

    F.   Before Departing the Company, Fortunato and Nuzzo Sell $88 Million
        Dollars in GNC Stock .............................................................................23

    G.   GNC Falsely Reassures Investors Once Again that It Is in Compliance with
        Federal Regulations in Response to the New York AG's Investigation ...............24

V.     UNBEKNOWNST TO INVESTORS, GNC WAS KNOWINGLY MARKETING
     ILLEGAL SUPPLEMENTS .............................................................................26

    A.   GNC Knowingly and Unlawfully Sold Dietary Supplements with the Soviet-
        developed Synthetic Drug Picamilon as a Key Ingredient ....................28

    B.   GNC Knowingly and Unlawfully Sold Dietary Supplements with the
        Synthetic Amphetamine-like Drug BMPEA as a Key Ingredient ........................33

VI.    GNC'S UNLAWFUL PRODUCTS AND PRACTICES ARE REVEALED AS
     THE COMPANY'S FINANCIAL RESULTS DECLINE AMIDST
     HEIGHTENED REGULATORY SCRUTINY ...............................................39

    A.   The Oregon AG Files a Civil Action Against General Nutrition Corporation ......39

    B.   GNC Announces Its Third-quarter Earnings .........................................43

VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND
MARKET REACTIONS THERETO ...................................................................44

    A.  Defendants' False and Misleading Statements Throughout the Class Period .......44

        1.  Defendants' False and Misleading Statements in the Company's
Forms 10-K ....................................................................................45

    B.  Defendants' False and Misleading Statements at the Beginning of the Class
Period ...................................................................................................49

    C.  Defendants' False and Misleading Statements Concerning DMAA ...................49

        1.  May 23, 2012 – Morgan Stanley Retail Conference................................50

        2.  July 26, 2012 – 2Q12 Earnings Conference Call....................................52

        3.  April 26, 2013 – 1Q13 Earnings Conference Call...................................55

        4.  September 10, 2013 – Goldman Sachs Global Retailing
Conference .....................................................................................56

        5.  May 6, 2014 – 1Q14 Earnings Conference Call .....................................57

    D.  Defendants' False and Misleading Statements in Response to the New York
AG's Investigation ................................................................................59

        1.  February 12, 2015 – 4Q14 Earnings Conference Call..............................59

        2.  March 30, 2015 – GNC Press Release Announcing NYAG Letter
Agreement and March 30, 2015 8-K ..................................................59

        3.  April 30, 2015 – 1Q15 Earnings Conference Call...................................61

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ......................................................61

    A.  GNC Worked Closely with Vendors and Reassured the Market About the
Quality of Their Products.........................................................................63

    B.  GNC Structured Its Vendor Contracts to Allow It to Sell Unlawful
Ingredients Without Repercussions ............................................................67

    C.  The Individual Defendants Had Knowledge of and Access to Information
Regarding Relevant Product Recalls and Regulatory Concerns About
Specific Products that Support a Strong Inference of Scienter............................67

    D.  GNC's Vendors Had Histories of Ethical and Legal Violations that Add to
the Strong Inference of Scienter ................................................................70

    E.  The Individual Defendants Are Presumed to Know About the Company's
Core Operations ...................................................................................72

    F.  Fortunato's and Nuzzo's Insider Sales During the Class Period Further
Support a Strong Inference of Their Scienter ................................................74

    G.  Defendants' SOX Certifications Further Support a Strong Inference of
Scienter ..............................................................................................78

      H.     The Cumulative Knowledge of GNC's Executives Is Imputed to the
             Company ........................................................................................................80

IX.     LOSS CAUSATION ................................................................................................80

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE .................................................82

X.      CONTROL PERSON ALLEGATIONS .......................................................................83

XI.     INAPPLICABILITY OF SAFE HARBOR ..................................................................85

XII.    CLASS ACTION ALLEGATIONS ..........................................................................86

XIII.   PRAYER FOR RELIEF .........................................................................................92

XIV.   JURY DEMAND ................................................................................................92

Lead Plaintiff KBC Asset Management NV ("KBC" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by its undersigned attorneys, alleges the following against GNC Holdings, Inc. ("GNC" or the "Company") and the Individual Defendants (defined below), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through its counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning GNC and the Individual Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by GNC with the U.S. Securities and Exchange Commission ("SEC"); (iv) GNC's corporate website; (v) interviews with former GNC employees; (vi) materials received from the U.S. Food and Drug Administration ("FDA") pursuant to a Freedom of Information Act ("FOIA") request; and (vii) other publicly available information. Lead Plaintiff expects to receive additional materials from the FDA pursuant to its FOIA request and further believes that substantial additional evidentiary support for the allegations herein will continue to emerge through investigation and discovery.

Lead Plaintiff brings this federal securities class action on behalf of itself and on behalf of a class consisting of all persons and entities who purchased the common stock of the Company from November 16, 2011, through and including October 28, 2015 (the "Class Period"), and were damaged thereby, subject to certain exclusions addressed in ¶ 230 below (the "Class").[1]   The

---

[1] References to ¶ __ are to paragraphs in this Amended Class Action Complaint for Violations of the Federal Securities Laws.

defendants in this action are GNC; Joseph M. Fortunato ("Fortunato"), GNC's former President and Chief Executive Officer ("CEO"); Michael M. Nuzzo ("Nuzzo"), GNC's former Executive Vice President ("EVP") and Chief Financial Officer ("CFO"); Andrew S. Drexler ("Drexler"), GNC's former Senior Vice President and Corporate Controller; Michael G. Archbold ("Archbold"), GNC's current CEO; and Patrick A. Fortune ("Fortune"), GNC's current Corporate Controller (collectively, the "Defendants").  Lead Plaintiff and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

## I.     INTRODUCTION

1.     This securities fraud class action emanates from a series of material misrepresentations and omissions by GNC and its most senior executives concerning key drivers of the Company's success:  its product quality and its purported compliance with critical federal regulations.

2.     GNC is a "nutritional supplement" retailer.   Defendants assured investors throughout the Class Period that, among other things, GNC "set[] the standard in the nutritional supplement industry" with respect to "truth in labeling" and "ingredient safety."   In reality, however, GNC had been knowingly selling dozens of products containing unlawful and potentially dangerous ingredients **for years**.  As Oregon Attorney General Ellen F. Rosenblum (the "Oregon AG") stated in connection with her October 2015 enforcement action against GNC, the Company's Class Period representations were "untrue."

3.     During the Class Period, GNC maintained that the third-party products it sold met the Company's "premium" standards.   This was critically important to investors because the Company relied heavily on sales of products manufactured by third-party vendors, deriving at least 50% of its retail revenue from these products.  GNC emphasized in its Class Period SEC filings

that, with respect to products purchased from third-party manufacturers, "[e]ach of our distribution centers has a quality control department that monitors products received from our vendors to ensure they meet our quality standards."  Similarly, throughout the Class Period, GNC asserted that "[a]s a recognized industry leader, GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality."  These were material assertions to investors, because Defendants attributed the Company's success and product quality during the Class Period, in part, to "close relationships with [their] vendor partners" that enabled GNC to "negotiate first-to-market opportunities."  Indeed, Defendant Fortunato assured investors that GNC was "**joined at the hip with [vendors] on everything they are doing**" and that the third-party vendors were "**in bed with us**."  (Emphasis added.)  These were not empty promises. As the Oregon AG's investigation later revealed, the Company closely tracked and scrutinized the ingredients in its third-party products to determine which ingredients "looked promising" for possible development by the Company in its GNC-branded products.  Consistent with these findings, the Company's former employees explained that GNC relied upon the sophisticated data management system, OnBase, to track every ingredient contained in the third-party products sold by GNC.

4.      GNC's success during the Class Period hinged in large measure on its ability to introduce legally and incorporate "cutting edge" ingredients without having to provide robust safety data like that required in the pharmaceutical industry for prescription drugs.  Although the supplement industry is regulated by the FDA, the applicable regulatory regime does not require companies to "prove" that a product is safe before it is marketed and sold.  The applicable regulations do require, however, that the supplements GNC sold had to consist solely of "dietary ingredients," which include, *inter alia*, vitamins, minerals, herbs and other botanicals that occur

naturally.  Nonetheless, the regulatory scheme allowed GNC to operate essentially on the honor code regarding whether it met this requirement.

5.      During the Class Period, two scandals emerged in the supplement industry that threatened GNC's success and heightened the threat of increased regulatory action.  Each time, GNC successfully and falsely assured investors that it complied with all legal requirements and that the fundamental precepts of its business – purity and "premium" standards – had not suffered. First, in late 2011, the FDA began to warn that certain products that were widely promoted by numerous retailers (including GNC) contained an unlawful and potentially dangerous ingredient called dimethylamylamine ("DMAA") and that those products should not be sold.  In response, GNC repeatedly told investors that the FDA action would not affect Company sales given that it had other "reformulated" products to take the place of items containing DMAA.

6.      Investors did not know at the time, and Defendants misleadingly omitted to disclose, that the items that had "replaced DMAA" included products containing equally unlawful ingredients.

7.      Second, in early 2015, New York State Attorney General Eric T. Schneiderman (the "New York AG") announced that his office had sent letters to GNC and other retailers requesting that they "cease and desist" the sale of certain popular herbal products.  According to the New York AG, GNC allegedly sold GNC-brand herbal supplement products in New York that were misbranded because they contained ingredients not listed on the label.  GNC responded falsely by stating that "[a]s an industry leader we have always gone above and beyond the minimum requirements in pursuing quality for our consumers."  This and other similar false statements reassured investors, mitigating the potential harm to GNC's reputation.

8.      The Company's true business practices were revealed in October 2015.  On October 22, 2015, the Oregon AG publicly filed an enforcement action against GNC for violations of the Oregon Unlawful Trade Practices Act, citing multiple counts of "misrepresentations" and "untrue" statements concerning GNC's business practices and products (the "Oregon AG Complaint").  The Oregon AG Complaint relied on numerous internal GNC emails and files, along with other information obtained during the agency's confidential investigation.

9.      The Oregon AG Complaint revealed that GNC routinely sold third-party products that it knew or recklessly disregarded contained unlawful ingredients.  Specifically, GNC sold, both in its stores and on its website, dozens of third-party products that contained at least one of two potentially dangerous drugs:  "picamilon" or β-Methylphenethylamine ("BMPEA").  The Oregon AG Complaint established through GNC's confidential product files that, as early as May 2007, "GNC knew that picamilon [wa]s not a lawful dietary ingredient."  Instead, picamilon is a Soviet-developed neurological drug available by prescription in Russia.  In support of the Oregon AG's Complaint, a senior FDA official submitted a sworn affidavit that picamilon did not meet **any** of the categories of a dietary ingredient under the regulations.  The Oregon AG Complaint further established that BMPEA is a chemical synthesized as a replacement for amphetamine (i.e., speed) that has never been studied on humans.  As set forth in the Oregon AG's Complaint, even after being notified in 2015 that FDA scientists had determined (1) BMPEA was not a dietary ingredient, and (2) numerous products labeled as containing an ingredient called "acacia rigidula" were actually spiked with BMPEA, GNC continued to sell products labeled as containing BMPEA and acacia rigidula.

10.      The market was shocked by the Oregon AG's announcement, particularly in light of GNC's prior reassurance that it required its vendors to meet "high standards of quality."  By the

close of trading on October 22, 2015, the price of GNC common stock had plummeted by approximately 14%, causing massive losses to the Company's shareholders.

11.     Then, on October 29, 2015, GNC disclosed that it was lowering its guidance for the full year 2015 to approximately $2.85-$2.90 per share from the $3.00-$3.10 per share forecast that the Company had provided previously.  Following the Company's announcement, analysts voiced heightened concerns that the Oregon AG's prosecution would have far more wide-reaching effects on the Company's financial future than previously thought, with one analyst citing the "Oregon AG situation" as a reason why the "outlook for GNC isn't as promising as we had initially hoped for earlier in 2015."  That day, the price of GNC common shares plummeted to close at $28.24 per share – a 26.9% drop from the previous day's closing price of $38.64 per share.

12.     In total, GNC's stock price declined over $30 per share from its Class Period high of over $60 per share, or over 50% – a market cap decline of over **$2.75 billion**.  Although investors suffered enormous losses, GNC insiders reaped immense profits.  During the Class Period, Defendant Fortunato sold over 2 million shares of GNC stock for $78 million, while Defendant Nuzzo sold hundreds of thousands of shares of GNC stock for profits of $10.5 million.

13.     By this action, Lead Plaintiff (on behalf of itself and the Class it seeks to represent) seeks to recover damages for the substantial losses suffered by GNC shareholders as the truth regarding  Defendants' materially false and misleading statements and omissions came to light.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as GNC's principal executive office is located within this District at 300 6th Avenue, Pittsburgh, Pennsylvania 15222, and many of the acts and practices complained of herein occurred in substantial part in this District.

16.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiff

17.     On January 20, 2016, this Court appointed KBC to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  *See* ECF No. 36.

18.     KBC is a large institutional investment company based in Brussels, Belgium, that provides financial and investment services.  As part of KBC's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds.  At the end of 2015, KBC had approximately €208 billion ($228 billion) of assets under management.  During the Class Period, KBC's funds purchased shares of GNC's common stock and suffered damages as a result of the securities law violations alleged herein.

### B.     Defendants

#### 1.     The Company

19.     Defendant GNC is a specialty retailer of health and wellness products, including vitamins, minerals, herbal supplement products, sports nutrition products, and diet products.  GNC generates 55% of its sales from Sports (44%) and Diet (11%) products.  GNC also sells products through its website, GNC.com.  In 2011, GNC described itself as "a premier distributor of sports

nutrition products" and a "leading distributor of third-party sports nutrition brands." All of GNC's operations are conducted through its subsidiaries, including General Nutrition Corporation.[2]

20.     GNC is headquartered in Pittsburgh, Pennsylvania. The Company's common stock is listed and trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GNC." As of October 23, 2015, there were more than 82.6 million GNC common shares outstanding.

### 2.     The Individual Defendants

21.     Fortunato served as GNC's President, CEO, and member of the Company's Board of Directors from the beginning of the Class Period through August 4, 2014, when he was terminated unexpectedly from the Company. Specifically, he began his service as a director of GNC in March 2007. He was appointed the Company's President and CEO on November 10, 2005. GNC's 2013 14A Proxy Statement filed with the SEC on April 11, 2013, states that Fortunato's "years of experience with us, his comprehensive knowledge of our business and perspective of our day-to-day operations led to the conclusion that he should serve as a director on the Board." In his capacity as a Company director, President, and CEO, and as detailed herein, Fortunato made false and misleading statements during the Class Period. For example, Fortunato signed GNC's 2011 Form 10-K, 2012 Form 10-K, and 2013 Form 10-K. He also executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") in 2012, 2013, and 2014 in connection with the Company's Forms 10-K. Fortunato also was responsible for actionable misstatements made, among other times, during the Company's scheduled earnings calls.

---

[2] In connection with the wrongdoing alleged herein, the Company and General Nutrition Corporation are referred to as "GNC."

22.     Nuzzo served as GNC's EVP and CFO from 2008 until June 13, 2014, when GNC issued a press release announcing that Nuzzo had resigned from his positions as EVP and CFO of GNC effective with the release of the Company's June 30, 2014 financial results.  In his capacities as EVP and CFO of the Company, and as detailed herein, Nuzzo made false and misleading statements during the Class Period.  For example, Nuzzo signed GNC's 2011 Form 10-K, 2012 Form 10-K, and 2013 Form 10-K.  He also executed SOX Certifications in 2012, 2013, and 2014 in connection with the Company's Forms 10-K.  Further, he was responsible for actionable misstatements made, among other times, during investor-related presentations.

23.     Drexler served as GNC's Senior Vice President and Corporate Controller from 2011 through March 2014.  In his capacity as Senior Vice President and Corporate Controller, and as detailed herein, Drexler made actionable false and misleading statements during the Class Period.  In that regard, Drexler signed GNC's 2011 Form 10-K, 2012 Form 10-K, and 2013 Form 10-K.

24.     Archbold has served as GNC's CEO and as member of the Company's Board of Directors since August 5, 2014.  Prior to that time, Archbold was the President and Chief Operating Officer ("COO") of Vitamin Shoppe, Inc. from April 2011 to 2012, having served as its EVP, COO, and CFO since April 2007.  In his capacity as Company CEO and a GNC director, and as detailed herein, Archbold made false and misleading statements during the Class Period.  For example, Archbold signed GNC's 2014 Form 10-K and wrote an Open Letter Regarding GNC's Expanded Customer Quality Standards in April 2015.  He also executed SOX Certifications in connection with the Company's 2015 Form 10-K.  Further, he was responsible for actionable misstatements made, among other times, during scheduled earnings calls and during investor-related presentations.

25.     Fortune has served as GNC's Corporate Controller since March 2014.   In his capacity as the Company's Corporate Controller, and as detailed herein, Fortune made actionable false and misleading statements during the Class Period.   In that regard, Fortune signed GNC's 2014 Form 10-K.

26.     Defendants Fortunato, Nuzzo, Drexler, Archbold, and Fortune are collectively referred to herein as the "Individual Defendants."

27.     Defendant GNC and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     BACKGROUND AND THE NATURE OF THE FRAUD

### A.     Background Regarding the Company

28.     GNC is a specialty supplement retailer.   During the Class Period, GNC sold vitamins, minerals, herbal supplement products, sports nutrition products, and diet products.   GNC sold both GNC proprietary products that it manufactured, as well as products it purchased from third-party vendors.   GNC derived approximately 50% of its retail revenues from sales of third-party products.[3]

29.     While GNC sells a broad range of products, historically it has focused on the "sports nutrition" segment, which has been one of the Company's most significant areas of sales and sales growth.   During the Class Period, over 50% of GNC's sales were from its sports nutrition product sales.[4]   According to Defendant Nuzzo, the standard industry growth rate for the sports nutrition segment was 6% to 7%, but GNC was "able to grow at above this standard industry growth rate

---

[3] GNC Holdings, Inc., Annual Report (Form 10-K), at 10 (Feb. 11, 2016).

[4] Michael G. Archbold, CEO of GNC, Tr. of ICR XChange Conference 2 (Bloomberg Jan. 13, 2016).

because of [its] innovation . . . [and] relationship with third party suppliers."[5]  Analysts recognized that GNC's sports nutrition was a key driver of the Company's success, with Credit Suisse noting that "GNC is very dependent on sports nutrition" and that category "has an outsized impact on the company's sales."

30.     During the Class Period, GNC distinguished itself in the industry by touting its scientific "expertise [as] 2nd to none," with over 120 specialists, "[p]harmaceutical-style R&D," "[h]ighly credentialed procedures & protocols," "[a]ccess to world class technologies" that was "unparalleled," and "[c]linical trial capabilities" that "set [them] apart" from their competitors."[6] GNC touted its "high-quality" "premium" "value-added nutritional products," and stated that it ensured that its third-party products met its standards for the products GNC produced internally. Similarly, on GNC's website (in the Media Room section), the Company stated that it "sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the cutting-edge of nutritional science."

31.     GNC expressed to investors that it ensured the third-party products it sold met the Company's "premium" standards.  GNC emphasized in its Class Period Form 10-K filings with the SEC that, with respect to products purchased from third-party manufacturers, "[e]ach of our distribution centers has a quality control department that monitors products received from our vendors to ensure they meet our quality standards."[7]  Similarly, throughout the Class Period, GNC

---

[5] Michael M. Nuzzo, Tr. of William Blair Growth Stock Conference 3 (Bloomberg June 12, 2012).

[6] GNC Presentation Slides at 10, Morgan Stanley Global Consumer Conference (Nov. 13, 2012).

[7] GNC Holdings, Inc., Annual Report (Form10-K), at 10 (Feb. 11, 2016); GNC Holdings, Inc., Annual Report (Form 10-K), at 13 (Feb. 17, 2015); GNC Holdings, Inc., Annual Report (Form 10-K), at 15 (Feb. 20, 2014); GNC Holdings, Inc., Annual Report (Form 10-K), at 12 (Feb. 22, 2013); GNC Holdings, Inc., Annual Report (Form 10-K), at 12 (Feb. 27, 2012); GNC Holdings, Inc., Amended Annual Report (Form 10-K/A), at 12 (Feb. 26, 2013); and March 2012, October 2011, and April 2011 Offering Materials.

posted on its website that "[a]s a recognized industry leader, GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet our high standards of quality."

32.     Analysts credited the Company's representations.  For example, on July 29, 2014, Sterne Agee noted "GNC's product differentiation and superiority."[8]  On February 13, 2015, Stephens Inc. wrote that "Mr. Archbold is focused on building on the core value proposition of GNC's deep expertise in health & wellness . . . maintaining rigorous quality standards."[9]

33.     Driven by this reputation for best-in-class quality, GNC experienced greater than projected success.  From 2011 to the close of the Class Period in 2015, GNC reported that net product revenues for the Company increased from $2.07 billion in 2011 to $2.64 billion in 2015, and that the Company's annual net income soared from $132 million 2011 to $219 million in 2015. During the Class Period, GNC regularly exceeded analysts' expectations of the Company's earnings per share ("EPS") results.  As a result, GNC's stock price rose during the Class Period from $26.77 per share to a Class Period-high of $60.98 per share.

34.     As investors later learned, however, Defendants' statements during the Class Period regarding "pure" quality ingredients in GNC's third-party products and Defendants' assurances that those products met the Company's "premium" "quality standards" were false and misleading as Defendants were knowingly and/or recklessly selling third-party supplements containing illegal ingredients.  This, in turn, exposed the Company to significant regulatory action and caused enormous damage to the Company's brand and stock price.

---

[8] Charles Grom, CFA et al., *Look Forward . . . Not Back; Risk/Reward Attractive, Adjust EPS and PT to $36* 1(Sterne, Agee & Leach Inc. July 29, 2014).

[9] Joe Edelstein, CFA, *4Q Beat; Positive Guide Outlook; Slight Incr. to Ests.; Maintain $50 Tgt & EW* 2 (Stephens Inc. Feb. 13, 2015).

**B.     GNC Worked Closely with Its Vendors Yet Employed a Business Model that Allowed It to Evade Product Liability for Third-party Products**

35.     Defendants attributed the Company's success and product quality during the Class Period, in part, to "close relationships with [their] vendor partners"[10] that enabled GNC to "negotiate first-to-market opportunities."[11]   For example, when asked on a July 25, 2013 conference call if GNC was "very close" with the Company's suppliers, Defendant Fortunato replied, "we are in close connection with them.   They literally – almost every vendor comes in here once a month. . . . [GNC is] joined at the hip with them on everything they are doing.   And we plan various things with them, whether it's exclusive, separate flavors, certain sizes, various things that come to GNC before they go to other places.   So that relationship continues, and I think it's stronger than it has ever been."[12]   Similarly, on the Company's May 6, 2014 conference call, Defendant Fortunato explained that the third-party vendors were "in bed with us."[13]

36.     GNC kept careful track of each and every ingredient in both its proprietary and third-party products and routinely reviewed the scientific literature on many of the ingredients used in its third-party products.   GNC's former employees confirmed that GNC meticulously tracked the ingredients in its third-party products.   Specifically, GNC's Associate Category Merchandising Manager for Sports Nutrition (the "Associate Category Manager") from 2010-2015 explained that GNC relied upon a computerized data management system called "OnBase" to track every third-party product GNC marketed.   According to OnBase's website, OnBase "centralizes

---

[10] GNC Holdings, Inc., Annual Report (Form 10-K), at 4 (Feb. 27, 2012); GNC Holdings, Inc., Annual Report (Form 10-K), at 5 (Feb. 11, 2016).

[11] *Id.*

[12] Joe Fortunato, President & CEO of GNC, Tr. of GNC - Q2 2013 GNC Holdings, Inc. Earnings Conf. Call 8 (Thomson Reuters July 25, 2013).

[13] Joe Fortunato, Chairman, President & CEO of GNC, Tr. of GNC - Q1 2014 GNC Holdings, Inc. Earnings Conf. Call 9 (Thomson Reuters May 6, 2014).

your important business content in one secure location."   The Associate Category Manager recalled that, through OnBase, GNC employees could immediately call up the ingredient listing for every GNC product, for each formulation of that product.   GNC used this system to track, identify, and catalogue each label, as well as each ingredient in the product.

37.     Indeed, the Company closely scrutinized the ingredients in its third-party products for potential use in its GNC-branded products.   The Oregon AG Complaint revealed that GNC's Senior Project Manager for Technical Research, Jennifer Jakell ("Jakell"), was specifically charged with evaluating the ingredients in GNC's third-party products and determining which ingredients "'looked promising' for possible development by Nutra Manufacturing ('Nutra'), GNC's manufacturing arm."   As GNC's Director of International Business Operations and a Regional Sales Director from 2002-2015 (the "Sales Director") explained, if products from a third party were selling well but GNC was not manufacturing its own products to include those same ingredients, he would question it, because it would be odd for a company in an industry that routinely copies products not to put successful third-party ingredients in its own products.   As investors later learned, GNC avoided including certain ingredients in its own private-brand products, even though it continued to profit off their use in third-party products, because it knew those ingredients were unlawful.

38.     GNC continued selling products with unlawful ingredients because the Company's contracts with its vendors purported to indemnify GNC for financial repercussions if their third-party products violated FDA or local regulations.   Specifically, GNC entered into contracts and guarantees with all vendors that were written to absolve GNC of any and all liability resulting from

the sale of third-party products (the "Vendor Guarantee").  GNC's third-party vendor agreement provided that:

> Vendor Warrants that the Goods covered by this purchase order have been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (21 U.S.C. § 301 ET SEQ) and requirements of all applicable federal, state and local laws rules and regulations.

Based on the Vendor Guarantee, GNC maintained that it would be indemnified for any legal actions arising out of unlawful third-party vendor products sold at GNC stores or sold by GNC over the Internet.

39.    In fact, GNC had a history of successfully obtaining indemnification from liability when it came to actionable issues related to its third-party vendor products.  Following an FDA warning in May 2009 based on 23 reports of liver injuries, GNC was one of the defendants in over 100 lawsuits related to Hydroxycut products.  The manufacturer of the product accepted the Company's request for defense and indemnification in the Hydroxycut matters and GNC accrued no liability.

40.    Accordingly, GNC was incentivized to "push the envelope" with its dietary supplements that were marketed by third parties.  As the Oregon AG later determined, "GNC did not rely on these [third-party] guarantees in good faith," because Defendants knew or should have known that, as outlined below, many of its products contained unlawful dietary ingredients.

41.    Simply stated, GNC was using these agreements as a shield when, in fact, it was aware of what its vendors were doing and the danger their products posed to unsuspecting customers.

**C.      The Threat of Increased Regulation of the Supplement Industry Was a
Significant Risk to GNC's Continued Success**

42.      The Federal Food, Drug, and Cosmetics Act of 1938, as amended by the Dietary

Supplement Heath and Education Act of 1994 (together, the "FD&C Act"), is the principal law

governing the dietary supplement industry.  Under the FD&C Act, supplements are exempt from

the FDA's strict approval process for prescription medications, which requires companies to prove

that their products are safe and effective on humans and to obtain federal approval before selling

them.[14]  For an ingredient to be legally sold as a dietary supplement under the FD&C Act, it must

first be shown to exist in a naturally occurring substance.  Specifically, under the FD&C Act, a

"dietary ingredient" is "(A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino

acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary

intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient

described in clause (A), (B), (C), (D), or (E)."  Second, the dietary ingredient must have a

documented history of use in a dietary supplement before 1994 or, if a supplement maker plans to

introduce new ingredients to the market, it must submit safety data to the FDA in a "New Dietary

Ingredient" ("NDI") submission.  If the FDA does not comment within 75 days after the NDI

submission, then the ingredient can legally be used in dietary supplements in the United States.

43.      Under this regulatory scheme, it is up to the FDA to identify any risky supplements

from among the estimated 85,000 on the market and to prove that they are adulterated in that they

---

[14] *See* 21 U.S.C. § 321(ff)(1)(C) (for purposes of the FD&C Act, "a dietary supplement shall be
deemed to be a food"); *see also* Trine Tsouderos, *Dietary supplements: Mfg. troubles widespread,
FDA inspections show*, Chi. Trib., June 30, 2012, http://articles.chicagotribune.com/2012-06-
30/news/ct-met-supplement-inspections-20120630_1_dietary-supplements-inspections-american-
herbal-products-association/2.

(a) contain unlawful dietary ingredients or (b) present an unreasonable risk of illness or injury.[15] Yet the FDA only tests about one percent of the dietary supplements on the market for safety.[16] While the FDA requires that companies verify that every supplement they manufacture is safe and accurately labeled, the FD&C Act allows companies essentially to operate on the honor code, under which anything labeled as a dietary supplement is assumed to be safe until proven otherwise, leaving companies to self-police their compliance with federal regulations.  However, when the FDA did take action, it had significant financial repercussions for the affected companies.

44.     In light of the uncertainty engendered by this regulatory scheme, GNC's exposure to regulatory risk from its third-party products was a material concern to analysts.  Indeed, throughout the Class Period, analysts noted that regulatory and reputational risks were the biggest threats facing the Company.  For example, on February 1, 2011, the *Nutrition Business Journal* wrote that "continued scrutiny by federal regulators – more concerned than ever about product adulteration – have many industry leaders predicting another challenging year for weight-loss supplement makers."[17]  On October 7, 2013, Jefferies noted that "GNC could fail to reach [analysts' target stock prices] if . . . product safety issues are raised on any major product lines" or there are "unexpected product safety issues, which could attract negative publicity or lawsuits."[18]

---

[15] *See* Natasha Singer & Peter Lattman, *Is the Seller to Blame?*, N.Y. Times, Mar. 17, 2013, http://www.nytimes.com/2013/03/17/business/a-soldiers-parents-take-aim-at-gnc-and-a-supplement-maker.html?_r=0.

[16] *See* Cameron Scott, *Americans Spend Billions on Vitamins and Herbs That Don't Work*, Healthline News, Mar. 19, 2015, http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915#11.

[17] *Weight-Loss Sales in 2010 Return to 2003 Levels in Wake of Hydroxycut Recall*, Nutrition Bus. J., Feb. 1, 2011.

[18] Mark Wiltamuth, *Initiating at Buy:  Gold Card Rollout Sets Up for Robust 2014-2015*, at 1, 3 (Jefferies Grp. LLC Oct. 7, 2013).

Furthermore, on February 13, 2014, Sterne Agee stated that "regulatory and product recall risk could result in lower product sales and/or liability pressures."[19]

45.     Defendants admitted that regulatory and reputational risks were some of the most significant potential risks facing the Company.  Indeed, in each of its Forms 10-K during the Class Period, GNC stated that "[u]nfavorable publicity or consumer perception of our products, the ingredients they contain . . . could have a material adverse effect on our reputation, the demand for our products and our ability to generate revenues and the market price of our common stock.  We are highly dependent upon consumer perception of the safety and quality of our products and the ingredients they contain."[20]

### D.     GNC Falsely Reassures Investors that It Will Withstand Increased Federal Regulatory Scrutiny

46.     The Class Period begins on November 16, 2011, when the threat of greatly increased regulatory scrutiny emerged as a potential headwind to GNC's financial success.  In early 2011, the federal government enacted the FDA Food Safety Modernization Act ("FSMA"), which mandated that the FDA issue new guidance regarding NDIs, including when and how a new dietary ingredient notification must be submitted to the FDA.  The agency issued draft guidance concerning NDIs on July 5, 2011.  The draft guidance proposed to tighten significantly the safety standards for NDIs, as well as raising the standards for when NDIs must be submitted to the FDA. The draft guidance was highly controversial in the supplement industry, with one industry group, the Council for Responsible Nutrition, announcing that it "[r]aises [f]undamental [c]oncerns" and that "the economic impact of this draft guidance on the dietary supplement industry would be

---

[19] Charles Grom, CFA et al., *Like DG @ $43 in December '12?  We Think So; Adjust EPS & PT to $52*, at 7 (Sterne, Agee & Leach Inc. Feb. 13, 2014).

[20] *See, e.g.*, GNC Holdings, Inc., Annual Report (Form 10-K), at 22 (Feb. 22, 2013).

substantial."[21]   According to GNC's SEC filings, implementation of the draft guidance would "negatively impact our business in several ways, including, but not limited to, enjoining the manufacturing of our products until the FDA determines that we are in compliance and can resume manufacturing, increasing our liability and reducing our growth prospects."

47.   In response to this potential regulatory sea change, analysts emphasized that increased regulation could mean increased regulatory and reputational risk for the Company.  For example, on November 2, 2012, J.P. Morgan noted that "[o]ne of the biggest risks for the [supplement] industry is major product recalls."[22]   On December 7, 2012 and July 25, 2013, Wedbush incorporated these heightened risks into their analysis noting that "[r]isks to attainment of [calculated] share price target include[d] . . . regulatory risk" and related "litigation risk."[23]   On December 12, 2012 and January 17, 2013, Morgan Stanley stated that increased regulation could create "[u]nexpected product safety or quality issues."[24]   On February 3, 2015, Great Lakes stated that "any change in regulation regarding the safety of dietary ingredients could have a material impact on results."[25]

---

[21] *FDA Draft Guidance on New Dietary Ingredients for the Dietary Supplement Industry*, Backgrounder, Council for Responsible Nutrition, Mar. 12, 2012, at 2, 3.

[22] Christopher Horvers, CFA et al., *The Gorilla is Working Out; Goldcard Rollout is a Unique Opportunity; Remain Overweight* 6 (J.P. Morgan Nov. 2, 2012).

[23] Kurt Frederick, CFA CPA, *Trends Remain Solid on Benefit from New Product Launches, Member Pricing; Maintain OUTPERFORM* 2 (Wedbush Sec., Inc. Dec. 7, 2012); Kurt Frederick, CFA CPA, *Q2 Upside Surprise and EPS Guidance Raise on Strength of Gold Card Member Pricing Rollout; Maintain OP; PT to $60*, at 2 (Wedbush Sec., Inc. 2013).

[24] Mark Wiltmuth et al., *Gold Card Provides a 2 Yr Catalyst:  Raising Estimates* 2 (Morgan Stanley Research Dec. 12, 2012); Mark Wiltmuth et al., *Gold card, hormonal teenagers, new ad campaign:  Plenty of drivers for 2013*, 2 (Morgan Stanley Research Jan. 17, 2013).

[25] Elliott L. Schlang, CFA & Jason A. Rodgers, CFA, *NY Attorney General Case Likely Limited Near-Term Impact* 2 (Great Lakes Review Feb. 3, 2015).

48.     GNC went to great lengths to assuage any concerns and reassure its investors that the Company was in compliance with all federal regulations and would not suffer any negative consequences from increased regulatory scrutiny.  For example, on November 16, 2011, the first day of the Class Period, Defendant Fortunato reassured investors that GNC understood the increased regulatory risk to the Company and took measures to protect GNC from that exposure, stating "[w]hether it's the industry or company specific[,] I would say this is always a risk in the regulatory environment.  I always look at that.  We've been dealing with it for 20 years.  The company deals with it all the time. **We know how to manage it**."[26]  Thereafter, Defendants stated repeatedly throughout the Class Period that GNC was only selling goods that were of the quality required by federal law.

49.     Yet, despite Defendants' assurances and unbeknownst to investors, Defendants were not even attempting to manage risk to GNC during the Class Period.  Rather, GNC was routinely marketing products that exposed the Company to regulatory action, product recalls, and critical loss of reputation.

### E.    GNC Secretly and Illegally Substitutes BMPEA and Picamilon for DMAA and Falsely Represents to Investors that Any Related Risk Is Behind the Company

50.     By late 2011, after GNC's stock price had doubled from its initial offering price of $16 per share, a controversy involving a particular ingredient in some of GNC's top-selling products began to engulf the Company.

51.     Specifically, many of GNC's sports nutrition products contained the ingredient DMAA, which is a stimulant in supplements that exercisers used to prepare for workouts and

---

[26] Joseph Fortunato, CEO, President & Dir. of GNC, Tr. of Morgan Stanley Global Consumer & Retail Conference 8 (Nov. 16, 2011) (emphasis added).

dieters took to curb appetites. In late 2011, the U.S. Department of Defense removed products containing DMAA from all stores on military installations, including more than 100 GNC outlets, due to concerns over its negative impact on human health. On April 27, 2012, the FDA sent warning letters to ten companies, including GNC, to stop selling dietary supplements containing DMAA.[27] In response to these letters, manufacturers replaced their products or reformulated them to exclude DMAA rather than leave them on the market with DMAA.

52.      GNC repeatedly reassured investors that the regulatory actions would not affect Company sales given that it had other products to replace its DMAA products. In 2012, GNC began selling "reformulated" DMAA products. In response, Barclays noted that it did "not expect any financial impact from the phasing out of [DMAA] because there [wa]s a high occurrence of substitution with pre-workout supplements."[28]

53.      Similarly, on a July 26, 2012 earnings call, Defendant Fortunato told investors that "[w]e have made a very concerted effort to move away from DMAA products in the stores. . . . [T]he products that have replaced DMAA are selling at a faster pace than the DMAA products are going off."[29]

54.      Defendants' representations had their intended effect, and investors and analysts provided a positive assessment of the Company's removal of risk related to DMAA-tainted products. By November 15, 2012, Great Lakes Review noted that "GNC has transitioned away from DMAA products to alternatives and believes this issue is now behind it."[30] Deutsche Bank

---

[27] Staff and Wire Reports, Pittsburgh Post-Gazette, May 1, 2012, at A-6.

[28] Brian Wang, CFA & Meredith Adler, CFA, *Member Pricing Goes National* 4 (Barclays Capital Inc. Apr. 29, 2013).

[29] Joe Fortunato, President & CEO of GNC, Tr. of GNC - Q2 2012 Earnings Conference Call 7 (Thomson Reuters July 26, 2012).

[30] Elliott L. Schlang, CFA et al., GNC Holdings, Inc. 11 (Great Lakes Review Nov. 15, 2012).

explained on April 2, 2013, that "we believe the DMAA-specific issue is in the rearview mirror" because "manufacturers have reformulated their products."[31]   On April 11, 2013, Deutsche Bank noted that, for GNC, "there has been a shift in sales away from products containing DMAA toward reformulated products and to other non-DMAA supplements," adding that "GNC has said that any DMAA recall should not impact their earnings outlook."[32]   Also on April 11, 2013, J.P. Morgan stated, "[c]learly we believe that the sales risk is minimal now that 10/11 companies have completely reformulated."[33]   Finally, on April 29, 2013, BMO Capital Markets concluded that "DMAA should be a non-issue going forward."[34]

55.   Defendants' reassurances also had their intended effect on GNC's stock price. Even in the face of the DMAA controversy, GNC's stock price almost doubled in 2013, rising from $33.89 per share on January 4, 2013, to $60.98 per share on November 29, 2013.

56.   In reality, however, GNC had not removed all material regulatory risk regarding its products.  Rather, the Company had merely traded one illegal ingredient for others.  Defendants and GNC's vendors knew that once the DMAA-spiked products were no longer available the Company would lose customers who bought the products because of the effects created by the now-banned ingredient.  Thus, in order to stave off any loss of sales, GNC and its vendors covertly switched out illegal DMAA (i.e., a **non**-naturally occurring **non**-dietary ingredient) from its products and replaced it with other unlawful **non**-naturally occurring **non**-dietary ingredients.

---

[31] Shane Higgins et al., *U/G to Buy on Multiple Initiatives + Favorable Risk/Reward* 3 (Deutsche Bank Apr. 2, 2013).

[32] Shane Higgins et al., *FDA Turns Up the Heat on DMAA; Buy GNC on Any Weakness* 1 (Deutsche Bank Apr. 11, 2013).

[33] Christopher Horvers, CFA et al., *DMAA in the News, Not So Much in Sales; Risk De Minimis – ALERT* 1 (J.P. Morgan Apr. 11, 2013).

[34] Karen Short & Ryan J. Gilligan, CFA, *New Pricing Should Drive Share Gains; Raising Our Price Target, Maintaining Outperform* 7 (BMO Capital Markets Corp. Apr. 29, 2013).

Specifically, GNC's manufacturers reformulated a number of DMAA products to contain either the synthetic methamphetamine-like chemical BMPEA (in products such as Fastin, Lipodrene, Redline Ultra Hardcore, and Lipo 6), or picamilon, a Soviet-developed neurological drug (in products such as Charge Extreme Energy Booster, Mr. Hyde, and DNPX).

57.     Significantly, as explained below, BMPEA and picamilon were also illegal, and thus the switches that were made in these products did not reduce any regulatory liability or reputational risk facing the Company.  Thus, GNC had no reasonable basis for touting BMPEA- or picamilon-laced DMAA-replacement products to its investors as a key to the Company's future success.

## F.     Before Departing the Company, Fortunato and Nuzzo Sell $88 Million Dollars in GNC Stock

58.     As Defendants' misleading reassurances drove up GNC's stock price, Defendants Fortunato and Nuzzo engaged in massive insider sales during the Class Period that earned them millions of dollars in illicit profits.

59.     In total, prior to his unexpected departure from the Company in August 2014, Fortunato sold 2,076,275 shares of GNC stock during the Class Period for proceeds of $77,895,035, all while in possession of material non-public information and while the price of GNC's stock was artificially inflated.

60.     Also during the Class Period while GNC's stock price was artificially inflated and he was in possession of material, non-public information, Nuzzo, who left the employ of the Company in mid-2014, sold 260,000 shares of GNC stock for proceeds of $10,458,803.   As detailed in ¶¶ 186-99, Fortunato's and Nuzzo's trades were inherently suspicious.

### G. GNC Falsely Reassures Investors Once Again that It Is in Compliance with Federal Regulations in Response to the New York AG's Investigation

61.     In early 2015, GNC faced another regulatory scandal relating to its products. However, just as with DMAA, the Company successfully mitigated any concerns of investors by reassuring them – through misleading statements – about GNC's product quality.  On February 3, 2015, the New York AG issued a press release (the "New York AG press release") announcing that his office had sent letters to GNC, Target, Wal-Mart, and Walgreen Co. requesting that they "cease and desist" the sale of certain popular products, including Echinacea, Ginseng, St. John's Wort, and others.  According to the New York AG press release, GNC allegedly sold store brand herbal supplement products in New York that either could not be verified to contain the labeled substance, or which were found to contain ingredients not listed on the labels.  The New York AG press release explained that using "DNA barcoding technology to examine the contents of herbal supplements, the Attorney General's investigation is focused on what appears to be the practice of substituting contaminants and fillers in the place of authentic product" and that the testing revealed that GNC and other retailers had been selling "a large percentage of supplements for which modern DNA barcode technology could not detect the labeled botanical substance."

62.     GNC immediately went on the offensive in an attempt to manage a material reputational risk and reassure investors' confidence.  On February 3, 2015, the same day as the New York AG announcement, Laura Brophy, a spokeswoman for GNC, said in a public statement that the Company tests all of its products using "validated and widely used testing methods."[35]

---

[35] Christie Smythe, *GNC, Wal-Mart Found by New York to Sell Fake Herbal Remedies*, Bloomberg Business, Feb. 3, 2015, http://www.bloomberg.com/news/articles/2015-02-03/gnc-wal-mart-found-by-new-york-to-sell-fake-herbal-supplements.

63.     On February 9, 2015, GNC denied the claims made by the New York AG. Defendant Archbold stated that "'[a]ll GNC products are submitted to rigorous and generally accepted testing before they reach our customers. . . . We are committed to providing our customers with the highest quality supplements available, using the purest and most effective ingredients, to help them live healthier lives.'"[36]  Similarly, on February 12, 2015, in an earnings conference call, Defendant Archbold once again stated that "all of our products continue to be pure, safe and fully compliant with all regulations."  Defendants' reassurances worked as intended and ensured that GNC's stock price did not experience a drop.

64.     On March 27, 2015, GNC entered into a letter agreement with the New York AG to resolve the investigation.[37]  At that time, GNC agreed to require its suppliers to implement a more sophisticated testing protocol and not to sell the specific product lots that were the subject of the New York AG's inquiry.

65.     Defendants used the NYAG Letter Agreement as a hook to convince investors that GNC was appropriately managing any potential regulatory risk.  For example, on March 30, 2015, GNC stated in a Form 8-K that "[a]s an industry leader we have always gone above and beyond the minimum requirements in pursuing quality for our consumers, and we will continue to lead the efforts for higher standards."  On April 1, 2015, Defendant Archbold stated that GNC "'share[s]

---

[36] Bryan Locke et al., *GNC Refutes New York State Attorney General's Claims in Full and Robust Response*, Business Wire, Feb. 9, 2015, http://www.businesswire.com/news/home/20150209006388/en/GNC-Refutes-York-State-Attorney-General%E2%80%99s-Claims.

[37] Letter from Simon G. Brandler, Senior Advisor & Special Counsel, Office of the Attorney General, to Michael G. Archbold, CEO, GNC Holdings, Inc. (Mar. 27, 2015) (the "NYAG Letter Agreement").

the Attorney General's objective of ensuring that consumers can rely on companies like GNC to deliver pure, properly labeled products and, as expected, these results demonstrate that fact.'"[38]

66.     Analysts and investors believed Defendants' reassurances.  For example, on March 30, 2015, Sterne Agee wrote, "we believe CEO Mike Archbold has 'turned lemons into lemonade' with the company now taking a leadership position in quality control standards as a result of the New York AG's investigation.   To this end, better testing and controls should lead to: (1) improved confidence in GNC products by consumers; (2) reduced headline/regulatory risks down the road; and (3) some much needed positive . . . media attention . . . we like the move and expect GNC to benefit meaningfully."

## V.     UNBEKNOWNST TO INVESTORS, GNC WAS KNOWINGLY MARKETING ILLEGAL SUPPLEMENTS

67.     In reality, as later revealed by the Oregon AG Complaint, *see* ¶¶ 9, 37, 74, 76, 86, 96, 101-03, 173, GNC routinely sold third-party products containing ingredients that it knew or recklessly disregarded contained unlawful ingredients.  Specifically, GNC sold both in its stores and on its website dozens of third-party products that contained at least one of two potentially dangerous drugs – picamilon and BMPEA.  Those drugs were not dietary ingredients at all.  But, even if they were, neither picamilon nor BMPEA had been registered with the FDA as required. Indeed, as noted above, while GNC had sold products containing picamilon and BMPEA for years, following the DMAA scandal, several of GNC's vendors switched the key ingredient in their best-selling products from DMAA to picamilon or BMPEA.  Thus, when GNC touted the fact that its

---

[38] Brian Locke et al., *GNC Announces Independent, Third Party Test Results Conclusively Confirming Safety, Quality, Purity and Proper Labeling in Herbal Plus® Product Line*, Business Wire, Mar. 10, 2015, http://www.businesswire.com/news/home/20150310006583/en/GNC-Announces-Independent-Party-Test-Results-Conclusively.

vendors could seamlessly transition from DMAA to other ingredients – without loss of customers – in reality, GNC was simply substituting different unlawful non-dietary ingredients for DMAA.

68.     The chart below provides examples of products that GNC and its vendors reformulated by replacing DMAA with BMPEA or picamilon:

| COMPANY | PRODUCT | DMAA | BMPEA | PICAMILON |
|---|---|---|---|---|
| Hi Tech Pharmaceuticals | Fastin | X | | |
| Hi Tech Pharmaceuticals | Fastin DMAA Free | | X | |
| Hi Tech Pharmaceuticals | Lipodrene (Original, Hardcore or Extreme) | X | | |
| Hi Tech Pharmaceuticals | Lipodrene XR | | X | |
| VPX Sports, Inc. | Redline Ultra Hardcore | X | | |
| VPX Sports, Inc. | Redline Ultra Hardcore | | X | |
| Nutrex Research | Lipo 6 | X | | |
| Nutrex Research | Lipo 6 | | X | |
| Labrada Bodybuilding Nutrition | Charge Extreme Energy Booster | X | | |
| Labrada Bodybuilding Nutrition | Charge Extreme Energy Booster | | | X |
| Labrada Bodybuilding Nutrition | Lean Body for Her Fat Burner | X | | |
| Labrada Bodybuilding Nutrition | Lean Body for Her Fat Burner | | | X |
| Labrada Bodybuilding Nutrition | Lean Body High Energy Fat Burner | X | | |
| Labrada Bodybuilding Nutrition | Lean Body High Energy Fat Burner | | | X |
| ProSupps | Hyde | X | | |
| ProSupps | Mr. Hyde | | | X |
| Isatori Global Technologies | MX-LS7 | X | | |
| Isatori Global Technologies | MX-LS7 | | X | |

A.     **GNC Knowingly and Unlawfully Sold Dietary Supplements with the Soviet-developed Synthetic Drug Picamilon as a Key Ingredient**

69.     Throughout the Class Period, GNC sold dozens of dietary supplements that were marketed to increase energy and assist in weight loss.  These products – like "Charge Extreme Energy Booster" and "Mr. Hyde" – contained supposedly lawful dietary ingredients, including, among other things, the ingredient picamilon (also known as pikamilon or pikatropin).  Picamilon is currently a prescription drug in Russia used to treat a variety of neurological conditions.  It has never been approved as a prescription or over-the-counter drug in the United States.  Picamilon is popular among GNC's target demographic for "increasing focus" and enhancing cognitive abilities.

70.     According to the Oregon AG, "[a]s early as May 22, 2007, GNC knew that picamilon [wa]s not a lawful dietary ingredient."  At that time, Jakell, *see* ¶ 37 above, whose responsibilities at GNC included "ensuring that [GNC's] labeling and scientific claims [we]re accurate," initiated a project specifically to evaluate whether picamilon was a lawful dietary ingredient.  GNC's files on picamilon (collected by Jakell and stamped "confidential") consisted of documents translated from Russian, which, among other things, stated that picamilon was "synthesized in 1969 by the All-Union Scientific Research Institute" and that "by chemical structure picamilon is a derivative of the gamma-amino-butyric acid (GABA) and nicotinic acid."  (This underlining was done by Jakell.)  Those files further noted that picamilon "has proven an effective medicinal treatment for patients with disorders of a neurotic level."  Nothing in Jakell's research indicated that picamilon occurs in nature, has any parallel in nature, or that it can be derived from a natural source.  Thus, GNC's own research made it clear that picamilon is not a dietary ingredient under the categories set forth in the FD&C Act.

71.     Further, even if picamilon was a dietary ingredient – and the Company's own files establish GNC knew it was not – the Company also knew that picamilon was not a **lawful** dietary ingredient, because no "New Dietary Ingredient" notification (defined above as "NDI") had been filed for picamilon.

72.     GNC's files make it clear that Jakell, no later than May 2007, knew that there had been no NDI filed for picamilon.  At that time, Jakell documented in the file "No NDI that I could find."  Then, in April 2014, Jakell again looked for an NDI on picamilon and wrote "still no NDI found."  If Jakell did not believe an NDI was necessary, then there would be no need for her to investigate whether one had been filed.

73.     Although – as the Company's own files establish – GNC had long been aware that picamilon was not a lawful dietary ingredient (and thus should not be sold in GNC's stores), the Company continued to sell picamilon products even as regulators, scientists, and legislators began to question the inclusion of picamilon in dietary supplements sold to the public.

74.     For example, as the public only later learned in the Oregon AG Complaint, on June 16, 2015, the Oregon AG issued a confidential Investigative Demand (the "Investigative Demand") to GNC that "demanded production of documents and information relating to Defendant's sale of picamilon."  According to the Oregon AG Complaint, "[t]he Investigative Demand clearly discussed the likelihood that picamilon was not a lawful dietary ingredient."  GNC produced documents and other information in response to the Investigative Demand.  Notwithstanding this clear notice issued directly to the Company, "GNC continued to sell products that contain picamilon nationally and in Oregon."

75.     Just one month later, in July 2015, scientists from the National Center for Natural Products Research, along with Harvard Professor Dr. Pieter A. Cohen ("Dr. Cohen"), published

an article in the peer-reviewed journal *Drug Testing and Analysis* regarding the sales of picamilon supplements in the United States (the "Picamilon Study").  The Picamilon Study specifically highlighted picamilon as a "prescription drug[] never approved by the [FDA]," but that was openly listed on the labels of (unnamed) dietary supplements sold in the USA.  The article explained that picamilon was developed by Soviet scientists in an effort to increase central nervous system levels of GABA.  Theoretically, drugs that increase GABA activity in the brain have the potential to provide "anti-anxiety or anti-convulsive effects," but GABA itself does not cross the blood-brain barrier when it is consumed orally.  Hence, to carry GABA across the blood-brain barrier, Soviet scientists developed picamilon by combining GABA with nicotinic acid.  When orally administered, picamilon crosses the blood-brain barrier and supposedly increases GABA in the brain.  In any event, according to the article, "[w]hile GABA and nicotinic acid are found in nature, to our knowledge, picamilon had only been produced synthetically and has no known natural source."  The Picamilon Study did not name any specific dietary supplements that contained picamilon, nor did it mention GNC or any other retailers who sold picamilon supplements.

76.    On September 28, 2015, Dr. Cara Welch of the FDA provided a sworn expert declaration in support of the Oregon AG Complaint that confirmed "picamilon does not qualify as a dietary ingredient" under the FD&C Act (the "FDA Affidavit").  In her role as the Acting Deputy Director, Division of Dietary Supplement Programs at the FDA, Dr. Welch was "responsible for the interpretation and application of relevant dietary supplement statute and regulations for the FDA's dietary supplement office."   Dr. Welch emphasized that "picamilon is formed by synthetically combining niacin with GABA.  **There is no indication in the literature that this compound is found in nature**."  (Emphasis added.)  To the extent that there was any question that such a synthetic compound did not fall within any established categories of dietary ingredients,

Dr. Welch analyzed each possible category and disregarded it as a possible classification for picamilon:

- ▪ "Picamilon is not a vitamin.  While picamilon may be synthesized from a vitamin (niacin), it is a different chemical entity, Picamilon is neither an organic substance nor a minor component of foods.  Neither is picamilon essential for normal physiological functions.  Picamilon is not produced endogenously in amounts adequate to meet normal physiologic needs."

- ▪ "Picamilon is not a mineral as it does not provide a form or source of inorganic elements to the diet."

- ▪ "Picamilon is not an herb or other botanical as it is not found in nature and is not a plant, alga, or fungus, nor an exudate thereof."

- ▪ "Picamilon is not an amino acid. . . . Additionally, picamilon is not a constituent of proteins."

- ▪ "Picamilon is not a dietary substance for use by man to supplement the diet by increasing the total dietary intake" and the FDA could not identify any "food use" of picamilon.  "In the absence of such a use, picamilon is not a dietary substance for use by man to supplement the diet by increasing the total dietary intake."

- ▪ Finally, "Picamilon is not a concentrate, metabolite, constituent, extract, or combination of any ingredient."  "While picamilon is a synthetically modified version of niacin and GABA, both dietary ingredients on their own, it is a different chemical entity."

The FDA Affidavit was not made public until the Oregon AG filed its complaint on October 22, 2015, as discussed below.

77.     On October 6, 2015, the newsletter *NutraIngredients-USA* quoted an FDA spokesperson who said that "[a]ccording to the FDA's review, picamilon does not satisfy the definition of a dietary ingredient.  Therefore, FDA does not consider picamilon to be either an old dietary ingredient or a new dietary ingredient."[39]

---

[39] Stephen Daniells, *FDA:  Picamilon is not a dietary ingredient*, NutraIngredients-USA, Oct. 5, 2015, http://www.nutraingredients-usa.com/Regulation/FDA-Picamilon-is-not-a-dietary-ingredient.

78.    The next day, Senator Claire McCaskill, the ranking member of the Senate Special Committee on Aging, issued an open letter to the FDA calling on the agency to suspend all sales of supplements containing picamilon pending an investigation.

79.    Critically, even though, as the Oregon AG later established, the Company consistently monitored its third-party products for ingredients that "looked promising" for GNC to develop internally through its own manufacturing arm, GNC did not manufacture products containing picamilon.  As the Oregon AG averred, this was "presumably because GNC [knew] that picamilon [was] not a lawful dietary ingredient."  GNC was willing to push the envelope and sell unlawful products from third parties that had assumed the risk of liability, but were unwilling to create GNC-based versions of the same.

80.    Notwithstanding GNC's knowledge since 2007 that picamilon was not a lawful dietary ingredient, GNC continued to sell picamilon products through 2015.  The Oregon AG set forth examples of picamilon products that GNC sold in Oregon, as set forth below:

| DESCRIPTION | VENDOR |
|---|---|
| Charge Extreme Energy Booster | Labrada Bodybuilding Nutrition |
| Lean Body for Her Fat Burner | Labrada Bodybuilding Nutrition |
| Lean Body Hi Energy Fat Burn | Labrada Bodybuilding Nutrition |
| Testek | QNT International, Inc. |
| Riptek V2 | QNT International, Inc. |
| Tru Mangodrin | Truderma, LLC |
| Turbo Shred | Swole Sports Nutrition |
| Jacked Pack | BD Health Partners |
| Mr. Hyde — Fruit Punch | Prosupps USA LLC |
| Mr. Hyde — Watermelon | Prosupps USA LLC |
| Dr. Jekyll — Power Punch | Prosupps USA LLC |
| Dr. Jekyll — Watermelon | Prosupps USA LLC |
| Mr. Hyde — Orange Guava | Prosupps USA LLC |
| Vanish Bonus | Prosupps USA LLC |

| DESCRIPTION | VENDOR |
|---|---|
| Mr. Hyde — Red Razz | Prosupps USA LLC |
| Mr. Hyde RTD Blue Razz | Prosupps USA LLC |
| Mr. Hyde — Blue Razz | Prosupps USA LLC |
| Mr. Hyde RTD Fruit Punch | Prosupps USA LLC |
| Nirvana | Sensatus Group LLC |
| ENGN Fruit Punch | Evlution Nutrition |
| ENGN Blue Raz | Evlution Nutrition |
| ENGN Green Apple | Evlution Nutrition |

81.     GNC continued to sell products containing picamilon until September 21, 2015, when, unbeknownst to investors at the time, the Oregon AG issued a "Notice of Unlawful Trade Practices and Proposed Resolution."  At that time, finally, and without notice to investors or customers, GNC removed all picamilon products from its store shelves.

### B.     GNC Knowingly and Unlawfully Sold Dietary Supplements with the Synthetic Amphetamine-like Drug BMPEA as a Key Ingredient

82.     The Company also sold dozens of sports nutrition and weight-loss products containing the unlawful ingredient BMPEA throughout the Class Period.  Specifically, GNC sold numerous products that either were labeled as containing BMPEA or as containing the ingredient "acacia rigidula," which GNC knew or should have known was "spiked" with BMPEA.  Acacia rigidula is a bushy shrub found in parts of Texas and Mexico that has appeared increasingly in dietary supplements in recent years.  Acacia rigidula purportedly provided stimulant, appetite suppressant, fat-burning, and weight-loss benefits, among other things.  BMPEA, on the other hand, is a synthetic amphetamine isomer chemical that has the same chemical formula as amphetamine (i.e., speed), but a slightly different structure.  According to the Oregon AG, BMPEA "was first synthesized in the 1930s as a replacement for amphetamine, but for unknown reasons it was never studied in humans.  There are anecdotal reports that BMPEA is associated with hemorrhagic stroke."  BMPEA is banned for use by athletes by the World Doping Agency.

83.    GNC knew by no later than the Fall of 2013 that (1) BMPEA is not a lawful dietary ingredient, and (2) numerous products that were labeled as containing acacia rigidula actually were secretly spiked with BMPEA.  At that time, FDA scientists published an article in the peer-reviewed publication the *Journal of Pharmaceutical and Biomedical Analysis* titled "Determination of selected biogenic amines in *Acacia rigidula* plant materials and dietary supplements using LC-MS/MS methods" (the "FDA Study").[40]  The FDA Study noted that "[e]xtracts of *Acacia rigidula* leaves are used in weight-loss products sold in vitamin shops and over the internet with little or no published data about their potential biological effects."[41]

84.    The FDA Study compared the chemical structure of acacia rigidula plants with the chemical structure of the supplements that purport to contain extracts of acacia rigidula as part of their work in detecting and removing adulterated supplements from the market.  The FDA concluded that BMPEA "was not found in any of the authenticated samples of *A. rigidula*" and "**we did not find any literature describing its presence in any other botanical**."[42]  In other words, there was no evidence that BMPEA was a lawful dietary ingredient.  However, the FDA found that nine of the twenty-one dietary supplements that supposedly contained acacia rigidula actually contained BMPEA.  (Only two of the nine supplements included BMPEA in their list of ingredients.)  On November 2, 2013, Jakell received an email from a scientific research website notifying her of the FDA Study with a link to its full text.

---

[40] Rahul S. Pawar et al., *Determination of selected biogenic amines in* Acacia rigidula *plant materials and dietary supplements using LC-MS/MS methods*, 88 J. of Pharm. & Biomedical Analysis 457-66 (2014).

[41] *Id.* at 1.

[42] *Id.* at 464-65 (emphasis added).

85.     On November 19, 2013, *USA Today* published an article about the FDA Study that caused a cascade of concerns within GNC.  Jakell circulated the article in question to nearly 100 people at GNC's corporate headquarters, **including Defendant Nuzzo**, GNC's Senior Vice President and Chief Innovation Officer, Guru Ramanathan, and the Company's Vice President and General Counsel for regulatory affairs, David Sullivan.  The article explicitly stated that "scientists have found a 'non-natural' amphetamine-like compound in dietary supplements."

86.     According to the Oregon AG, the *USA Today* article "stimulated significant concern and discussion within GNC."  As documented in the Oregon AG Complaint, "[w]ithin minutes" of receiving the email, a GNC merchandising manager wrote to GNC's director of merchandising, "Please tell me we won't have to get rid of acacia now."

87.     In response, GNC senior executives scrambled to identify all products that the Company sold in its stores containing acacia rigidula.  According to the Oregon AG, Nathaniel Kennedy, GNC's Director of e-Commerce, immediately identified six products sold by GNC with acacia rigidula.  Then, Brian Cavanaugh, GNC's Senior Vice President of Merchandising, wrote to Steve Cherry, GNC's Vice President of Purchasing, and David J. Sullivan, GNC's Vice President and General Counsel, offering to do a "database search to find all [stock keeping units]" associated with products containing acacia rigidula products.  Even after all of this investigation, GNC did nothing to curtail its sales of acacia rigidula products.

88.     Indeed, remarkably, GNC did not reach out to its manufacturers who produced products containing acacia rigidula to query whether those products contained BMPEA or to ask them to reformulate those supplements to remove the unlawful dietary ingredient if they did contain BMPEA.  One vendor, Rightway Nutrition, independently emailed GNC Director of Merchandising Bob Emilian to forward him the *USA Today* article and to ask "**obviously you**

**would like us to reformulate as fast as possible** and replace the inventory in the stores in warehouse with new inventory yes."   (Emphasis added.)   Mr. Emilian responded, "**Yes for starters**."  (Emphasis added.)

89.     But according to the Oregon AG, "despite widespread knowledge that the acacia rigidula products sold by GNC were at high risk of having been spiked with BMPEA," GNC continued to sell products that contained acacia rigidula "without testing these products to determine whether the product was adulterated with BMPEA or informing consumers of the risk that these products were adulterated."

90.     Moreover, GNC also continued selling third-party products that were labeled as containing BMPEA, even though "it knew or should have known" from the FDA Study that BMPEA is a synthetic substance similar to amphetamine (and in fact is an amphetamine isomer with the same chemical formula as speed) and was not a lawful dietary ingredient in the eyes of the FDA.  As the Oregon AG later detailed, GNC sold numerous such products, including a number of products that the manufacturers reformulated in 2012 and 2013, to remove DMAA and replace it with BMPEA.   The Oregon AG found in 2015 that GNC continued to sell in Oregon the following products that were labeled as containing BMPEA, or were acacia rigidula products spiked with BMPEA:

| DESCRIPTION | VENDOR |
|---|---|
| Hit Fastin XR | Hi Tech Pharmaceuticals |
| Lipodrene XR | Hi Tech Pharmaceuticals |
| Fastin XR DMAA Free | Hi Tech Pharmaceuticals |
| Jetfuel Superburn | World Health Products LLC |
| MX-LS7 | Isatori Global Technologies |
| Phenylcore | *Unknown* |
| Fastin | Hi Tech Pharmaceuticals |
| Fastin DMAA Free | Hi Tech Pharmaceuticals |

| DESCRIPTION | VENDOR |
|---|---|
| Meltdown Watermelon | VPX Sports, Inc. |
| Meltdown Peach Mango | VPX Sports, Inc. |
| Meltdown Exotic Fruit | VPX Sports, Inc. |
| Lipo 6 Black | Nutrex Research |
| Meltdown | VPX Sports, Inc. |
| Redline Ultra Hardcore Twinpk | VPX Sports, Inc. |
| Redline Ultra Hardcore Bonus | VPX Sports, Inc. |
| Redline Ultra Hardcore | VPX Sports, Inc. |
| Redline Hardcore Blister Pak | VPX Sports, Inc. |

91.     Not only did GNC continue to sell products containing acacia rigidula (and were thus highly likely to be spiked with BMPEA), even after the FDA Study, GNC specifically approved the inclusion of acacia rigidula in **new** products for sale in its stores.  According to the Oregon AG, on February 21, 2014, supplier Riley Judd wrote to GNC employee Russell Barba that "Rhino Rush is currently reformulating the current ephedra version shot.  To replace the ephedra, they would like to use Acacia Rigidula (leaves)-is this ingredient acceptable[?]"  GNC then approved Rhino Rush's use of acacia rigidula.

92.     Other evidence confirmed that acacia rigidula products were improperly spiked with BMPEA and potentially risked harm to GNC's customers.  For example, in November 2014, the newsletter *NutraIngredients-USA* reported that Danish and Swedish regulatory agencies had issued warnings that a dietary supplement labeled as containing acacia rigidula was spiked with BMPEA.  According to the Oregon AG, this specific issue of the newsletter was "widely distributed throughout GNC headquarters."

93.     Similarly, in December 2014, Health Canada (the FDA's Canadian equivalent) announced a recall of the acacia rigidula-labeled dietary supplement called "Jet Fuel Superburn" because it was spiked with undisclosed BMPEA.  The Sales Director confirmed that GNC would

have been aware of the recall, as he confirmed that GNC's international divisions were in close contact with their U.S. counterparts. The Sales Director further stated that, with respect to Canada, the head of the Canadian division reported to the CEO and the EVP of Operations in the United States during the Class Period. Given this structure, the Sales Director confirmed that GNC would have been aware of any recalls in Canada. Despite knowing about the Canadian recalls, according to the Oregon AG's investigation, GNC continued to sell the same version of Jet Fuel Superburn in the United States.

94.     Finally, in April 2015, researchers (including Dr. Cohen, *see* ¶ 75) published the results of a study titled "An amphetamine isomer whose efficacy and safety in humans has never been studied, β-methylphenylethylamine (BMPEA), is found in multiple dietary supplements" in the journal *Drug Testing and Analysis* (the "BMPEA Study"). The BMPEA Study concluded that **more than 50% of tested dietary supplements labeled as containing acacia rigidula were spiked with BMPEA**. While the BMPEA Study did not identify GNC as a retailer selling these products, the article did identify the names of the tested products and which ones included BMPEA.

95.     On April 23, 2015, after the results of the BMPEA Study had been published, the FDA formally announced that BMPEA did not meet the statutory definition of a dietary ingredient and sent warning letters to manufacturers whose products contain BMPEA. At that point, GNC finally stopped selling products containing BMPEA, including, notably, products labeled as containing acacia rigidula that were not labeled as containing BMPEA. In other words, when the FDA finally took the formal step to announce that BMPEA was not a lawful dietary ingredient, the Company removed not just the labeled BMPEA products, but also all acacia rigidula products – indicating that GNC knew that those products were spiked with BMPEA.

96.     In 2015, as the Oregon AG investigated GNC's sales of acacia rigidula products, it conducted its own testing of three dietary supplements sold by GNC that were labeled as containing acacia rigidula but were **not** labeled as containing BMPEA.  According to the Oregon AG Complaint, the Oregon AG's expert "tested these products using a state-of-the-art methodology: rapid resolution liquid chromatography-accurate mass-quadrupole-time of flight-tandem mass spectrometry."  All of the products tested positive for BMPEA.

97.     According to the Oregon AG, as with picamilon, GNC did not itself manufacture products containing BMPEA, "presumably because GNC [knew] that BMPEA [was] not a lawful dietary ingredient."  Thus, as with picamilon, GNC was willing to sell unlawful products from third parties that had assumed the risk of liability, but were unwilling to create GNC-based versions of the same.

## VI.     GNC'S UNLAWFUL PRODUCTS AND PRACTICES ARE REVEALED AS THE COMPANY'S FINANCIAL RESULTS DECLINE AMIDST HEIGHTENED REGULATORY SCRUTINY

### A.     The Oregon AG Files a Civil Action Against General Nutrition Corporation

98.     During the Fall of 2015, investors finally learned that Defendants' claims regarding the purity and quality of GNC dietary supplements, and the ingredients within those supplements, were materially false and misleading.  Rather than adhering to the regulatory framework in place to protect the public from illegal and dangerous dietary ingredients, the Company had knowingly or recklessly marketed adulterated products to consumers for years.

99.     On the morning of October 22, 2015, the Oregon AG announced the filing of a civil action in Oregon against General Nutrition Corporation[43] for selling products containing BMPEA and picamilon in Oregon, revealing the fraudulent scheme discussed in Part IV.  In a press release,

---

[43] General Nutrition Corporation is a wholly owned subsidiary of the Company.

the Oregon AG summarized the allegations of the Oregon AG Complaint, noting that GNC "violated the Oregon Unlawful Trade Practices Act . . . by misrepresenting certain products as lawful dietary supplements when they are actually unapproved drugs that may not be lawfully sold in the United States as a dietary supplement."  The press release stated "that GNC sold products labeled as containing botanical acacia rigidula that had been spiked with unlabeled BMPEA."

100.    The Oregon AG had pursued a months-long investigation of General Nutrition Corporation, which included the Investigative Demand.  *See* ¶ 74.  Key to the investigation were high-level internal confidential emails and the FDA Affidavit.  *See* ¶¶ 6, 76.  The above-referenced press release added that "[i]t is scary to know that certain products sold by GNC contain an ingredient that is not even labeled—let alone approved in the United States."  The Oregon AG stated that Oregonians "deserve to know that the ingredients in the products are safe and comply with the law."

101.    Further, the Oregon AG Complaint illuminated in great detail the control that GNC had over its third-party vendors and the knowledge that GNC executives had of the ingredients contained in the products they promoted and sold.  In particular, the complaint alleged that "GNC works closely with third-party vendors to ensure that labeling and marketing materials comply with GNC's requirements and expectations" and that "[t]hird-party vendors may not make changes to a product's formula, label, or store advertising without GNC's express permission."  The complaint further alleged that GNC's representations that it "sets the standard in the nutritional supplement industry" and "requires its vendors to be honest, ethical, reliable and capable of providing products that meet [its] high standards of quality" were "**untrue**."  (Emphasis added.) Indeed, according to the Oregon AG, GNC "did not rely on [third-party vendors'] guarantees [that their products complied with legal requirements] in good faith, **because GNC knew or should**

**have known that [picamilon and BMPEA] were unlawful, and that products containing these ingredients are deemed to be adulterated**." (Emphasis added.)

102. The Oregon AG Complaint specifically averred that GNC sold products containing picamilon despite knowing, as early as May 22, 2007, that it was an unlawful dietary ingredient and that it had never been submitted to the FDA in an NDI. Specifically, GNC did not cease selling these adulterated products until the Oregon AG issued a "Notice of Unlawful Trade Practices and Proposed Resolution" on September 21, 2015.

103. As for BMPEA, the Oregon AG Complaint averred that GNC knew in November 2013, based on a published analysis by the FDA, that the plant acacia rigidula did not contain BMPEA. Indeed, the FDA Study found that many of the dietary supplements labeled as containing acacia rigidula were "spiked" with BMPEA. Still, as the Oregon AG Complaint alleged, "GNC approved inclusion of [acacia rigidula] in products supplied to GNC by a third-party vendor."

104. Significantly, Nuzzo was aware of the risk of the Company's products containing acacia rigidula as Jakell emailed numerous GNC employees, **including Nuzzo**, referencing a significant *USA Today* article on the subject. ¶ 85. Not until the FDA issued warning letters to manufacturers of products containing BMPEA did GNC stop selling those products. ¶ 95.

105. The news media and investors responded quickly to the Oregon AG's press release and the Oregon AG Complaint. On October 22, 2015, a *Wall Street Journal* report entitled "Oregon Sues GNC, Alleging Supplements Contained Illegal Ingredients" highlighted several of the facts alleged in the Oregon AG Complaint, including that "GNC's staff knew of picamilon's status as an unlawful dietary ingredient as early as 2007, but still sold thousands of units of

supplements containing the ingredient."[44]  The article added that the "complaint also alleges GNC continued selling products containing picamilon even after Oregon authorities contacted the company in June asking for information on the company's use of the ingredient, and the company only stopped selling products with BMPEA after the FDA sent the warning letters to its suppliers earlier this year stating that the substance doesn't meet the statutory definition of a dietary supplement."  Similar reports appeared that same day in other widely circulated news sources, including *Bloomberg* and the *USA Today*.

106.    Analysts also raised questions about the extent of GNC's compliance problems.  On October 22, 2015, a Morgan Stanley report called the Oregon AG's Complaint a "serious matter," noting that the "outcome [was] unclear without additional information."

107.    Sterne Agee's Health & Wellness equities analysts downgraded GNC stock to Neutral (from a Buy rating), writing that the Oregon AG Complaint was a "**blow to GNC's reputation and likely, sales going forward**."  (Emphasis added.)  The report continued:  "While the top-line ramifications are unknown at this point, **if allegations are true, the reputational damages will take time to repair and headline/regulatory risk is likely to hang over GNC . . . . [T]his news qualifies as a 'game changer' and we believe it is prudent to move to the sidelines and let the dust settle until more clarity emerges**."  (Emphasis added.)  The report emphasized that GNC's conduct had likely resulted in long-term "reputational damages that can be extraordinarily difficult to overcome" and "will likely continue to negatively weigh on sales":

> **[O]ur experience with this type of reputational damages in the vitamin space suggests it has the potential to impair sales for several quarters, not just weeks . . . the tide of negative national news can be extraordinarily difficult to overcome. . . . [H]eadline risks in this vertical [i.e., this niche industry] are a**

---

[44] Sara Germano & Serena Ng, *Oregon Sues GNC, Alleging Supplements Contained Illegal Ingredients*, Wall St. J., Oct. 22, 2015, http://www.wsj.com/articles/oregon-sues-gnc-alleging-supplements-contained-illegal-ingredients-1445543143.

**considerable risk factor that have and will likely continue to negatively weigh on sales.**

(Emphasis added.)

108.    The market was shocked by the severity of the Oregon AG's claims and related concerns about GNC's marketing and sales practices.  Over eleven million shares of GNC's common stock (compared to the average daily trading volume the year before of approximately 1.2 million shares) changed hands on October 22, 2015.  In fact, the volume was so high that the NYSE twice halted trading of the stock.[45]  By the end of the day, the price of GNC common shares had plummeted nearly 15% on very heavy trading volume from an opening price of $40.38 per share to a closing price of $34.50 per share.

### B.    GNC Announces Its Third-quarter Earnings

109.    On the morning of October 29, 2015, GNC issued a press release, which was also filed with the SEC on a Form 8-K, announcing the Company's financial results for the quarter ended September 30, 2015.  For the quarter, GNC reported a 29% drop in profit to $45.8 million. In addition, the Company press release announced that GNC had reduced its 2015 earnings per share outlook to approximately $2.85-$2.90 per share from the $3.00-$3.10 per share outlook that the Company had announced previously on July 30, 2015.

110.    That day, analysts continued to raise issues about the Oregon AG's lawsuit.  A Deutsche Bank report listed the Oregon lawsuit among its major concerns.  Specifically, the report noted that "we believe that it heightens regulatory risk in general."  Further, a Sterne Agee report

---

[45] *See* Peter Blumberg, *GNC Plunges After Oregon Says Unapproved Drugs in Supplement*, Bloomberg Business, Oct. 22, 2015, http://www.bloomberg.com/news/articles/2015-10-22/gnc-plunges-after-oregon-sues-over-supplement-ingredients.

included the "Oregon AG situation" as a factor supporting its analysis that the "outlook for GNC

isn't as promising as we had initially hoped for earlier in 2015."

111.    On October 29, 2015, the price of GNC common shares plummeted on very heavy

trading volume to close at a price of $28.24 per share – a 26.9% drop from the previous day's

closing price of $38.64 per share.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND ANALYST AND MARKET REACTIONS THERETO[46]

### A.    Defendants' False and Misleading Statements Throughout the Class Period

112.    Throughout the Class Period, GNC prominently declared on the Company's

website, www.gnc.com,[47] that, "[a]s a recognized industry leader, *GNC requires its vendors to be*

*honest, ethical, reliable and capable of providing products that meet our high standards of*

*quality*."[48]

113.    This statement was materially false and misleading when made and continued to be

materially false and misleading throughout the Class Period because it led investors to conclude

that GNC took affirmative and concrete steps to require its vendors to be "*honest, ethical, reliable*

*and capable*" of providing products that met "*high standards of quality*" and thus were, at a

minimum, legal and safe.  As discussed in ¶¶ 67-97, however, this was not the case.  To the

contrary, GNC worked closely with its third-party vendors to promote and sell numerous products

---

[46] In this section, Defendants' statements that are ***bolded and italicized*** are alleged to be false and misleading.  Other statements are included to provide context, including those that are **bolded** (and not italicized) for emphasis.

[47] During each quarterly earnings conference throughout the Class Period, analysts and investors were specifically directed to visit the Company's website for more information about the Company's financial results.

[48] Investors could easily access this statement by clicking on "About GNC" and "Vendor Relations."

that contained BMPEA and picamilon although neither met the statutory definition of a "dietary ingredient" under the FD&C Act, no NDI had been filed for either, and thus both were deemed "adulterated" by the FDA and were not lawful for use in dietary supplements.  Indeed, the Oregon AG specifically found that this statement was "**untrue**."  *See, e.g.*, ¶¶ 72, 84-85, 89, 101-04.

114.    Similarly, throughout the Class Period, GNC prominently declared in the Media Room section of its website that GNC "***sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety, and product potency, all while remaining on the cutting-edge of nutritional science***."

115.    This statement was materially false and misleading when made and continued to be materially false and misleading throughout the Class Period for the reasons discussed in ¶ 113 above and because it led investors to believe that GNC demanded "***truth in labelling, ingredient safety, and product potency***."  As discussed in ¶¶ 98-105, however, this was not the case.  Indeed, the Oregon AG specifically found that this statement was "**untrue**."

### 1.    Defendants' False and Misleading Statements in the Company's Forms 10-K

116.    On February 27, 2012, GNC filed its Form 10-K for the 2011 fiscal year ending December 31, 2011 ("2011 Form 10-K"), with the SEC.  The 2011 Form 10-K was signed by, among others, Fortunato, Nuzzo, and Drexler.  In the 2011 Form 10-K, GNC stated that it "***maintain[s] high standards of product quality***" and "***monitors products received from our vendors to ensure they meet our quality standards***":

> *Vertically integrated operations that underpin our business strategy.*  To support our company-owned and franchise store bases, we have developed sophisticated manufacturing, warehousing and distribution facilities.  These consist of a manufacturing facility in Greenville, South Carolina, distribution facilities in Leetsdale, Pennsylvania, Anderson, South Carolina, and Phoenix, Arizona, and a transportation fleet of over 100 delivery trucks and trailers.  ***Our vertically integrated business model allows us to control the production and timing of new***

*product introductions, control costs, maintain high standards of product quality, monitor delivery times, manage inventory levels and enhance profitability.*

*. . . .*

*Each of our distribution centers has a quality control department that monitors products received from our vendors to ensure they meet our quality standards.*

117.    The above statements by GNC in the 2011 Form 10-K were materially false and misleading when made because they led the market to believe that GNC "*maintain[ed] high standards of product quality*" and "*monitor[ed] products received from [GNC's] vendors to ensure they [met GNC's high] quality standards*," when, in fact, GNC failed to ensure that these products were safe and in compliance with applicable regulations, much less of "high quality."  In particular, GNC regularly purchased and sold numerous products from third-party vendors containing BMPEA and picamilon – two substances that did not meet the definition of a "dietary ingredient" under the FD&C Act, had not been the subject of any NDI filing, and thus were deemed "adulterated" by the FDA and were not lawful for use in dietary supplements.  *See, e.g.*, ¶¶ 72, 79, 84-85, 89, 97, 101-04.  Defendants' statements were also materially false and misleading when made because they led the market to believe that the Company had taken affirmative steps to ensure the safety and quality of the products being sold in its stores – whether they were produced in GNC's facilities or in its vendors' facilities.  In reality, GNC's control over its vendors is what enabled these illegal products to reach the market.  *See, e.g.*, ¶¶ 3, 35, 101, 166.

118.    GNC repeated the statements in ¶ 116 above in its March 13, 2012 Form 424B1 Prospectus;[49] its February 22, 2013 Form 10-K for fiscal year ending December 31, 2012[50] ("2012

---

[49] This prospectus was related to a secondary offering pursuant to a March 1, 2012 S-1 registration statement and a March 12, 2012 S-1/A amended registration statement signed by Defendants Fortunato, Nuzzo, and Drexler.

[50] The 2012 Form 10-K was signed by Fortunato, Nuzzo, and Drexler, as well as other members of the Board.

Form 10-K"); its February 20, 2014 Form 10-K for the fiscal year ending December 31, 2013[51] ("2013 Form 10-K"); and its February 17, 2015 Form 10-K for the fiscal year ending December 31, 2014[52] ("2014 Form 10-K").  Each time GNC published these statements to investors, they were materially false and misleading for the same reasons as listed in ¶ 117.

119.    The 2011 Form 10-K also provided the following warning to GNC's investors regarding the implications of FDA scrutiny and how that might affect the Company's financial results:

> The processing, formulation, safety, manufacturing, packaging, labeling, advertising and distribution of our products are subject to federal laws and regulation by one or more federal agencies, including the FDA, the FTC, the CPSC, the USDA, and the EPA.  These activities are also regulated by various state, local and international laws and agencies of the states and localities in which our products are sold.  ***Government regulations may prevent or delay the introduction, or require the reformulation, of our products, which could result in lost revenues and increased costs to us***.  For instance, the FDA regulates, among other things, the composition, safety, manufacture, labeling and marketing of dietary supplements (including vitamins, minerals, herbs, and other dietary ingredients for human use).  The FDA may not accept the evidence of safety for any new dietary ingredient that we may wish to market, may determine that a particular dietary supplement or ingredient presents an unacceptable health risk based on the required submission of serious adverse events or other information, and may determine that a particular claim or statement of nutritional value that we use to support the marketing of a dietary supplement is an impermissible drug claim, is not substantiated, or is an unauthorized version of a "health claim." . . . Any of these actions could prevent us from marketing particular dietary supplement products or making certain claims or statements with respect to those products.  ***The FDA could also require us to remove a particular product from the market.  Any future recall or removal would result in additional costs to us, including lost revenues from any products that we are required to remove from the market, any of which could be material.  Any product recalls or removals could also lead to an increased risk of litigation and liability, substantial costs, and reduced growth prospects.***

---

[51] The 2013 Form 10-K was signed by Fortunato, Nuzzo, and Drexler, as well as other members of the Board.

[52] The 2014 Form 10-K was signed by Archbold and Fortune, as well as other members of the Board.

120.    This warning was materially false and misleading because GNC failed to disclose that it was then currently in violation of the FD&C Act and a governmental investigation of GNC was not just a mere possibility, but a significant probability.   Indeed, GNC was, at that time, promoting and selling numerous products from third-party vendors that contained BMPEA and picamilon, even though neither met the statutory definition of a "dietary ingredient" under the FD&C Act, Defendants knew or should have known that no NDI had been filed for either, and both had been deemed "adulterated" by the FDA and were, therefore, not lawful for use in dietary supplements. *See, e.g.*, ¶¶ 72, 79, 84-85, 89, 97, 101-04.

121.    GNC further published statements similar to those in ¶ 119 in its March 13, 2012 Form 424B1 Prospectus; its 424B7 Prospectuses filed on August 10, 2012, August 13, 2012, November 7, 2012, and November 9, 2012;[53] its 2012 Form 10-K; its 2013 Form 10-K; and its 2014 Form 10-K.   Each time GNC published these statements to investors, they were materially false and misleading for the same reasons as listed in ¶ 120.

122.    On August 9, 2012, Fortunato signed the Company's Form S-3 that incorporated, among other things, GNC's 2011 Form 10-K.   Accordingly, for the reasons listed above, the Form S-3 was materially false and misleading. *See* ¶¶ 117, 120.

---

[53] These prospectuses were related to secondary offerings pursuant to an August 9, 2012 Form S-3 automatic shelf registration statement signed by Defendants Fortunato, Nuzzo, and Drexler.

**B.      Defendants' False and Misleading Statements at the Beginning of the Class Period**

123.    The Class Period begins on November 16, 2011, when Fortunato spoke at the Morgan Stanley Global Consumer Conference, discussing the supplement industry's regulatory environment.  He stated:

> Whether it's the industry or company specific.  I would say this is always a risk in the regulatory environment.  I always look at that.  We've been dealing with it for 20 years.  The company deals with it all the time.  ***We know how to manage it***.

124.    The above statements were materially false and misleading when made because they led the market to believe that GNC looked at, and knew how to manage, regulatory risk, and thus was in compliance with all applicable regulations.  In fact, GNC did not "***know how to manage***" regulatory risk.  To the contrary, GNC promoted and sold numerous products that contained BMPEA and picamilon although neither met the statutory definition of a "dietary ingredient" under the FD&C Act, Defendants knew or should have known that no NDI had been filed for either, and thus both were deemed "adulterated" by the FDA and were not lawful for use in dietary supplements, exposing the Company to significant regulatory risk.  *See, e.g.*, ¶¶ 72, 79, 84-85, 89, 97, 101-04.

**C.      Defendants' False and Misleading Statements Concerning DMAA**

125.    As discussed above, on April 27, 2012, the FDA announced that it had issued warning letters to ten manufacturers and distributors of dietary supplements containing DMAA, for marketing products for which evidence of the safety of the product had not been submitted to the FDA.[54]   The Director of the FDA's Dietary Supplement Program stated that "[b]efore marketing products containing DMAA, manufacturers and distributors have a responsibility under

---

[54] FDA News Release, U.S. Food & Drug Admin., FDA challenges marketing of DMAA products for lack of safety evidence (Apr. 27, 2012).

the law to provide evidence of the safety of their products.  They haven't done that and that makes the products adulterated."

126.    While analysts expressed concern regarding how GNC would react to the FDA's scrutiny and investigation of DMAA supplements (demonstrating the materiality of Defendants' statements on these topics), Defendants sought to assure the market that GNC could offset any losses related to the recall/removal of DMAA with new products.  What Defendants failed to state publicly, however, was that the "reformulated" products they were touting also were adulterated within the meaning of the FD&C Act.

### 1.    May 23, 2012 – Morgan Stanley Retail Conference

127.    On May 23, 2012, Nuzzo presented at the Morgan Stanley Retail Conference.  At the conference, an analyst asked Nuzzo about the impact of the FDA's warnings about DMAA products on GNC's sales of pre-workout sports supplements and related financial prospects.  Nuzzo stated that GNC would not be greatly affected because GNC and its vendors could "replace" DMAA with "substitute ingredients" and that such "reformulation" is "a viable option":

Mark Wiltmuth – Morgan Stanley – Analyst:

**And should the product get withdrawn from the shelves, what are some of the alternatives for customers out there?  These are pre-workout products for the sports nutrition customer.**

Nuzzo:

Right.  I would just say this.  This space is a pretty broad space, the pre-workout space.  And so a lot of people have talked about, well, what is the true business impact.  Well, there will be a degree of substitution and even to the extent where these products have been on the shelf for two or three years, and like any cycling that happens in the sports nutrition area, you have products that come out, are big sellers and then they get replaced by new products.  And we have seen that happen.

And so some of our better sports nutrition products are products that don't contain DMAA.  We manufacture through the Pro Performance brand a number of pre-workout products.  I take one before I work out.  It doesn't contain DMAA in it.  **There are a number of other vendors as well that have products out there.  So we**

*believe that the substitution effect will be substantial and we also believe that we have got these great associates in the stores that can help educate and direct people to alternative products.*  And so we will see how that plays out, but at the end of the day, we see it as sort of -- the good thing is we see it as part of this natural evolution that takes place in sports nutrition anyway.

Mark Wiltmuth – Morgan Stanley – Analyst:

**And what about the option of reformulation?**  How long does it take for a manufacturer to go through that?  And I understand at least one manufacturer has done that and maybe we can talk about that a little bit.

Nuzzo:

*Yes, well, like anything, it is an ingredient that can be replaced with substitute ingredients.  So I cannot speak for the manufacturers themselves, but there is no reason to believe that reformulation isn't a very viable option.  And the timing on reformulation, it can be relatively quick.  Again, there is probably cases where manufacturers have already done some planning in case that is the result.  So I don't think that would be a very difficult process to undertake.*

128.    Nuzzo's statements were materially false and misleading because they led the market to believe that the substitutes for DMAA would be legal and approved "dietary ingredients" pursuant to the FD&C Act.  In particular, Nuzzo's statements that "*there are a number of other vendors as well that have products out there*" and "*the substitution effect will be substantial*" were materially false and misleading because, unbeknownst to investors, the products GNC and its vendors were substituting for DMAA products were products that contained BMPEA and picamilon, which did not meet the definition of a "dietary supplement" under the FD&C Act, had not been the subject of any NDI filing, and thus were deemed "adulterated" by the FDA and were not lawful for use in dietary supplements.  Similarly, Nuzzo's statement that DMAA "*is an ingredient that can be replaced with substitute ingredients*" was materially false and misleading because GNC and its vendors were replacing DMAA with picamilon and BMPEA: ingredients that were equally illegal, as well as unsafe.  Likewise, Nuzzo's statement that "*there is no reason to believe that reformulation isn't a viable option*" was materially misleading because the

"reformulation" of DMAA products that GNC and its vendors were undertaking merely substituted two other equally illegal and unsafe ingredients in place of DMAA. *See, e.g.*, ¶¶ 52-54, 56-57, 67-68, 84-85, 89-92.

### 2. July 26, 2012 – 2Q12 Earnings Conference Call

129. On July 26, 2012, GNC hosted an earnings conference call with analysts and investors to discuss the Company's second quarter 2012 results. Fortunato and Nuzzo participated on the call. During the call, multiple analysts asked Fortunato about GNC's transition away from DMAA. In response, Fortunato assured analysts and investors that "***the pre-workout category is still strong***" and "***is not being driven by DMA[A] products***" because GNC was "***switching customers over***" to "***replacement products***" that "***were very good, very effective***" and "***did not have the so-called tarnished effect of DMAA.***" Fortunato said that GNC had proven that customers were finding that these replacement products "***very effectively work***," "***work[] just as well***," and that according to GNC's "***customer research***," customers were "***continuing to buy and again at a very accelerated pace***." The discussion proceeded as follows:

Simeon Gutman – Credit Suisse – Analyst:

**First question with regard to the pre-workout category, can you talk about its progress throughout the quarter? I know there is perhaps some product transitions happening. Then as my follow-up, can you talk about now that it appears that there is *non-DMAA* variants available across the category will GNC still carry them or will there be a transition away over time?**

Fortunato:

We will address it this way. The pre-workout category is still strong, but it is not being driven by DMA[A] products. We have made a very concerted effort to move away from DMAA products in the stores. ***And we have done that in a number of ways that we usually can do to control movement, whether it is promotional monies backing those products or backing other products that we would prefer to sell in their place.***

So we have kind of stripped off [product mixes] onto DMAA products, doubled [product mixes] on some of the other products that were supported by vendors so

we remained margin neutral out of the situation, and we decelerated the sale of DMAA products significantly.  ***So if we look at our exposure to DMAA products right now we are very comfortable that the guidance we are giving you would include any kind of effect on DMAA which is continued to decline by the day.***  Even better news is the products that have replaced DMAA are selling at a faster pace than the DMAA products are going off.

. . . .

Chris Horvers – JP Morgan – Analyst:

Thanks.  **One quick follow-up on the DMAA and then another separate question. When did you start to see products like Jack3d start to come down and Oxy Elite as well, and when did the uptake on these substitutions really come into play?**  I think a lot of people think it has happened more recently, but our sense is that is something that started at the end of last year.

Fortunato:

Jack3d started to decline at the end of last year going into the beginning of this year. Oxy did not.  Oxy stayed at a pretty high level up until the time we started to diminish the sales of it by bringing in replacement products and switching customers over to those products rather than keep the controversy going on DMAA, which seemed just an easier thing to do.

***The replacement products are very good, very effective, and did not have the so-called tarnished effect of DMAA, which again really to date has not shown any reason to have a tarnished effect to it.***

So the answer shortly is Jack3d had started to decline, there were other products that come in on the pre-workout side of the business.  Some of them our own brands; we had started to evolve with some of our product lines.  Oxy we pretty much have run down in the course of business on our own, more recently in the past six, eight weeks.

. . . .

Damian Witkowski – Gabelli & Co. – Analyst:

**Who makes the replacement products [for DMAA products]?  Is it the same companies under a different brand name or is it completely someone different?**

Fortunato:

No, there is four or five companies that have stepped up to the table and brought product in.  Good news for us is we had already started bringing in products,

because we like to keep a very competitive product assortment in our stores.  We don't like any of the products moving up towards 6%, 7%, 8% of sales.

So we had already been in the midst with certain companies of bringing in pre-workout products so it was not a difficult transition.  It wasn't like we were starting from square one.  ***We were able to execute and execute against that very quickly, very efficiently and do what we said we were going to do and accomplish the same things from our financial protection downside and with our consumer.***

130.    Fortunato's statements during GNC's July 26, 2012 earnings conference call were materially false and misleading because they led the market to believe GNC was successfully switching its customers over to "replacement products" that were not, like DMAA, "tarnished" with "controversy," when in reality the "replacement products" Fortunato touted were replacing DMAA with BMPEA and picamilon – two substances that did not meet the definition of a "dietary supplement" under the FD&C Act, had not been the subject of any NDI filing, and thus were deemed "adulterated" by the FDA and were not lawful for use in dietary supplements.   In particular, Fortunato's statement that "***the replacement products are very good, very effective, and did not have the so-called tarnished effect of DMAA***" was materially false and misleading because he failed to disclose that the replacement products also contained ingredients that were not lawful for use in dietary supplements.  Fortunato's statement that GNC "***accomplish[ed] the same things from [their] financial protection downside***" was likewise materially false and misleading because by replacing DMAA with similarly tainted products, the Company was in violation of applicable regulations and, as such, was not protecting its financial health.  *See, e.g.*, ¶¶ 52-54, 56-57, 67-68, 72, 84-85, 89-92.

131.    Furthermore, Fortunato's statement that the Company was "***comfortable***" that its guidance "***include[d] any kind of effect on DMAA which . . . continue[s] to decline by the day***" was materially false and misleading because GNC was not providing an accurate picture of its financial condition to investors.  In point of fact, the "DMAA effect" and related regulatory risks

were not being mitigated by the Company because it was replacing DMAA products with products that were equally illegal.  *See, e.g.*, ¶¶ 54, 90-92.

132.    After this earnings call, GNC's stock rose approximately 2.9%, from $37.11 per share on July 26, 2012, to a closing price of $38.21 per share on July 27, 2012.

### 3.    April 26, 2013 – 1Q13 Earnings Conference Call

133.    On April 26, 2013, GNC hosted an earnings conference call, led by Fortunato and Nuzzo, with analysts and investors to discuss the Company's 2013 first quarter results.  Fortunato responded to an analyst's questions about the FDA's recent actions by assuring investors that "GNC's concern is not . . . big at all" and "basically doesn't exist" because GNC "***had already started the launch***" of "***non-DMAA products***," including a "replacement formula with a different version without DMAA" that "will be in the stores within the next three months."  As a result, GNC's "concern . . . basically doesn't exist."  The discussion proceeded as follows:

Mark Wiltamuth – Morgan Stanley – Analyst:

**Okay.  Thank you.  And lastly on the DMAA -- the FDA came out with some more aggressive tone on that, saying they were going to try to gets the remaining products removed from the market over time.  Maybe you could give some commentary on how big those product sales remain in the store?**

Fortunato:

. . . They're going to replace the formula with a different version without DMAA. They've already launched one they're going to launch a different one as well that will be in the stores within the next three months.  ***So the transition over to non-DMAA products as we have shown you in the past we can do very effectively and we have already started the launch again a move towards non-DMAA products by raising [product mixes] on DMAA products, lowering [product mixes] on DMAA products various things like that.***  We took that liability down last year as we told you from I think the guess on the Street was somewhere it was about 6% of our business.  I can tell you it's under half and moving down on a weekly basis.

Mark Wiltamuth – Morgan Stanley – Analyst:

Okay.

Fortunato:

So our concern is not being big at all.  Obviously it basically doesn't exist because once again the replacements products -- those consumers are still buying something.  They are agency [sic] going to come in and buy the new product, as we have already shown.

134.     Fortunato's statements during the April 26, 2013 earnings call were materially false and misleading because they led the market to believe that the replacement products in question were safe for consumers.  In reality, however, the replacement products were also adulterated.  In that regard, GNC failed to disclose to investors that many of the replacement products contained BMPEA and picamilon, which are not dietary ingredients under the FD&C Act, had never been the subject of a NDI filing, and thus could not lawfully be included in dietary supplements.  *See, e.g.*, ¶¶ 52-54, 56-57, 67-74, 84-85, 89-92.

135.     Over the next few days, GNC's stock price rose approximately 1%, from a closing price of $44.85 per share on April 26, 2013, to a closing price of $45.40 per share on April 29, 2013.

136.     Analysts also responded quickly and favorably to Fortunato's reassurances made during the April 26, 2013 earnings call.  On April 29, 2013, BMO Capital Markets reported that "DMAA should be a non-issue going forward."

### 4.        September 10, 2013 – Goldman Sachs Global Retailing Conference

137.     On September 10, 2013, Fortunato and Nuzzo presented at the Goldman Sachs Global Retailing Conference.  At that conference, Fortunato discussed consumer protection as follows:

Matt Fassler – Goldman Sachs – Analyst:

. . .  **I guess the one last question I would want to ask you relates to the regulatory environment.  There is a bit of a tussle that lasted a while, it related to DMAA.**  It seemed like some down Gs were being tested perhaps on both sides,

that it may or may not have been the intent, but the effect.  **Where do you feel this role sits in the regulatory perspective right now?**

Fortunato:

I think it is probably, it always is there since 1994 when [Dietary Supplement Health and Education Act] was passed.  The regulatory environment in the United States has always [been a] part of being in this industry.  *I look at GNC and the number one priority for us is always to protect our consumer*.

138.     Fortunato's statements during the September 10, 2013 Goldman Sachs Global Retailing Conference that GNC's "*number one priority was to protect [its] consumer*" was materially false and misleading.  In point of fact, GNC was marketing, promoting, and selling unsafe products that did not comply with applicable laws and regulations and were potentially harmful to human health.  *See, e.g.*, ¶¶ 9, 67-74, 82-84.

139.     After this conference, GNC's stock price rose by approximately 2%, from a closing price of $53.35 per share on September 10, 2013, to a closing price of $54.44 per share on September 11, 2013.

### 5.     May 6, 2014 – 1Q14 Earnings Conference Call

140.     On May 6, 2014, GNC hosted an earnings conference call, led by Fortunato and Nuzzo, with analysts and investors to discuss the Company's 2014 first quarter results.  During the call, Fortunato stated that GNC "*did a great job at replacing the [DMAA] products*."  The relevant discussion between the analysts and Fortunato proceeded as follows:

Mark Wiltmuth – Jefferies & Company – Analyst:

Okay.  **So it was really the last gasp of the DMAA inventory and the replacement DMAA products?**

Fortunato:

*Yes.  I can say we did a great job at replacing the products, as I told you in the last second and third quarter last year.  And we were effectively hurdling the combination rate of the DMAA products, Oxy and Jack, mostly.  But if you -- as you got further into this year, because we did a good job with the replacement*

*products, we were still against very strong peak numbers from those products and against strong numbers from the replacement products . . . .*

Meredith Adler – Barclays Capital – Analyst:

. . . **My next question is just kind of a little bit about the industry, and maybe starting with DMAA or pre-workout products.  Obviously, for whatever reason, people bought ahead -- I think is the right way to think of it; that's what happened last year.  But is there any reason to believe that sort of category is fading? …**

. . . .

Fortunato:

Can I answer one other thing?  You've also got to remember that because we were so strong with the Pre-Workout category, and that was impacted by DMAA, we got hurt the most.  *So we've done a good job of replacing it and making -- trying to offset those trends.  But we were probably the strongest of anybody in the marketplace with selling DMAA type products.*

141.    Fortunato's statements during the May 6, 2014 earnings conference call were materially false and misleading because they led the market to believe that GNC "***did a great job at replacing the [DMAA] products***."  Fortunato omitted the material fact that GNC replaced many of these products with illegal BMPEA and picamilon products that were themselves "adulterated" within the meaning of the FD&C Act.  *See, e.g.*, ¶¶ 52-53, 56-57, 67-74, 89-92.

142.    Following the May 6, 2014 earnings conference call, analysts were buoyed by GNC's assurances.  For example, on May 9, 2014, analysts at Jefferies wrote in detail about the DMAA controversy, and commented that "the replacement product sales have marched on."  On July 29, 2014, Sterne Agee noted "GNC's product differentiation and superiority."  A day later, Deutsche Bank noted GNC's "product superiority."

**D.** **Defendants' False and Misleading Statements in Response to the New York AG's Investigation**

143. As explained above, *see* ¶¶ 7, 61, on February 2, 2015, the New York AG sent GNC a cease-and-desist letter ordering GNC to pull a number of products from its shelves following an investigation that found those products were not accurately labeled.[55]

### 1. February 12, 2015 – 4Q14 Earnings Conference Call

144. On February 12, 2015, GNC hosted an earnings conference call with analysts and investors to discuss the Company's 2014 fourth quarter results. GNC's new CEO, Archbold, participated on the call, during which he responded to the New York AG's allegations by claiming that GNC's "***customer[s] want[] pure, safe, efficacious product[s], and that's what GNC delivers for them every day***."

145. Archbold's statement during the February 12, 2015 earnings conference call was materially false and misleading because it led the market to believe that GNC had been and was selling lawful and safe products. The Company was, in fact, marketing, promoting, and selling illegal and unsafe supplements. *See, e.g.*, ¶¶ 52-54, 67-74, 89-92.

146. Analysts heeded Archbold's reassurances. A day after this earnings call, Stephens Inc. wrote that "Mr. Archbold is focused on building on the core value proposition of GNC's deep expertise in health & wellness . . . maintaining rigorous quality standards."

### 2. March 30, 2015 – GNC Press Release Announcing NYAG Letter Agreement and March 30, 2015 8-K

147. On March 27, 2015, GNC entered into the NYAG Letter Agreement to resolve that agency's investigation. *See* ¶ 64.

---

[55] *See* Anahad O'Connor, *New York Attorney General Targets Supplements at Major Retailers*, N.Y. Times, Feb. 3, 2015, http://well.blogs.nytimes.com/2015/02/03/new-york-attorney-general-targets-supplements-at-major-retailers/?_r=0.

148.     On March 30, 2015, GNC issued a press release announcing that it had reached an

agreement with the New York AG, stating that:

> Our customers trust and value our products, and ***we are steadfastly committed to
> maintaining that trust and confidence.  As an industry leader we have always
> gone above and beyond the minimum requirements in pursuing quality for our
> consumers, and we will continue to lead the efforts for higher standards.***  This is
> good for consumers, good for the industry, and good for GNC.

149.     On March 31, 2015, GNC filed a Form 8-K, which included the above press release.

150.     GNC's statements in the March 30, 2015 press release and March 31, 2015 8-K

were materially false and misleading because they led the market to believe that GNC was in full

compliance with all regulatory requirements.  As detailed elsewhere herein, such was not the case.

*See, e.g.*, ¶¶ 67-74.  In reality, GNC was selling dietary supplements that were "adulterated" under

applicable law.  Further, contrary to the press release, GNC was not "***steadfastly committed to

maintaining that trust and confidence***" of its customers, because it was then marketing,

promoting, and selling products containing illegal and potentially harmful ingredients, such as

BMPEA and picamilon.  *See, e.g.*, ¶¶ 67-74, 82-85, 90-91.

151.     On March 30, 2015, Sterne Agee signaled their acceptance of Archbold's

reassurances, writing that "we believe CEO Mike Archbold has 'turned lemons into lemonade'

with the company now taking a leadership position in quality control standards as a result of the

New York AG's investigation.   To this end, better testing and controls should lead to:

(1) improved confidence in GNC products by consumers; (2) reduced headline/regulatory risks

down the road; and (3) some much needed positive . . . media attention . . . we like the move and

expect GNC to benefit meaningfully."

### 3.      April 30, 2015 – 1Q15 Earnings Conference Call

152.    On April 30, 2015, GNC hosted an earnings conference call, led by Archbold, with analysts and investors to discuss the Company's 2015 first quarter results.  Archbold stated that GNC's products were safe and "*fully compliant with all applicable regulatory requirements*":

> So before we open up the call for questions, I wanted to provide some context as relates to the agreement that we announced in March with the New York Attorney General.

> As outlined in the open letter I published earlier this month, our objective included establishing ultimate clarity to what we already knew and what the New York Attorney General has now confirmed, that *our products are pure, safe and fully compliant with all applicable regulatory requirements*.

153.    Archbold's statements during the April 30, 2015 earnings conference call were materially false and misleading when made because GNC was not "*fully compliant with all applicable regulatory requirements*."  In truth, GNC was actively promoting and selling products containing BMPEA and picamilon, which were not lawful "dietary ingredients."  Archbold's statement that GNC's "*products are pure, safe and fully compliant with all applicable regulatory requirements*" was materially false and misleading because the Company was in fact, marketing, promoting and selling dietary supplements whose key active ingredients were not "dietary ingredients," not subject to any NDI, met the FDA's definition of "adulterated," and thus were illegal for use in a dietary supplement.  *See, e.g.*, ¶¶ 52-54, 67-74, 82-85, 90-92.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS[56]

154.    As GNC's most senior executives, the Individual Defendants were active, culpable, primary participants in the fraud, as evidenced by their knowing issuance and control over GNC's materially false and misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements

---

[56] In this section, all emphases have been added unless otherwise indicated.

issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

155.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding GNC, its operations, and its business practices, their control over and/or receipt of GNC's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning GNC, were active and culpable participants in the fraudulent scheme alleged herein.   The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.   The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as occurred, without the knowledge and/or recklessness and complicity of personnel at the highest levels of the Company, including the Individual Defendants.

156.   As set forth above, the Individual Defendants made numerous specific statements regarding the Company's operations, the products it promoted and sold, and GNC's purported compliance with applicable laws and regulations.   *See* ¶¶ 112, 114, 116, 118-19, 121-23, 127, 129, 133, 137, 140, 144, 148-49, 152.   These specific statements reflect the fact that the Individual Defendants were in receipt of information regarding each of these subjects.   The only other plausible inferences that can be drawn from these specific pronouncements is that the Individual Defendants either fabricated the information that they provided to investors and the market or that they deliberately ignored information they possessed regarding such matters.   In either event, such deliberate recklessness would satisfy the scienter requirement.

157.    The inference of scienter in this case is further bolstered by, among other things, the following:

a)      Defendants repeatedly spoke about GNC's closeness with its vendors, demonstrating a knowledge of those vendors' business practices;

b)      The manner in which the Company's vendor agreements were structured;

c)      GNC operates in a regulated environment and the Company knew of, and made statements regarding, attempts by lawmakers to expand the breadth of applicable regulations;

d)      Certain of the Company's vendors had extensive histories of unethical and unlawful behavior that were either known to or recklessly disregarded by the Defendants;

e)      The supplement market, and in particular sports nutrition products, constituted a core operation of GNC;

f)      Fortunato's and Nuzzo's insider trades during the Class Period; and

g)      Defendants' SOX Certifications.

158.    When reviewed collectively, as required by applicable law, Lead Plaintiff's allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.  In either case, scienter has been adequately pled.

**A.    GNC Worked Closely with Vendors and Reassured the Market About the Quality of Their Products**

159.    GNC and the Individual Defendants specifically and carefully tracked each ingredient in their third-party products and repeatedly emphasized GNC's "close connection" with its vendors and superior knowledge regarding the vendors' products.  As a result, the Defendants had ready access to specific knowledge that the Company's vendors were adulterating the products

sold to GNC with unlawful dietary ingredients, rendering Defendants' statements to investors materially false and misleading.

160.    First, the Oregon AG Complaint and Lead Counsel's investigation confirm that GNC did, in fact, specifically record and track for easy access by the Company and the Individual Defendants each ingredient contained in the third-party products.  As the Oregon AG Complaint established, GNC's Senior Project Manager for Technical Research was specifically charged with evaluating the ingredients in GNC's third-party products and determining which ingredients "'looked promising' for possible development by Nutra Manufacturing ('Nutra'), GNC's manufacturing arm."  ¶ 37.

161.    The accounts by GNC's former employees confirm this report.  As noted above, the Associate Category Manager explained that GNC maintained a system called the "OnBase System," which was used to track every third-party product GNC marketed.  GNC used this system to track, identify, and catalogue each label, as well as each ingredient in the product.  ¶ 36.  According to OnBase's website, OnBase "centralizes your important business content in one secure location."  The Associate Category Manager recalled that, through OnBase, GNC employees could immediately call up the ingredient listing for every GNC product, for each formulation of that product.  Both picamilon and BMPEA were set forth on the labels of most of the relevant products at issue, so there is no question that the Defendants knew, or should have known, that GNC was selling products containing these two ingredients. *See* ¶¶ 3, 36.

162.    Additionally, GNC's former employees confirmed that GNC would have been aware of Health Canada's December 2014 recall of the AR-labeled dietary supplement called "Jet Fuel Superburn" that was spiked with undisclosed BMPEA and that was one of the subjects of the Oregon AG Complaint.  *See* ¶ 93.  The Sales Director stated that GNC's international divisions

were in close contact with their U.S. counterparts (with respect to Canada, he noted that the head of the Canadian division reported during the Class Period to the CEO (Defendant Fortunato) and EVP of Operations in the United States). *Id*.  Given this structure, the Sales Director confirmed that senior management at GNC would have been aware of any recalls in Canada. *Id*.

163.    Second, throughout the Class Period, Defendant Fortunato repeatedly told the market that the Company worked closely with its third-party vendors, thereby demonstrating GNC executives' intimate knowledge of these manufacturers' products and policies.  For example, during the Company's 3Q2011 Earnings Call on October 31, 2011, Fortunato stated that GNC's "vendors love doing business with us" and explained how GNC was "pushing" its vendors to "bring[] new product innovation to the market" and "insisting on certain things."  Specifically, Fortunato stated that:

> **The vendors love doing business with us.  Obviously, they get big upside if they support this business.  And they are bringing new product innovation to the market too because we are pushing them to do so.  And we are insisting on certain things, and they have been great partners for us.  And will continue to be . . . .**

164.    Similarly, in a July 25, 2013 earnings conference call, Defendant Fortunato responded to an analyst's question by touting that GNC was "***in close connection***" with its vendors.  Fortunato noted that "almost every vendor comes in here once a month" and that GNC is "joined at the hip with them on everything they are doing":

Gary Balter – Credit Suisse – Analyst:

Okay, and then just a business question I was hoping to ask.  New products and relationships with suppliers.  We noticed in the quarter on hot items like this Garcinia or even some of the Quest Bars and some of the flavors, GNC seems to be getting a strong selection early on, nice selection of product, pretty good messaging.

So I guess on the idea of products in relationship with suppliers, how are you able to move things to the market that quick?  Are you very close with suppliers, I guess, early on, et cetera?  You seem to be doing a good job in that area.

<u>Fortunato</u>:

Well, we still win from that side, because if you go back in history, significantly back in history, we've always had the advantage of suppliers coming to us because we're the largest.  And obviously, if they want to get a boost in sales and get their products marketed across 4000 or 5000 stores, the place to come is to us.

**So we also -- we are in close connection with them.  They literally -- almost every vendor comes in here once a month.  So we are tied -- joined at the hip with them on everything they are doing.  And we plan various things with them, whether it's exclusive, separate flavors, certain sizes, various things that come to GNC before they go to other places.**

**So that relationship continues, and I think it's stronger than it has ever been.  Because their reliance on us gives us the leverage to go out and be able to cut deals and do things with them, and we insist on getting the supply as fast as we can get it and first when these products hit the market.**

165.   On September 10, 2013, at the Goldman Sachs Global Retailing Conference, Fortunato again touted GNC's close relationship with its vendors:

**[T]here is not a vendor out there that is selling to anybody that really didn't start at GNC**, whether it was five years ago, 10 years ago, 15 years ago.  And this to me, because they know how well we are performing, **gives us an edge to continue to get products from them that are only sold to GNC** for a while, some exclusive offerings.  **Things they are willing to do for us, that they are not doing for anybody else.**  To me it gives us leverage.  Us being able to perform the way we are versus our peers, competitors, and other people in the mass market, and the mass market to me is a whole different thing.  **It gives us an edge with the vendors** . . . .

166.   On the May 6, 2014 earnings conference call, Fortunato again promoted GNC's "very close" relationship with its vendors, with whom GNC was "working side-by-side" and which he repeatedly said were "very much . . . in bed with us":

We know a number of the third-party vendors have gotten very weak.  We also know a couple that **very much, let's say, in bed with us** and are **working side-by-side with us, have already given us a couple of exclusives**, and have been one of our many partners over the years, except for a period where they had some issues to deal with on their own.  **They are very much, let's say, in bed with us**, and we are very excited about the products they're bringing to the marketplace.  And they should help drive that third-party business alone.

167. Finally, throughout the Class Period in the Company's annual reports to the SEC on Forms 10-K, GNC repeatedly assured investors that it had taken affirmative steps to ensure that its vendors' products were safe and legal, stating that "**[e]ach of our distribution centers has a quality control department that monitors products received from our vendors to ensure they meet our quality standards**." ¶¶ 3, 31, 116.

### B.    GNC Structured Its Vendor Contracts to Allow It to Sell Unlawful Ingredients Without Repercussions

168. As discussed above, GNC's vendor contracts contained the "Vendor Guarantee" that purported to indemnify GNC for any financial repercussions if its third-party products violated FDA or local regulations. Accordingly, GNC was incentivized to "push the envelope" with its dietary supplements. As a result, as a Category Merchandise Manager for Sports Nutrition at GNC during part of 2011 and 2012 who reported to the Company's Vice President of Sports Nutrition stated, the Company "would buy anything from any vendor." But as the Oregon AG later determined, "GNC did not rely on these [third-party] guarantees in good faith," because Defendants knew or should have known that, as outlined herein, many of the products being provided by the Company's vendors contained unlawful dietary ingredients.

### C.    The Individual Defendants Had Knowledge of and Access to Information Regarding Relevant Product Recalls and Regulatory Concerns About Specific Products that Support a Strong Inference of Scienter

169. GNC's success was driven by its reputation for having the most cutting edge, purest products on the market. Given the importance of product quality – in combination with the reputational and regulatory risks of product recalls – the Individual Defendants and other senior GNC executives were particularly attuned to issues involving specific products and trends.

170. Indeed, the Sales Director recalled that Defendant Fortunato held weekly executive meetings each Monday with GNC's executive and senior vice presidents, including Defendant

Nuzzo.   According to the Sales Director, during those meetings, GNC's most senior officers (including Defendants Fortunato and Nuzzo) would discuss product issues and a broad range of other issues.  According to the Sales Director, these discussions would invariably lead to further meetings with department heads and other senior employees throughout the day.   Each of these meetings (both the morning meeting and the follow-up meetings) would be held in Fortunato's personal conference room, which was attached to his office.  These "Bloody Monday" meetings were so critical that, according to the Sales Director, GNC headquarter employees learned not to schedule other meetings during the day because they would be rescheduled to accommodate follow-up informational requests from Fortunato, Nuzzo, and other executives.

171.    The Sales Director further commented that, unlike many CEOs who only received high-level status summaries from their subordinates of key information, Defendant Fortunato "wanted a briefing on almost everything.  He would actually get involved with making a decision on . . . things that most people wouldn't . . . . [I]f anything was going on, Joe would know about it."  The Sales Director also conveyed that there were weekly product status meetings at GNC headquarters, which would cover any product or supply issues or recall notices.  They would last about 30 minutes and would be held during the week because "you never planned anything on a Monday."  The Executive Vice President of Merchandising would attend and would report on that information at the next Monday morning meeting with Fortunato and Nuzzo if the information was not urgent, but GNC handled serious issues really quickly.   "You didn't ignore something if you had a recall.  You didn't ignore things; you couldn't ignore things."  "If there was a legal issue, there is no way anybody's ignorant of it at 300 6th [referring to the address of GNC headquarters]."  The Sales Director stressed that GNC's executives would have known about serious product issues – even if they did not act on them – because there was a "paranoia" among the executives.

172.     Indeed, the attendees of Fortunato's Monday meetings were kept well-informed of the issues regarding BMPEA and picamilon as they emerged in the press, as discussed above.  The Sales Director recalled that Jakell (who, as noted above, *see* ¶ 85, transmitted the contemporaneous studies regarding BMPEA and picamilon internally) was responsible for researching and communicating the information.  Jakell's responsibilities at GNC included "ensuring that [GNC's] labeling and scientific claims are accurate," and, according to the Sales Director, Jakell dealt with competitive intelligence and industry intelligence.  Jakell would tailor the recipients of the information she conveyed, depending on the information.  As the Sales Director made clear, Jakell "wasn't just a clerk passing around things; she wouldn't waste your time with that."

173.     The Sales Director further established that Jakell would not make decisions about product recalls or product marketing; that was left to the senior recipients of her emails, including Nuzzo.  Indeed, as evidenced by the Oregon AG Complaint, there can be no doubt as to Nuzzo's knowledge of the risks associated with the amphetamine-like compound, acacia rigidula, in GNC's products.  On November 19, 2013, Jakell wrote to numerous GNC employees, including Defendant Nuzzo, regarding the *USA Today* article discussing the FDA Study.  *See* ¶ 85.

174.     The Associate Category Manager confirmed that Jakell's emails were vital sources of information and action within GNC.  Specifically, the Associate Category Manager recalled that, after Jakell circulated emails concerning the New York AG investigation, GNC management sat down with the Associate Category Manager and others to discuss the issues at the heart of that investigation.

175.     In sum, GNC had a close-knit and well-developed system of transmitting vital information, including concerning product safety and adulteration.  This system contributes to a strong inference of Defendants' scienter.

**D.     GNC's Vendors Had Histories of Ethical and Legal Violations that Add to the Strong Inference of Scienter**

176.    Taking the Defendants at their word (that there was a close relationship between the Company and its third-party vendors, *see, e.g.*, ¶¶ 3, 35, 163-66), Defendants knowingly or recklessly ignored a number of glaring "red flags" evidencing that several of GNC's third-party vendors – including Driven Sports and Hi-Tech Pharmaceuticals – had extensive histories of unethical behavior and legal violations in the supplement industry.  The troublesome history of these significant vendors should have caused Defendants to pay particular attention to the products these vendors were supplying to GNC and to ensure that these products complied with applicable federal law.

177.    First, Matt Cahill, the CEO of Driven Sports – the vendor for "Craze," one of the products containing BMPEA and a subject of the Oregon AG Complaint – was a known felon.  On July 25, 2013, *USA Today* reported that Cahill had "spent time in prison for selling dangerous weight-loss pills."[57]   According to the article, "Cahill was facing federal charges for mixing a highly toxic pesticide with baking powder, stuffing it in capsules and selling it over the Internet for weight loss."  The article noted that "[l]ast November, the FDA received a report from the parent of a 15-year-old boy who said their son had used Craze and was found 'unconscious and unresponsive.'"

178.    Shortly thereafter, on July 31, 2013, *USA Today* further reported that Wal-Mart had pulled Craze from its website "after the investigation showed that the product's maker, Matt Cahill, has a history of putting risky supplements on the market."[58]   According to an October 14, 2013

---

[57] Alison Young, *The supplement danger zone*, USA Today, July 25, 2013, at 1A.

[58] Alison Young, *Wal-Mart suspends sales of Craze; Senator urges tougher rules after USA TODAY report*, USA Today, July 31, 2013, at 5A.

*Boston Globe* article, Cahill also "has served time in prison for selling and transporting a highly toxic industrial chemical packaged as a weight loss supplement that resulted in a young woman's death" and "is facing a federal criminal charge for marketing a body-building supplement that allegedly contained an unapproved new drug linked to liver problems."[59]  On October 16, 2013, *USA Today* reported that, in addition to Wal-Mart, Bodybuilding.com and several other online retailers stopped selling Craze during the summer of 2013 in the wake of the *USA Today* investigation.[60]  GNC continued to sell Craze even after these reports.

179.    Second, Jared Wheat, the CEO of Hi-Tech Pharmaceuticals – the vendor for several of the BMPEA-spiked drugs at issue in the Oregon AG Complaint, *see* ¶ 90 above – has an equally troubled past.   According to a November 3, 2013, *The Atlanta Journal-Constitution* article, Mr. Wheat "started Hi-Tech Pharmaceuticals in the late 1990s, shortly after he completed a federal prison sentence for selling Ecstasy in his native Alabama."[61]  The article noted that "[i]n 2003, Hi-Tech agreed to destroy seven of its products after the federal government sought an injunction against it for selling unapproved and misbranded drugs."  In that case, "the government portrayed Wheat as the mastermind of an enterprise that purported to sell cheap, generic drugs from Canada when in fact they were manufactured under unsanitary conditions in Belize."  The government described Mr. Wheat as "'a dangerous drug dealer who has perhaps squirreled away millions of dollars and is a significant flight risk'" and quoted a witness who said that "he'd buried hundreds of thousands of dollars behind Wheat's house at Wheat's request."  The government also "alleged that Wheat and others had discussed hiring a private detective to blackmail an assistant

---

[59] Deborah Kotz, *Banned drug used in sports aid*, The Boston Globe, Oct. 14, 2013, at B1.

[60] *See* Alison Young, *Maker of Craze suspends production*, USA Today, Oct. 16, 2013, at 3A.

[61] Danny Robbins, *Ga. firm stays out of FDA reach*, The Atlanta Journal-Constitution, Nov. 3, 2013, at 1A.

U.S. attorney and obtaining a gun and silencer to attack an FDA agent." Wheat ultimately pleaded guilty to conspiracy to commit mail and wire fraud and selling unapproved and adulterated drugs and was sentenced to 50 months in prison.

180.    Given GNC's repeated assertions of its close relationship with its vendors, *see, e.g.*, ¶¶ 3, 35, 163-66, as well as the publicity surrounding the activities described herein, there can be no doubt of Defendants' knowledge or reckless disregard of the highly questionable (and even illegal) behavior of certain of GNC's suppliers and their executives. At a minimum, the foregoing facts should have caused Defendants to review the ingredients in the products provided by, at the very least, Driven Sports and Hi-Tech Pharmaceuticals to ensure that they complied with federal regulations and, at a minimum, contained lawful dietary ingredients.

### E.    The Individual Defendants Are Presumed to Know About the Company's Core Operations

181.    Defendants' scienter is further demonstrated by the fact that third-party products were a central part of the Company's success and, as discussed above, Defendants touted the special relationship they had with their vendors as a significant competitive advantage. The fact that the misstatements and omissions at issue here pertained directly to one of the most significant factors that gave the Company its competitive advantage further supports a strong inference of Defendants' scienter.

182.    The sports nutrition market was the cornerstone of (and critically important to) GNC's growth strategy and, as such, constituted a core operation of the Company. In 2011, GNC described itself as "a premier distributor of sports nutrition products" and a "leading distributor of third-party sports nutrition brands." ¶ 19. During the Class Period, over 50% of GNC's sales were from sports nutrition sales. ¶ 29. GNC was "able to grow above this [6% to 7%] standard industry growth rate" for its sports nutrition segment, further demonstrating its growing significance to the

Company.  *Id*.  Moreover, at least half of the Company's retail revenue was derived from third-party products.  Analysts and commentators stressed the importance of sports nutrition supplements to GNC's bottom line throughout the Class Period.  *See, e.g.*, ¶¶ 29, 129, 140, 142. For example, Credit Suisse noted that "GNC is very dependent on sports nutrition" and the category "has an outsized impact on the company's sales."  ¶ 29.

183.    GNC's former employees confirmed the central role that the Company's third-party vendors played in the Company's operations.  In addition to the reports generated through the OnBase system discussed above at ¶¶ 36, 161, the Sales Director confirmed that GNC held significant in-person meetings with its vendors once or twice a year.  In those meetings, GNC and its vendors would discuss products, how products are doing, and new products coming up.

184.    Indeed, given that the products being sold by GNC admittedly are subject to substantial governmental regulation regarding "processing, formulation, safety, manufacturing, packaging, labeling, advertising and distribution," ¶ 119, it is unsurprising that Defendants closely monitored each of these areas during the Class Period.  This is particularly true given the Company's express acknowledgements that the FDA was considering an expansion of regulatory authority over the industry to target alleged abuses.  *See, e.g.*, ¶¶ 44, 51, 78, 95.

185.    When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, *see, e.g.*, ¶¶ 112, 114, 116, 118-19, 121-23, 127, 129, 133, 137, 140, 144, 148-49, 152, there is a strong inference that such officer knew the statement was materially false and misleading when made.  Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company. Moreover, as signatories to the Company's SEC filings, *see, e.g.*, ¶¶ 21-25, 116, 118, 121-22,

certain of the defendants had an affirmative obligation to familiarize themselves with the facts relevant to GNC's core operations.

> **F.** **Fortunato's and Nuzzo's Insider Sales During the Class Period Further Support a Strong Inference of Their Scienter**

186.    An executive's insider sales can be probative of scienter.  Here, Fortunato's and Nuzzo's massive insider sales during the Class Period reveal their motive to commit fraud.

187.    In total, Fortunato sold 2,076,275 shares of GNC stock during the Class Period for proceeds of $77,895,035, all while in possession of material non-public information and while the price of GNC's stock was artificially inflated.  Fortunato's Class Period sales and proceeds are reflected in the following table:

| DATE | NO. SHARES | PRICE | PROCEEDS | 10b5-1 PLAN |
|---|---|---|---|---|
| 08-Feb-2012 | 89,600 | 29.64 | $2,655.744 | Yes (entered into 12-15-11) |
| 09-Feb-2012 | 197,500 | 29.81 | $5,887,475 | Yes (entered into 12-15-11) |
| 13-Feb-2012 | 122,131 | 30.02 | $3,666,373 | Yes (entered into 12-15-11) |
| 14-Feb-2012 | 14,969 | 30.00 | $449,070 | Yes (entered into 12-15-11) |
| 15-Feb-2012 | 75,800 | 30.01 | $2,274,758 | Yes (entered into 12-15-11) |
| 16-Feb-2012 | 225,000 | 31.23 | $7,026,750 | Yes (entered into 12-15-11) |
| 22-Feb-2012 | 4,900 | 32.82 | $160,818 | no |
| 23-Feb-2012 | 95,100 | 33.17 | $3,154,467 | no |
| 19-Mar-2012 | 50,000 | 33.50 | $1,675,000 | no |
| 26-Mar-2012 | 7,500 | 33.50 | $251,250 | no |
| 26-Mar-2012 | 144,116 | 34.79 | $5,013,796 | Yes (entered into 02-23-12) |
| 27-Mar-2012 | 24,884 | 35.01 | $871,189 | Yes (entered into 02-23-12) |
| 28-Mar-2012 | 31,000 | 35.00 | $1,085,000 | Yes (entered into 02-23-12) |
| 03-Apr-2029 | 100,000 | 35.52 | $3,552,000 | Yes (entered into 02-23-12) |
| 29-Jun-2012 | 70,000 | 39.03 | $2,732,100 | Yes (entered into 05-07-12) |
| 02-Jul-2012 | 70,000 | 40.87 | $2,860,900 | Yes (entered into 05-07-12) |
| 03-Jul-2012 | 70,000 | 42.01 | $2,940,700 | Yes (entered into 05-07-12) |
| 06-Aug-2012 | 50,000 | 39.04 | $1,952,000 | no |
| 08-Aug-2012 | 50,000 | 39.08 | $1,954,000 | no |
| 06-Sep-2012 | 50,000 | 40.51 | $2,025,500 | Yes (entered into 08-07-12) |

| DATE | NO. SHARES | PRICE | PROCEEDS | 10b5-1 PLAN |
|---|---|---|---|---|
| 08-Oct-2012 | 28,200 | 41.06 | $1,157,892 | Yes (entered into 08-07-12) |
| 10-Oct-2012 | 14,300 | 41.01 | $586,443 | Yes (entered into 08-07-12) |
| 14-Feb-2013 | 35,000 | 39.03 | $1,366,050 | Yes (entered into 12-11-12) |
| 14-Feb-2013 | 25,000 | 38.30 | $957,5000 | Yes (entered into 12-11-12) |
| 15-Feb-2013 | 40,000 | 40.20 | $1,608,000 | Yes (entered into 12-11-12) |
| 20-Feb-2013 | 50,000 | 41.30 | $2,065,000 | no |
| 22-Feb-2013 | 50,000 | 40.82 | $2,041,000 | no |
| 31-Jul-2013 | 111,885 | 52.50 | $5,873,963 | Yes (entered into 06-03-13) |
| 13-Aug-2013 | 80,000 | 53.15 | $4,252,000 | no |
| 29-Oct-2013 | 45,000 | 58.38 | $2,627,100 | no |
| 29-Oct-2013 | 46,004 | 58.22 | $2,678,353 | no |
| 11-Nov-2013 | 8,386 | 58.77 | $492,845 | no |
| **Total:** | **2,076,275** | **Total:** | **$77,895,035** | |

188.    Furthermore, during the Class Period, while GNC's stock price was artificially inflated and he was in possession of material, non-public information, Nuzzo sold 260,000 shares of GNC stock for proceeds of $10,458,803.  Nuzzo's Class Period sales and proceeds are reflected in the following table:

| DATE | NO. SHARES | PRICE | PROCEEDS | 10b5-1 PLAN |
|---|---|---|---|---|
| 28-Nov-2011 | 2,574 | 28.18 | $72,545 | Yes (entered into 09-09-11) |
| 01-Dec-2011 | 1,000 | 28.00 | $28,000 | Yes (entered into 09-09-11) |
| 02-Dec-2011 | 19,500 | 28.09 | $547,755 | Yes (entered into 09-09-11) |
| 09-Feb-2012 | 31,026 | 30.10 | $933,883 | Yes (entered into 12-14-11) |
| 13-Feb-2012 | 35,900 | 30.07 | $1,079,513 | Yes (entered into 12-14-11) |
| 25-Apr-2012 | 90,000 | 38.73 | $3,485,700 | Yes (entered into 02-28-12) |
| 03-Jun-2013 | 1,074 | 45.07 | $48,405 | Yes (entered into 05-01-13) |
| 10-Jun-2013 | 18,926 | 45.25 | $856,402 | Yes (entered into 05-01-13) |
| 03-Sep-2013 | 20,000 | 50.95 | $1,019,000 | Yes (entered into 05-01-13) |
| 02-Dec-2013 | 40,000 | 59.69 | $2,387,600 | no |
| **Total:** | **260,000** | **Total:** | **$10,458,803** | |

189.    That some (but not all) of Fortunato's and Nuzzo's trades were made pursuant to 10b5-1 trading plans does not insulate them from scrutiny.  In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.

190.    The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan (10b5-1 plans).  *Id.*  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential (but not an absolute) defense to accusations of insider trading only if it is entered into by an insider "before becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

191.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith."[62]  Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

192.    During the Class Period, approximately 26% of Fortunato's stock sales were made outside of a 10b5-1 trading plan and approximately 15% of Nuzzo's stock sales were made outside of a 10b5-1 trading plan.

193.    For those stock sales Fortunato and Nuzzo made pursuant to a 10b5-1 plan, the circumstances under which those plans were created belie any inference that they were established in good faith.  In particular, during the Class Period, Fortunato had no fewer than *six* different 10b5-1 trading plans.  Moreover, nearly all of the plans in question were entered into during the

---

[62] Thomas J. Griffith, *Corporate Counsel's Guide to Insider Trading and Reporting* § 12:26 (2015).

Class Period,[63] well after Defendants knew or should have known that GNC was selling products with unlawful dietary ingredients.

194.    Fortunato's and Nuzzo's sales were irregular in terms of the number of shares sold and they occurred at irregular intervals.  Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here.  As reflected in the charts above, ¶¶ 187-88, Fortunato's and Nuzzo's trades were irregular and therefore inherently suspicious.

195.    Moreover, having not sold **any** GNC securities before the beginning of the Class Period, Nuzzo reaped over $10 million in proceeds from his Class Period trading while the Company's stock price was artificially inflated by Defendants' scheme described herein.

196.    Even if Fortunato and Nuzzo could demonstrate that their trading was not irregular (and they cannot), 10b5-1 plans have been heavily scrutinized by the SEC in light of an eye-opening *Wall Street Journal* investigation that found that insiders who were trading pursuant to such plans still were trading at opportune times and reaping better-than-expected results. According to the article, executives still can time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.[64]

197.    A subsequent *Wall Street Journal* article notes that, "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior."[65]  According

---

[63] All six of Fortunato's 10b5-1 plans and three out of four of Nuzzo's 10b5-1 plans were established during the Class Period.

[64] *See* Susan Pulliam & Rob Barry, *Executives' Good Luck in Trading Own Stock*, Wall St. J., Nov. 27, 2012, http://www.wsj.com/articles/SB10000872396390444100404577641463717344178.

[65] Jean Eaglesham & Rob Barry, *Trading Plans Under Fire*, Wall St. J., Dec. 13, 2012, http://www.wsj.com/articles/SB10001424127887324296604578177734024394950.

to one source cited in the article, "'[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading.'"[66]

198.    According to a report issued by the law firm Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such [trading] plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits—or avoided significant losses—by trading company stock in the days just before their companies issued market-moving news."  The report suggests that clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (e.g., 1,000 shares a month on the 15th day of the month)."[67]

199.    Finally, although Fortunato and Nuzzo filed Form 4 reports with the SEC disclosing their trades and indicating that certain of them were made pursuant to 10b5-1 plans, no further information is available on the plans.  Without discovery, investors cannot understand the details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.

### G.    Defendants' SOX Certifications Further Support a Strong Inference of Scienter

200.    During the Class Period, GNC's SEC filings included false and misleading SOX Certifications signed by Fortunato, Nuzzo, and Archbold.  *See* ¶¶ 21-22, 24.

201.    The SOX Certifications signed by Fortunato, Nuzzo, and Archbold were materially false and misleading because, at the time they were executed, these defendants were aware of, or recklessly disregarded, the severe deficiencies in the Company's controls from a financial and operational perspective.

---

[66] *Id.* (ellipsis in original).

[67] Steve Bochner & Nicki Locker, *WSGR Insight & Analysis* (Mar. 2013).

202.    The Individual Defendants were in a position to know that GNC lacked effective internal controls.

203.    The Individual Defendants also undertook the affirmative obligation to obtain knowledge to ensure the Company's disclosures to the market were truthful by executing SOX Certifications.

204.    The certification requirements set forth in the Sarbanes-Oxley Act were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch.  The SEC has expressly warned corporate officers that "a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."[68]

205.    As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports.  In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5.[69]

206.    Here, the SOX Certifications executed by Fortunato, Nuzzo, and Archbold are strong indicia of their scienter because the malfeasance at issue, namely the promotion and sale of products containing illegal ingredients, namely picamilon and BMPEA, directly implicate the adequacy of the Company's internal control systems.  In particular, the fact that GNC marketed and sold products that Defendants knew contained illegal substances suggests a conscious

---

[68] Certification of Disclosure in Companies' Quarterly and Annual Reports, Exchange Act Release No. 8124, 2002 WL 31720215, at *9 (Aug. 28, 2002) (footnote call number omitted).

[69] Kourtney T. Cowart, *The Sarbanes-Oxley Act:  How A Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004) (footnote call number omitted).

awareness or a high degree of recklessness on the part of those Individual Defendants who executed SOX Certifications.  If the Individual Defendants who executed the SOX Certifications had actually evaluated the effectiveness of the Company's controls, as they claimed in their certifications, GNC would not have been able to mislead investors throughout the Class Period regarding, *inter alia*, the Company's purported compliance with applicable regulatory requirements.

> **H.     The Cumulative Knowledge of GNC's Executives Is Imputed to the Company**

207.    As detailed herein, senior Company officials were, at all relevant times, aware of numerous, undisclosed adverse facts relating to (a) GNC's products, including the fact that certain of the items being promoted and sold at GNC retail outlets contained picamilon and BMPEA, and (b) the Company's lack of compliance with applicable laws and regulations.  Those allegations establish a strong inference that GNC as an entity acted with the requisite scienter throughout the Class Period.  The cumulative knowledge of all members of the Company's senior management team, including the Individual Defendants, regarding these matters is properly imputed to GNC.

## IX.    LOSS CAUSATION

208.    During the Class Period, Defendants' fraudulent scheme, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial economic loss, i.e., damages, under the federal securities laws.

209.    As set forth above in detail, Defendants presented a materially misleading picture of GNC's business practices by failing to disclose to investors the true nature of the products the Company promoted, marketed and sold and the actual (woeful) state of GNC's compliance policies and mechanisms.  Their materially false and misleading statements and omissions during the Class Period had the intended effect to cause and in fact caused GNC common stock to trade at

artificially inflated levels throughout the Class Period, reaching as high as $60.98 per share on November 27, 2013.

210.    The price of GNC's common stock significantly declined when the falsity of Defendants' misstatements, the information alleged herein to have been concealed from the market, or the effects thereof, were revealed; or when the risks that had been fraudulently concealed by Defendants materialized.  For instance, one such risk that materialized was that the Company would be subject to increased regulatory scrutiny and action if it continued to sell products containing unlawful dietary ingredients.

211.    As a result of their purchases of GNC common stock during the Class Period at these artificially inflated prices, Lead Plaintiff and the Class suffered substantial economic losses as the price of GNC's stock declined after Defendants' false and misleading statements were corrected and the risks concealed by them materialized.

212.    Specifically, on October 22, 2015, the Oregon AG filed its complaint against GNC for violations of the Oregon Unlawful Trade Practices Act.  This complaint made GNC's unlawful sales of picamilon and BMPEA products public for the first time, exposing GNC's flagrant violations of controlling FDA regulations and the greatly heightened risk of increased regulatory action against the Company.

213.    In response to these disclosures, the Company's stock price dropped from $40.23 per share to close at $34.50 per share, a sharp decline of approximately 14% in just one day, on heavy trading volume.

214.    Then, on October 29, 2015, GNC reported lowered earnings expectations for 2015, which analysts attributed, in part, to the Oregon AG's prosecution of GNC.  In response to this disclosure, which represented a further materialization of the risk relating to the Company's

unlawful practices, the price of GNC common stock dropped from $38.64 per share to $28.24 per share, a decline of almost 27%.

215.    These stock drops were a direct consequence of the market learning the truth and/or the materialization of the risks concealed by Defendants throughout the Class Period.

216.    The timing and magnitude of the price declines in GNC common stock negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions, macroeconomic, or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  Accordingly, as a result of their purchases of GNC common stock during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE

217.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

218.    In addition, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because the Company's common stock traded in an efficient market during the Class Period, as follows:

    a.      The Company's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of 1,646,414 million shares traded;

    b.      As a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

c.      The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.      The market reacted promptly to public information disseminated by the Company;

e.      The Company's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

f.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock.

219.    Therefore, the market for GNC common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in GNC's share price.  Under these circumstances, all purchasers of GNC common stock during the Class Period suffered similar injury through their purchase of GNC common stock at artificially inflated prices and a presumption of reliance applies.

## X.    CONTROL PERSON ALLEGATIONS

220.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

221.    It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and public statements, as

alleged herein, was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

222.    The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

223.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

224.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

225.   Each of the Individual Defendants is liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities.

## XI.   INAPPLICABILITY OF SAFE HARBOR

226.   Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.   Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

227.   As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt, of the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results.  Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects.  With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity

and misleading nature of that information, which they caused to be disseminated to the investing public.

228.    The PSLRA's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made.  Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

229.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.    CLASS ACTION ALLEGATIONS

230.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of the Company from November 16,

2011, through and including October 28, 2015, and were damaged thereby.  Excluded from the Class are:  Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

231.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, the Company had between approximately 82.65 million and 105.81 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

232.   Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

233.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

234.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.    whether and to what extent the market price of the Company's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.    whether Defendants acted with the requisite level of scienter;

e.    whether the Individual Defendants were controlling persons of the Company;

f.    whether reliance may be presumed; and

g.    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

235.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

236.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

237.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

238.   As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of the Company's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

239.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.  In addition, at least one of the Individual Defendants is liable to Lead Plaintiff and the Class for having sat silently during earnings calls or analyst events while another Individual Defendant made actionable false and misleading statements.  In that situation, the defendant remaining silent is liable for a material omission in failing to correct such statements in that context.

240.   As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud

upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

241.     In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

242.     By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

### COUNT II
### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

243.     Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

244.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

245.     As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

This fraudulent conduct was undertaken with scienter and GNC is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

246.    As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

247.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

248.    The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

249.    In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined

precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

250.   By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.   Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.   Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.   Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

DATED:  March 21, 2016                    Respectfully submitted,

                                          **MOTLEY RICE LLC**

                                          *s/ Gregg S. Levin*
                                          Gregg S. Levin (pro hac vice)
                                          William S. Norton (pro hac vice)
                                          Christopher F. Moriarty (pro hac vice)
                                          28 Bridgeside Boulevard
                                          Mt. Pleasant, SC  29464
                                          Telephone:  (843) 216-9000
                                          Facsimile:  (843) 216-9450
                                          Emails:      glevin@motleyrice.com
                                                       bnorton@motleyrice.com
                                                       cmoriarty@motleyrice.com

                                          William H. Narwold (pro hac vice)
                                          One Corporate Center, 20 Church St.
                                          Hartford, CT  06103-1246
                                          Telephone:  (860) 882-1681
                                          Facsimile:  (860) 882-1682
                                          Emails:      bnarwold@motleyrice.com

                                          *Lead Counsel for Lead Plaintiff KBC Asset*
                                          *Management NV and the Class*


                                          **BERNSTEIN LITOWITZ BERGER &**
                                          **    GROSSMANN LLP**
                                          John C. Browne (pro hac vice pending)
                                          Katherine M. Sinderson (pro hac vice pending)
                                          Kristin Ann Meister (pro hac vice pending)
                                          1251 Avenue of the Americas
                                          New York, NY  10020
                                          Telephone:  (212) 554-1400
                                          Facsimile:  (212) 554-1444
                                          Emails:      johnb@blbglaw.com
                                                       katherinem@blbglaw.com
                                                       kristin@blbglaw.com

                                          *Additional Counsel for the Class*


                                          **CARLSON LYNCH SWEET & KILPELA**
                                          Gary F. Lynch
                                          1113 Penn Avenue, 5th Floor

Pittsburgh, PA  15222
Telephone:  (412) 322-9243
Facsimile:  (412) 231-0246
Email:       glynch@carlsonlynch.com

*Liaison Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 21, 2016.

*s/ Gregg S. Levin*
Gregg S. Levin
