# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES MARTIN, Individually and on<br>Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GNC HOLDINGS, INC., JOSEPH M.<br>FORTUNATO, MICHAEL M. NUZZO,<br>ANDREW S. DREXLER, MICHAEL G.<br>ARCHBOLD, TRICIA K. TOLIVER, and<br>PATRICK K. FORTUNE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)  2:15-cv-01522<br>)<br>)  Judge Mark R. Hornak<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION

**Mark R. Hornak, United States District Judge**

Presently before the Court is a motion by Defendants GNC Holdings, Inc. ("GNC"), Joseph

M. Fortunato, Michael M. Nuzzo, Andrew S. Drexler, Michael G. Archbold, Tricia K. Toliver and

Patrick K. Fortune (collectively, the "Individual Defendants")[1] to dismiss Lead Plaintiff KBC Asset

Management NV's ("Plaintiff") Amended Class Action Complaint for Violations of the Federal

Securities Laws (the "Amended Complaint") (ECF No. 45) pursuant to the Private Securities

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA") and Federal Rules of Civil

Procedure 9(b) and 12(b)(6) (the "Motion to Dismiss") (ECF No. 53). In this class action securities

litigation, Plaintiff alleges that it and other similarly situated investors (the "Class") purchased

GNC's stock between November 16, 2011, and October 28, 2015 (the "Class Period"), and that GNC

and the Individual Defendants have violated Section 10(b) of the Securities and Exchange Act of

---

[1] Where appropriate, GNC and the Individual Defendants will be collectively referred to as "Defendants."

1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as a result of various claimed misrepresentations and omissions by Defendants during the Class Period. Plaintiff also claims that the Individual Defendants have violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Defendants have moved to dismiss the Amended Complaint on the basis that Plaintiff has failed to satisfy the heightened pleading burden that applies to securities fraud claims under the PSLRA. For the reasons set forth below, Defendants' Motion to Dismiss will be granted, and the Amended Complaint will be dismissed, without prejudice.

## I.    **BACKGROUND**

For purposes of ruling on the pending Motion to Dismiss, the Court will accept the facts as alleged in the Amended Complaint as true and review it in its entirety.[2] In reviewing the Amended Complaint, the Court notes that Plaintiff must satisfy the heightened pleading requirements established by the PSLRA as discussed in Part II, infra.

On January 20, 2016, the Court appointed KBC to serve as lead plaintiff in this case. See ECF No. 36. KBC, based in Brussels, Belgium, is a large institutional investment company that provides financial and investment services. Am. Compl. ¶ 18. KBC's funds purchased shares of GNC's common stock during the Class Period, and KBC claims to have suffered damages as a result of the securities law violations alleged in the Amended Complaint. Id.

GNC, headquartered in Pittsburgh, Pennsylvania, is a retailer of various health and wellness products, including vitamins, minerals, herbal supplements, diet products and sports nutrition products. Am. Compl. ¶¶ 19, 20. GNC manufactures and merchandises more than 2,000 different products, including its own proprietary-branded products and products purchased from third-party

---

[2] The Court also may review and consider "documents incorporated into the [Amended Complaint] by reference, and matters of which a court may take judicial notice," such as SEC filings, press releases and earnings call transcripts. Winer Family Trust v. Queen, 503 F.3d 319, 327 (3d Cir. 2007).

2

vendors. Id. ¶ 28; Decl. of Koji Fukumura in Supp. of Defs.' Mot. to Dismiss (ECF No. 55), Ex. 2 at 6.

Nuzzo served as GNC's Executive Vice President and CFO from 2008 until June 13, 2014. Am. Compl. ¶ 22. Fortunato served as GNC's President, CEO and a member of its Board of Directors from the beginning of the Class Period through August 4, 2014. Id. ¶ 21. Archbold succeeded Fortunato as GNC's CEO and serves as a member of its Board of Directors. Id. ¶ 24. Plaintiff alleges that Fortunato, Nuzzo and Archbold made false and misleading statements during the Class Period on GNC's scheduled earnings calls, at investor-related presentations and by signing GNC's Form 10-K filed with the Securities and Exchange Commission ("SEC") and executing certifications pursuant to the Sarbanes-Oxley Act ("SOX certifications").[3] Id. ¶¶ 21, 22, 24. As set out below, Plaintiff's claim of securities fraud revolves around alleged misrepresentations and omissions by GNC and the Individual Defendants regarding what Plaintiff refers to as key drivers of GNC's success – its product quality and its purported compliance with federal regulations. Id. ¶ 1.

According to Plaintiff, GNC's success was threatened by a scandal that emerged in the supplement industry late in 2011 involving a potentially dangerous ingredient called dimethylamylamine ("DMAA"). Am. Compl. ¶ 5. On April 27, 2012, the Food and Drug Administration ("FDA") sent a letter to ten companies, including GNC, advising that certain dietary

---

[3] Other Individual Defendants include Drexler, Fortune and Tolivar. Drexler served as GNC's Senior Vice President and Corporate Controller from 2011 through March 2014. Am. Compl. ¶ 23. Fortune has served as GNC's Corporate Controller since March 2014. Id. ¶ 25. Plaintiff alleges that Drexler made false and misleading statements during the Class Period by signing GNC's Form 10-K in 2011, 2012 and 2013, and that Fortune did so by signing GNC's Form 10-K in 2014. Id. ¶¶ 23, 25. Such allegations are insufficient to state a claim against these Individual Defendants for violation of the securities laws under the PSLRA, thus Drexler and Fortune will be dismissed without prejudice from this case on that basis. See In re Merck & Co., Inc. Sec., Derivative & ERISA Litig., MDL No. 1658, 2011 WL 3444199, at *28 (D.N.J. Aug. 8, 2011) (dismissing § 10(b) claims because "[CFO's] involvement in the fraud . . . appears to consist of signing various SEC forms"). As to Toliver, who only is identified in the case caption, the Court previously granted the parties' motion to strike her as a party in this case, without prejudice. See Tr. of Oral Argument held on August 10, 2016 (ECF No. 69), at 14.

and sports nutrition products contained DMAA and warning to stop selling those products. Id. ¶¶ 5, 51. After that, GNC began selling reformulated DMAA products and assured investors that the FDA's action would not affect its sales. Id. ¶ 52. However, Plaintiff alleges that the reformulated products contained two potentially dangerous ingredients: picamilon[4] or β-Methylphenethylamine ("BMPEA").[5] Id. ¶¶ 9, 56.

Regarding picamilon, Plaintiff alleges that Jennifer Jakell ("Jakell"), who was GNC's Senior Project Manager for Technical Research, maintained a file with documents translated from Russian indicating that it "is a derivative of the gamma-amino-butyric acid (GABA) and nicotinic acid" and it had "proven an effective medicinal treatment for patients with disorders of a neurotic level." Am. Compl. ¶¶ 37, 70. In May, 2007, Jakell made a notation in the file stating "[n]o NDI that I could find," apparently referring to the fact that a "New Dietary Ingredient" submission was not tendered to the FDA for picamilon. Id. ¶¶ 42, 72. Again in April 2014, Jakell wrote in the file "still no NDI found." Id. ¶ 72.

Subsequently, on September 28, 2015, Dr. Cara Welch of the FDA stated in a sworn declaration that "picamilon does not qualify as a dietary ingredient" under the Federal Food, Drug and Cosmetics Act of 1938, as amended by the Dietary Supplement Health and Education Act of 1994 (collectively, the "FDC Act").[6] Am. Compl. ¶¶ 42, 76. GNC had ceased selling products containing picamilon on September 21, 2015, one week prior to Dr. Welch's declaration. Id. ¶ 81.

---

[4] Picamilon is a prescription drug in Russia that is used to treat a variety of neurological conditions, but it has not been approved as a prescription drug in the United States. Am. Compl. ¶ 69. Picamilon purportedly increases focus and enhances cognitive abilities. Id.

[5] BMPEA is a synthetic amphetamine isomer chemical that has the same chemical formula as amphetamine, but a slightly different structure. Am. Compl. ¶ 82.

[6] The FDC Act exempts supplements from the FDA's strict approval process for prescription medications. Am. Compl. ¶ 42. However, for an ingredient to be legally sold as a supplement, it must qualify as a "dietary ingredient" (i.e., a

4

Plaintiff also alleges that during the Class Period, GNC sold sports nutrition and weight-loss products that contained BMPEA or acacia rigidula[7] spiked with BMPEA, despite knowing by the fall of 2013 that BMPEA was not a lawful dietary ingredient. Am. Compl. ¶¶ 82, 83. FDA scientists published an article about the use of acacia rigidula in weight-loss products and observed that some dietary supplements which supposedly contained acacia rigidula actually contained BMPEA, despite no evidence that BMPEA was a lawful dietary ingredient (hereinafter, "the Acacia Rigidula Study"). Id. ¶¶ 83, 84. According to Plaintiff, on November 2, 2013, Jakell received an email from a scientific research website with a link to the Acacia Rigidula Study. Id. ¶ 84. Then, on November 19, 2013, *USA Today* published an article about the Acacia Rigidula Study, which stated that "scientists have found a 'non-natural' amphetamine-like compound in dietary supplements" (hereinafter, the "*USA Today* article"). Id. ¶ 85. Jakell allegedly emailed the *USA Today* article to approximately 100 people at GNC's corporate headquarters, including Nuzzo. Id.

Plaintiff alleges that despite the Acacia Rigidula Study and the *USA Today* article, GNC continued to sell products that were labeled as containing BMPEA or acacia rigidula, which could have been spiked with BMPEA. Am. Compl. ¶¶ 89-91. However, on April 23, 2015, when the FDA formally announced that BMPEA did not meet the definition of a dietary ingredient, GNC stopped selling products with BMPEA and acacia rigidula. Id. ¶ 95.

Several months later on October 22, 2015, the Oregon Attorney General announced the filing of a civil action against GNC for selling products containing picamilon, BMPEA and acacia rigidula

---

vitamin, mineral, herb or other botanical, amino acid or a combination thereof). Id. In addition, the dietary ingredient must have a history of use in a dietary supplement prior to 1994, or if a manufacturer plans to introduce a new ingredient to the market, it must tender a "New Dietary Ingredient" ("NDI") submission to the FDA. Id. If the FDA does not comment within 75 days after the NDI submission, the ingredient legally can be used in dietary supplements. Id.

[7] Acacia rigidula, a bushy shrub found in parts of Texas and Mexico, purportedly provides stimulant, appetite suppressant, fat-burning and weight loss benefits. Am. Compl. ¶ 82.

5

spiked with BMPEA (the "Oregon AG Complaint"). Am. Compl. ¶¶ 99, 102, 103. When that announcement was made, the price of GNC's common stock fell from $40.38 per share to a closing price of $34.50 per share. Id. ¶ 108. One week later on October 29, 2015, GNC issued a press release announcing that it had reduced its 2015 earnings per share outlook from $3.00-$3.10 per share to $2.85-$2.90 per share. Id. ¶ 109. That day, GNC's common stock closed at $28.24 per share, down from the prior day's closing price of $38.64 per share. Id. ¶ 111.

Plaintiff alleges that Defendants made false and misleading statements during the Class Period regarding the following: GNC's quality controls and the purity of its products, Am. Compl. ¶¶ 112, 114, 116, 118, 144, 148, 152, GNC's ability to manage regulatory risk, id. ¶¶ 119, 123, 137, and GNC's ability to offset any losses related to the removal of DMAA from its products. Id. ¶¶ 127, 129, 133, 140. According to Plaintiff, the false and misleading statements appeared in a press release, on GNC's website and in its Form 10-K filed with the SEC for fiscal years 2011, 2012, 2013 and 2014. Id. ¶¶112, 114, 116, 118, 148. Fortunato, Nuzzo and Archbold also purportedly made false and misleading statements when they spoke on earnings conference calls and at investor-related presentations. Id. ¶¶ 123, 127, 129, 133, 137, 140, 144, 152. Plaintiff asserts that following some of these statements, GNC's stock price rose and/or analysts responded favorably to the information provided by GNC. Id. ¶¶ 132, 135, 136, 139, 142, 146, 151.

Plaintiff further alleges that the Individual Defendants made the misstatements knowingly or with reckless disregard of the fact that they were false or misleading. Am. Compl. ¶¶ 154-156. According to Plaintiff, several factors demonstrate Defendants' knowledge and/or deliberate recklessness. As a first example, Plaintiff cites GNC's "close connection" with its vendors and the manner in which GNC structured its vendor agreements. Id. ¶¶ 159-168. Regarding GNC's close working relationship with its vendors, a confidential witness identified as GNC's Associate Category

Merchandising Manager for Sports Nutrition from 2010 - 2015 (the "Associate Category Manager") explained that GNC used a computerized data management system called "OnBase" to track every third-party product GNC marketed.[8] Id. ¶¶ 36, 161. Because of that technology, Plaintiff asserts that Defendants would have had ingredient information for the third-party products, including knowledge of whether they contained picamilon or BMPEA. Id. ¶¶ 159, 161. Despite the availability of such information, another confidential witness who worked as a GNC Merchandise Manager commented that GNC "would buy anything from any vendor." Id. ¶ 168. According to Plaintiff, GNC was willing to "push the envelope" because its vendor contracts contained a guarantee that purported to indemnify GNC for any financial ramifications if a vendor-supplied product violated FDA or local regulations. Id.

Plaintiff further alleges that the Individual Defendants' knowledge and/or recklessness is demonstrated by the fact that they had access to information about product recalls and regulatory concerns related to certain products. Am. Compl. ¶¶ 169, 175. A confidential witness identified as GNC's Director of International Business Operations and a Regional Sales Director from 2002 -2015 (the "Sales Director") recalled that Fortunato held weekly meetings with senior executives every Monday, referred to as "Bloody Monday" meetings, to discuss product and other issues. Id. ¶¶ 37, 170. According to the Sales Director, Fortunato "wanted a briefing on almost everything" and stressed that GNC's executives would have known about serious product issues because there was "paranoia" among them. Id. ¶ 171. The Sales Director recalled that Jakell conveyed relevant product information to appropriate recipients within GNC, such as the *USA Today* article discussing the Acacia Rigidula Study. Id. ¶¶ 172-173.

---

[8] Based on the close vendor relationship, Plaintiff also asserts that Defendants should have been aware that two vendors had a history of unethical behavior and legal violations, which should have raised a red flag for GNC concerning the products they supplied. Am. Compl. ¶¶ 176-180.

7

The Sales Director also indicated that GNC held in-person meetings with its vendors once or twice a year purportedly to discuss current product performance and new product development. Am. Compl. ¶ 183. According to Plaintiff, those meetings highlight the central role vendors played in GNC's operations, and the Individual Defendants should be charged with knowledge concerning their products because third-party sports nutrition products represent a core operation of GNC. Id. ¶¶ 181-182, 183, 185.

Plaintiff additionally claims that Fortunato's and Nuzzo's insider sales of GNC stock during the Class Period are probative of their motive to commit fraud. Am. Compl. ¶ 186. Fortunato purportedly sold 2,076,275 shares of GNC stock during the Class Period for proceeds of $77,895,035, while Nuzzo sold 260,000 shares for proceeds of $10,458,803. Id. ¶¶ 187, 188. According to Plaintiff, Fortunato's and Nuzzo's 10b5-1 trading plans do not shield them from accusations of insider trading. Id. ¶¶ 189-199.

Finally, Plaintiff alleges that Fortunato, Nuzzo and Archbold signed GNC's false and misleading SOX certifications during the Class Period, which further evidences their knowledge or reckless disregard of the claimed material misrepresentations. Am. Compl. ¶¶ 200-201, 206. Plaintiff asserts that the SOX certifications were materially false and misleading when executed because these Individual Defendants were aware of, or recklessly disregarded, severe deficiencies in GNC's controls from a financial and operational perspective, namely the promotion and sale of products containing picamilon and BMPEA. Id. ¶¶ 201, 206.

As a result of Defendants' alleged material false and misleading statements and omissions during the Class Period, Plaintiff maintains that GNC common stock traded at artificially inflated levels, but the stock price declined when the falsity of the misstatements and the concealed information were revealed. Am. Compl. ¶¶ 209, 210. This supposedly occurred when the Oregon

AG Complaint was filed on October 22, 2015, and on October 29, 2015, when GNC reported lower earnings expectations for 2015, which analysts purportedly attributed, in part, to the Oregon AG Complaint. Id. ¶¶ 212-214. Plaintiff alleges that members of the Class suffered economic loss and damages as a result of their purchases of GNC common stock at artificially inflated prices during the Class Period. Id. ¶¶ 208, 211, 216.

## II. ELEMENTS OF A SECURITIES FRAUD CLAIM

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations . . ." prescribed by the SEC. 15 U.S.C. § 78j(b). To implement § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security. " 17 C.F.R. § 240.10b-5(b).

The Supreme Court has implied a private cause of action from the text and purpose of § 10(b) to investors who have been injured by its violation. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007). To state a securities fraud claim under § 10(b), a plaintiff must allege the following elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014).

9

In addition to pleading the foregoing elements, the PSLRA imposes two distinct, heightened pleading requirements that must be satisfied for a complaint to survive a motion to dismiss.[9] See Institutional Inv'rs Group v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009). First, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). That state of mind is "scienter," which is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and it requires knowledge or recklessness. Avaya, 564 F.3d at 252 (citations omitted). Notably, both provisions require facts to be pled with particularity.[10] This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." Id. at 253 (citation omitted).

---

[9] One of Congress' objectives in enacting the PSLRA was to establish a uniform pleading standard for § 10(b) actions. See Tellabs, 551 U.S. at 320. The PSLRA was "[d]esigned to curb perceived abuses of the § 10(b) private action — nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers" by installing both substantive and procedural controls. Id. (internal quotations and citations omitted).

[10] The PSLRA replaced Federal Rule of Civil Procedure 9(b) as the applicable pleading standard in private securities class actions. See Avaya, 564 F.3d at 253. Nevertheless, "Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u-4(b)(1) of the PSLRA." Id. (citations and internal quotation marks omitted). "The PSLRA's requirement for pleading scienter, on the other hand, marks a sharp break with Rule 9(b)." Id. Previously, under Rule 9(b), a plaintiff could plead the scienter element generally, but the PSLRA demands a more exacting pleading standard, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Tellabs, 551 U.S. at 321 (citing 15 U.S.C. § 78u-4(b)(2)).

## III. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Ordinarily, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

In addition to the traditional Rule 12(b)(6) standard, the Supreme Court has prescribed a three-step process for considering a motion to dismiss in a § 10(b) case. See Tellabs, 551 U.S. at 322-23. First, as with any motion to dismiss, the court must "accept all factual allegations in the complaint as true." Id. at 322. Second, the court must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. On this point, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis in original). Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id.

11

Guided by the foregoing legal principles, the Court finds that Plaintiff's Amended Complaint fails to state a claim for securities fraud under § 10(b) of the Exchange Act and a derivate claim under § 20(a) for the reasons we explain below.

## V. DISCUSSION

Plaintiff asserts in Count One of the Amended Complaint that GNC and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 by making false statements of material fact and/or omitting to state material facts, which deceived the investing public, artificially inflated GNC's common stock and caused Plaintiff and members of the Class to purchase GNC's common stock at artificially inflated prices. See Am. Compl. ¶¶ 238-242. Plaintiff claims in Count Two that the Individual Defendants are liable as controlling persons of GNC in violation of § 20(a) of the Exchange Act. Id. ¶¶ 245-250.

Defendants argue that Plaintiff's § 10(b) claim must be dismissed because: (1) Plaintiff fails to plead falsity with the requisite particularity; (2) Plaintiff fails to plead facts that raise a strong inference of scienter; and (3) Plaintiff fails to plead loss causation because there has been no corrective disclosure. The Individual Defendants also argue that Plaintiff's failure to allege a primary §10(b) violation is fatal to its control person claim under § 20(a), thus the § 20(a) claim must be dismissed as well.

Defendants are correct, in part. Although Plaintiff has pleaded several actionable misleading statements, Plaintiff has failed to adequately plead scienter and loss causation. For those reasons, the Amended Complaint must be dismissed.

12

## A. Although Most Challenged Statements are Non-Actionable Puffery or Protected by the Safe Harbor, the Amended Complaint Adequately Pleads Several Material Misrepresentations.

The first element of a securities fraud claim under §10(b) is a material misrepresentation or omission. Under the heightened pleading standard of the PSLRA, a plaintiff first must specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity. 15 U.S.C. § 78u–4(b)(1).

As required, Plaintiff has identified the allegedly misleading statements made by Defendants. See Am. Compl. ¶¶ 112, 114, 116, 118, 119, 123, 127, 129, 133, 137, 140, 144, 148, 152. Plaintiff also has asserted the reasons why the statements were false or misleading. See id. ¶¶ 113, 115, 117, 120, 124, 128, 130-131, 134, 138, 141, 145, 150, 153. Defendants argue, however, that the allegedly misleading statements and omissions are not actionable because they are immaterial, either as non-actionable puffery and/or as forward looking statements protected by the PSLRA's safe harbor provision. See 15 U.S.C. §78u-5(c)(1). Thus, we next address whether any of the challenged statements are actionable as material misrepresentations.

To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a misleading statement or omission as to a material fact. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (citing Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)). A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The Supreme Court has held that to satisfy the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32 (quoting TSC Industries, 426 U.S. at 449).

13

The Third Circuit has held that the question of materiality "typically presents a mixed question of law and fact," which traditionally has been viewed as appropriate for the trier of fact. Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000). However, ". . . complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Because some of the challenged statements fall into this latter category, the Court can rule on the materiality issue at this juncture.

### 1. Certain Challenged Statements Constitute Non-Actionable Puffery.

As an initial matter, the Court agrees with Defendants that some of the challenged statements are not material as defined above, but rather constitute non-actionable puffery. "Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism. . . ." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000). Such statements "constitute no more than 'puffery' and are understood by reasonable investors as such." Burlington Coat Factory, 114 F.3d at 1428 n.14. In other words, statements are deemed to be puffery if they "would not alter the total mix of relevant information available to a reasonable investor." EP Medsystems, 235 F.3d at 872.

The challenged statements set forth in ¶¶ 112, 114, 116, 118, 144 and 148 of the Amended Complaint, which relate to GNC's quality controls and product purity, essentially tout GNC as an "industry leader" who maintains "high standards" or "sets the [industry] standard," or otherwise reflect GNC's optimism about its products. In addition, the statement in ¶ 137 that GNC's number one priority is to protect the customer is vague and aspirational. None of those general statements of optimism would alter the total mix of information available to a reasonable investor, nor is there a

14

substantial likelihood that a reasonable investor would deem them important in deciding how to act. Rather, a reasonable investor would view these challenged statements as puffery and thus they are not actionable. See Burlington Coat Factory, 114 F.3d at 1428 n.14.

## 2. Other Challenged Statements are Protected by the PSLRA's "Safe Harbor."

The PSLRA's "safe harbor" provision exempts certain "forward-looking" statements from liability under § 10(b). A forward-looking statement includes, inter alia, projections of future financial and economic performance, plans and objectives for future operations and assumptions underlying statements about future financial, economic or operational performance. See 15 U.S.C. § 78u-5(i)(1).[11]

A statement that meets the statutory definition of "forward-looking" is exempt from § 10(b) liability if it either "is . . . identified as [such], and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or the plaintiff fails to prove the forward-looking statement "was made with actual knowledge by [the speaker] that the statement was false or misleading. . . . " 15

---

[11]The PSLRA defines a "forward-looking" statement as:

    (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

    (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

    (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC];

    (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

    (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

    (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the [SEC].

15 U.S.C. § 78u-5(i)(1)(A)-(F).

15

U.S.C. § 78u-5(c)(1)(A)(i) and (c)(1)(B)(i).[12] Thus, for the safe harbor to apply, the forward-looking statement must be accompanied by "meaningful cautionary statements." Such "[c]autionary language must be extensive, specific, and directly related to the alleged misrepresentation." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 282 (3d Cir. 2010) (citing GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir. 2004). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." OFI Asset, 834 F.3d at 491 (quoting GSC Partners, 368 F.3d at 243, n.3)). Absent meaningful cautionary language, the safe harbor may apply to a forward-looking statement if the plaintiff fails to show that the speaker made it with actual knowledge of its falsity. Avaya, 564 F.3d at 254.

Defendants contend that the safe harbor applies to certain challenged statements in ¶¶ 123, 127, 129, 133, 140 and 152 of the Amended Complaint. See Defs.' Mem. of Law in Supp. of Mot. to Dismiss (ECF No. 54), App. D; Defs.' Reply in Supp. of Mot. to Dismiss (ECF No. 65), App. A. To determine whether the safe harbor applies, we first must determine if the challenged statements meet the definition of "forward-looking" specified above. In general, "[f]orward-looking statements refer to a company's own future business plans and performance metrics, and they do not apply to characterizations of past events or current conditions." Frater v. Hemispherx Biopharma, Inc., 996 F. Supp. 2d 335, 348 (E.D. Pa. 2014) (citing Avaya, 564 F.3d at 255). The following challenged statements refer to GNC's future business plans and therefore meet the definition of forward-looking:

---

[12] The safe harbor also applies to a forward-looking statement that is immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii). "But, since the regulation based on § 10(b) already imposes a materiality requirement, 17 CFR 240.10b–5, that entrance [to safe harbor protection] is not relevant in cases claiming a § 10(b) violation." OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 491 n.6 (3d Cir. 2016).

- Addressing the replacement of DMAA products, Nuzzo stated, "There are a number of other vendors as well that have products out there. So we believe that the substitution effect will be substantial and we also believe that we have got these great associates in the stores that can help educate and direct people to alternative products." Am. Compl. ¶ 127. Nuzzo went on to state, "Yes, well, like anything, it is an ingredient that can be replaced with substitute ingredients. . . . there is no reason to believe that reformulation isn't a very viable option. And the timing on reformulation, it can be relatively quick. . . . So I don't think that would be a very difficult process to undertake." Id. Nuzzo's statements clearly address GNC's future plans and objectives to replace DMAA products.

- Concerning DMAA products, Fortunato stated, "So if we look at our exposure to DMAA products right now we are very comfortable that the guidance we are giving you would include any kind of effect on DMAA which is continued to decline by the day." Am. Compl. ¶ 129. Although Fortunato referenced "right now," it is apparent he did so in order to make a future projection concerning the financial effect of the DMAA replacement project.

To qualify for safe harbor protection, these forward-looking statements in ¶¶ 127 and 129 must have been identified as such and accompanied by meaningful cautionary statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i). Alternatively, the forward-looking statements will be eligible for safe harbor protection if Plaintiff has failed to show that the Individual Defendants made them with actual knowledge that they were false or misleading. See id. § 78u-5(c)(1)(B)(i).

Although the parties dispute whether Defendants identified the statements as "forward-looking" and provided "meaningful cautionary statements" that were "extensive, specific, and directly related to the alleged misrepresentation," see Aetna, 617 F.3d at 282 (citing GSC Partners, 368 F.3d at 243 n.3), the Court need not decide that issue.[13] This is because the forward-looking

---

[13] We also note that Plaintiff challenges as materially false and misleading one of the risk disclosures published in GNC's 2011 Form 10-K advising that government regulations may require the reformulation of its products, which could result in lost revenues and increased costs to GNC, and further advising that the FDA could require GNC to remove a particular product from the market, which could result in additional costs, increased risk of litigation and liability and reduced growth prospects. See Am. Compl. ¶¶ 119, 120. Plaintiff alleges that GNC published similar misleading statements in its Form 10-K in 2012, 2013 and 2014. See id. ¶ 121. This challenged risk disclosure is forward-looking because it provides a projection of possible operational and financial ramifications if a product recall or reformulation would be necessary at some future time, and by its very nature is a "meaningful cautionary statement." See Bondali v. Yum!

statements fall within the safe harbor as long as the Amended Complaint's allegations fail to raise a strong inference of scienter that Defendants knew of the statements' falsity. See 15 U.S.C. § 78u-5(c)(1)(B)(i); see also Avaya, 564 F.3d at 259; Williams v. Globus Med., Inc., ___ F.3d ___, 2017 WL 3611996, at *8 (3d Cir. Aug. 23, 2017) ("Absent facts giving rise to a strong inference of scienter, [defendant's] forward-looking [statements] are entitled to the protection of the PSLRA safe harbor."). That point is dispositive because we conclude in Part IV.B., infra, that the Amended Complaint fails to adequately plead a strong inference that Defendants acted with scienter as to any challenged statement.

Having determined that several challenged statements in ¶¶ 127 and 129 of the Amended Complaint fall within the safe harbor, we next address the other statements that Defendants contend are likewise protected. We conclude that the following challenged statements characterize past or present conditions and thus do not qualify as forward-looking statements eligible for safe harbor protection:

- Regarding regulatory risk, Fortunato stated, "We know how to manage it." Am. Compl. ¶ 123. Fortunato's statement clearly addressed GNC's current ability to manage regulatory risk, not its future ability to do so.

- With respect to the replacement of DMAA products, Fortunato stated, "The replacement products are very good, very effective, and did not have the so-called tarnished effect of DMAA, which again really to date has not shown any reason to have a tarnished effect to it." Am Compl. ¶ 129. Fortunato further stated, "We were able to execute and execute against that very quickly, very efficiently and do what we said we were going to do and accomplish the same things from our financial protection downside and with our consumer." Id. Fortunato's first statement addressed the current effectiveness of the DMAA replacement products and emphasized there was no reason to believe that DMAA was "tarnished" up to that point in time.

Brands, Inc., No. 15-5064, 620 F. App'x 483, 491 (6th Cir. 2015) ("Risk disclosures like the ones accompanying 10–Qs and other SEC filings are inherently *prospective* in nature. They warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company.") (emphasis in original).

Forutnato's second statement indicated that GNC *already* had quickly and efficiently replaced DMAA and had not been impacted financially as of that time.

- Also concerning the replacement of DMAA products, Fortunato stated, "So the transition over to non-DMAA products as we have shown you in the past we can do very effectively and we have already started the launch again a move towards non-DMAA by raising [product mixes] on DMAA products, lowering [product mixes] on DMAA products various things like that." Am. Compl. ¶ 133. This statement references GNC's past history of success in replacing a product, as well as GNC's current launch of non-DMAA products.

- Again addressing DMAA, Fortunato stated, "Yes. I can say we did a great job at replacing the products, as I told you in the last second and third quarter last year. And we were effectively hurdling the combination rate of the DMAA products, Oxy and Jack, mostly. But if you – as you got further into this year, because we did a good job with the replacement products, we were still against very strong peak numbers from those products and against strong numbers from the replacement products . . . ." Am. Compl. ¶ 140. Fortunato continued, "So we've done a good job of replacing it and making – trying to offset those trends. But we were probably the strongest of anybody in the marketplace with selling DMAA type products." Id. Fortunato's comments addressed the replacement of DMAA products that already had occurred and the strength of GNC's performance as of that time.

- Concerning regulatory compliance, Archbold stated, " . . . [O]ur products are pure, safe and fully compliant with all applicable regulatory requirements." Am. Compl. ¶ 152. Archbold's statement related to GNC's current product safety and compliance with applicable regulations, not its future willingness or ability to comply.

### 3. Seven Challenged Statements Are Material.

As discussed, most of the challenged statements are non-actionable corporate puffery or come within the safe harbor. In view of that, we are left with the following challenged statements just discussed: ¶ 123 indicating that GNC knows how to manage regulatory risk; two statements in ¶ 129 relating to effective replacement products for DMAA; ¶ 133 and two statements in ¶ 140 describing GNC's successful transition to non-DMAA products; and ¶ 152 indicating that GNC's products were fully compliant with all applicable regulatory requirements. Accepting as true Plaintiff's allegations

19

that these statements constituted misrepresentations, the Court finds that they are material because "there is a substantial likelihood that a reasonable shareholder would consider [them] important in deciding how to [act]." TSC Industries, 426 U.S. at 449. Before making an investment decision, it is logical that a reasonable shareholder would want to know whether a company like GNC that sells dietary supplements and sports nutrition products is compliant with applicable regulatory requirements,[14] whether it is experienced in managing regulatory risk, whether it can successfully execute the replacement of a particular product, and the associated impact of such a project on the company's overall performance.[15] For these reasons, the alleged misrepresentations in ¶¶ 123, 129, 133, 140 and 152 are material and would be actionable but for the fact that the Amended Complaint must be dismissed because Plaintiff has failed to adequately plead scienter and loss causation as discussed in Parts IV.B. and IV.C., infra.

## B. The Amended Complaint Fails to Adequately Plead Scienter.

Although Plaintiff has alleged certain actionable material misrepresentations, as we address next, Plaintiff has failed to plead with particularity facts giving rise to a strong inference that the Individual Defendants acted with scienter with respect to any alleged misrepresentation. See 15 U.S.C. § 78u-4(b)(2)(A).

As explained, "scienter" is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and "requires a knowing or reckless state of mind." Avaya, 564 F.3d at 252

---

[14]Archbold stated that GNC was compliant with applicable regulatory requirements following the New York AG Investigation, which related to products other than picamilon and BMPEA. See Am. Compl. ¶¶ 61-65, 152. Considering the Amended Complaint in the light most favorable to Plaintiff, the Court finds the alleged misrepresentation in ¶ 152 to be material even though it does not relate to picamilon and BMPEA. As stated, a reasonable shareholder would want to know, generally, whether a company is compliant with applicable regulatory requirements regardless of the product involved.

[15]Accordingly, the statements in ¶¶ 123, 129, 133, 140 and 152 do not constitute non-actionable puffery, despite Defendants contention to the contrary. See Defs.' Reply, App. A at 2, 6-7, 8, 9, 10.

(citations omitted). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 267, n.42 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir.1999) (internal quotations omitted)).

To reiterate, the PSLRA requires that a plaintiff plead scienter with particularity. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006). The particularity requirement is satisfied by a complaint that pleads "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Plaintiff alleges that the Individual Defendants acted with scienter because they knew or recklessly disregarded the fact that their statements and the public documents disseminated in GNC's name were materially false and misleading as to GNC's operations, its products and its purported compliance with applicable regulations. See Am. Compl. ¶¶ 154, 156. According to Plaintiff, Defendants' scienter is demonstrated by the following: (1) GNC's "close connection" with its vendors and the manner in which it structured its vendor agreements; (2) the Individual Defendants had access to information about product recalls and regulatory concerns regarding certain products; (3) third-party sports nutrition products is GNC's core operation; (4) certain Individual Defendants engaged in insider sales of GNC stock during the Class Period; and (5) certain Individual Defendants signed GNC's false and misleading SOX certifications.

Defendants counter that the foregoing factors do not give rise to a strong inference of scienter. Rather, Plaintiff's theory of securities fraud is premised on speculation that Defendants lied to investors beginning in 2011, because certain third-party products sold by GNC contained picamilon or BMPEA, even though the FDA did not declare them unlawful dietary ingredients until

21

2015. According to Defendants, the Amended Complaint contains no particularized facts to suggest that, at the time of any challenged statement, Defendants were aware that a small subset of GNC products contained picamilon or BMPEA, much less that Defendants knew or were consciously reckless in not knowing that those substances were unlawful.

To determine whether a complaint alleges facts that give rise to a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 324. A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. In making this assessment, the court must not "scrutinize each allegation in isolation but [rather] assess all the allegations holistically." Id. at 326. In sum, the court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. With these principles framing the analysis, the Court finds upon a holistic assessment of the Amended Complaint that it fails to plead particularized facts which give rise to a strong inference that Defendants acted with scienter.[16]

### 1.  GNC's Relationship With Its Vendors /Structure of Vendor Agreements

As a first example of Defendants' knowledge and/or deliberate recklessness, Plaintiff cites GNC's "close connection" with its vendors and the manner in which GNC structured its vendor agreements. Am. Compl. ¶¶ 159-168. On this point, a confidential witness identified as GNC's Associate Category Manager explained that GNC maintained the "OnBase System" for tracking

---

[16] The parties disagree whether Plaintiff can rely on allegations extracted from the Oregon AG Complaint to establish that the Individual Defendants acted with scienter. Despite the parties' disagreement, the Court finds from a holistic assessment of *all* allegations in the Amended Complaint that Plaintiff has failed to adequately plead scienter with the requisite particularity for the reasons explained herein.

third-party products marketed by GNC. Id. ¶¶ 36, 161. Because of that technology, Plaintiff maintains that Defendants would have had access to ingredient information for third-party products, including whether they contained picamilon or BMPEA. Id. ¶¶ 159, 161. Despite the availability of such information, another confidential witness who worked as a GNC Merchandise Manager commented that GNC "would buy anything from any vendor." Id. ¶ 168. Plaintiff alleges GNC was willing to do so because its vendor contracts contained a guarantee that purported to indemnify GNC for any financial ramifications if a vendor-supplied product violated any applicable regulations.

Although the inference that a defendant acted with scienter need not be of the "smoking gun" variety, see Tellabs, 551 U.S. at 324, we must be mindful that the PSLRA imposes a particularity requirement on all allegations. See Avaya, 564 F.3d at 263. Where, as here, a complaint contains confidential witness allegations, we are to apply the particularity requirement "by evaluating the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" Id. (quoting California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)). The Third Circuit has cautioned that, "[i]f anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply." Avaya, 564 F.3d at 263. If, however, "confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity." Id.

Here, the Court discounts the confidential witness allegations relied on by Plaintiff to establish that GNC's purported close connection with its vendors demonstrates that the Individual Defendants knew third party products contained picamilon or BMPEA or recklessly disregarded such information. First, the Amended Complaint is devoid of facts describing the Associate Category Manager's basis of knowledge concerning the "OnBase System," including the Associate Category

23

Manager's own familiarity with the system, which GNC employees utilized the system, whether the Individual Defendants ever personally accessed the system or whether they directed any subordinates to search the system regarding whether particular products contained picamilon and BMPEA and report on the results of such a search. See Am. Compl. ¶¶ 36, 161. Further, the Amended Complaint does not allege corroborating facts to indicate that the Individual Defendants actually accessed the OnBase System and possessed the information concerning third-party products that Plaintiff claims they may have had. See In re Bio-Technology Gen. Corp. Sec Litig., 380 F. Supp. 2d 574, 596 (D.N.J. 2005) (finding the mere fact that product sales data were sent to company's sales force and were ultimately available for review by defendants who were corporate executives does not give rise to a strong inference of scienter). Finally, the Amended Complaint does not contain any allegations to establish the Associate Category Manager's reliability.[17]

Even less reliable is the allegation that the Merchandise Manager commented GNC "would buy anything from any vendor." Am. Compl. ¶ 168. The Amended Complaint does not allege a single fact concerning the Merchandise Manager's basis of knowledge for making that statement, nor does it allege any facts to corroborate what appears to be nothing more than an individual employee's opinion.

Plaintiff presumably references the Merchandise Manager's comment that GNC would buy anything from any vendor to bolster the allegation that GNC was incentivized to "push the envelope" because of the structure of its vendor contracts. See Am. Compl. ¶ 168. Those contracts contained a

---

[17] The Amended Complaint also alleges that "GNC management sat down with the Associate Category Manager and others to discuss the issues at the heart of the [New York AG Investigation]." Am. Compl. ¶ 174. As with the other allegations involving the Associate Category Manager, this one does not support an inference of scienter, particularly because the New York AG Investigation did not involve BMPEA or picamilon. See id. ¶¶ 61-65. Moreover, the Amended Complaint contains no allegations to indicate who met with the Associate Category Manager, let alone whether the meeting involved one of the Individual Defendants, nor are there any allegations describing what was purportedly discussed at this meeting, much less that BMPEA or picamilon was one of the topics.

guarantee that purported to indemnify GNC for any financial repercussions if third-party products violated applicable regulations. Id. Although Plaintiff points to this as an example of Defendants' scienter, the Court does not agree that the structure of GNC's vendor contracts demonstrates any intent to deceive or defraud. Rather, one could draw the opposing inference that it is common business practice for a large company such as GNC to tender to its vendors a standard form contract containing an indemnification clause aimed to protect against unforeseen legal or financial risks.

Finally, related to the GNC/vendor "close relationship" allegations, Plaintiff asserts that the past history of two vendors adds to an inference of scienter on Defendants' part. Plaintiff alleges that Defendants should have been aware that two vendors had a history of unethical behavior and legal violations, which should have raised a red flag concerning the products they supplied. See Am. Compl. ¶¶ 176-180. However, the Amended Complaint does not allege that either of the two vendors' legal history involved citations or convictions related to the substances at issue. Therefore, these allegations do not support an inference of scienter, much less a strong one.

### 2. Access to Product Recall and Regulatory Concerns

Plaintiff further alleges that the Individual Defendants' scienter is demonstrated by the fact that they had access to information about product recalls and regulatory concerns related to certain products. Am. Compl. ¶¶ 169, 175. The Sales Director, who was another confidential witness identified in the Amended Complaint, recalled that Fortunato held weekly meetings with senior executives every Monday, referred to as "Bloody Monday" meetings, to discuss product and other issues. Id. ¶ 170. According to the Sales Director, Fortunato "wanted a briefing on almost everything" and stressed that GNC's executives would have known about serious product issues because there was "paranoia" among them. Id. ¶ 171. The Sales Director recalled that Jakell conveyed relevant product information to appropriate recipients within GNC, such as the *USA Today*

25

article discussing the Acacia Rigidula Study. Id. ¶¶ 172-173. Based on these allegations, Plaintiff asserts that the Individual Defendant knew or should have known that certain third-party products contained picamilon or BMPEA.

As with the confidential witness allegations discussed above, the Court discounts the allegations related to the Sales Director as lacking in detail, corroboration and explanation as to basis of knowledge. See Avaya, 564 F.3d at 263. First, there is no allegation in the Amended Complaint that the Sales Director personally attended the so-called "Bloody Monday" meetings conducted by Fortunato, which raises a question about the Sales Director's basis of knowledge concerning the topics discussed at those meetings, nor are there any allegations to corroborate the Sales Director's description of what occurred. Similarly, the Sales Director's uncorroborated statement that Fortunato "wanted a briefing on almost everything" is vague and invites speculation whether any such briefings involved third-party products purportedly containing picamilon or BMPEA. Indeed, there is no allegation that the Sales Director personally briefed Fortunato on any topic, let alone product issues involving picamilon or BMPEA, nor is there any allegation that the Sales Director was present for any such briefings. Further, the Sales Director's comment that GNC's executives would have known about serious product issues because there was "paranoia" among them appears to be an individual employee's unsupported opinion which otherwise lacks corroboration. Finally, there are no allegations as to the Sales Director's basis of knowledge that Jakell conveyed relevant product information to appropriate recipients at GNC, such as the *USA Today* article discussing the Acacia Rigidula Study.[18] Notably, there are no allegations that the Sales Director worked directly

---

[18] Plaintiff alleges that Jakell emailed the *USA Today* article to approximately 100 people at GNC's corporate headquarters, including Nuzzo. Am.Compl. ¶ 85. According to Plaintiff, the fact that Nuzzo was included on the email list contributes to an inference that he knew third-party products contained BMPEA. The Court disagrees. There is no allegation that Nuzzo actually read the email, but even if he had, it is significant that the FDA had not taken any position or action regarding BMPEA at that time. However, as alleged in the Amended Complaint, when the FDA made a formal

with Jakell, knew of her job responsibilities or ever communicated with her about how she decided to disseminate product information to GNC employees.

### 3. Core Operations

Plaintiff seeks to bolster the inference of scienter by relying on the core operations doctrine. According to Plaintiff, third-party sports nutrition products represent a core operation of GNC, thus the Individual Defendants should be charged with knowledge concerning its vendors' products.[19] Am. Compl. ¶¶ 181-182, 185. Contrary to Plaintiff's allegation, "[c]ourts have been hesitant to impute knowledge to a defendant pursuant to the core business doctrine absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements." Glover v. Deluca, No. 2:03-CV-0288, 2006 WL 2850448, at *9 (W.D. Pa. Sept. 29, 2006) (internal quotation and citation omitted); see also National Junior Baseball League v. Pharmanet Dev. Group Inc., 720 F. Supp. 2d 517, 559 (D.N.J. 2010) ("it is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question.") (citation omitted).

---

announcement concerning BMPEA (and acacia rigidula) in April 2015, GNC stopped selling products with those ingredients. See id. ¶ 95.

[19] To highlight the central role vendors played in GNC's operations, Plaintiff cites the Sales Director's report that GNC held in-person meetings with its vendors once or twice a year purportedly to discuss current product performance and new product development. See Am. Compl. ¶ 183. For the reasons already discussed, the Court discounts information provided by the Sales Director as lacking in detail, corroboration and basis of knowledge. The Amended Complaint does not allege that the Sales Director attended any GNC in-person meetings with vendors, so it is unclear how the Sales Director would know who attended the meetings or what was discussed. Moreover, there are no allegations to corroborate the Sales Director's description of the GNC/vendor meetings.

Accepting that third-party sports nutrition products is a core operation of GNC, which Defendants dispute,[20] such allegation, based on the Individual Defendants' status as senior executives, is sufficient "only when taken together with more specific allegations linking their positions to their knowledge." Kennilworth Partners L.P. v. Cendant Corp., 59 F. Supp. 2d 417, 428 (D.N.J. 1999) (internal quotation omitted). Here, Plaintiff's core operation allegations are insufficient to support a strong inference of scienter because the Amended Complaint fails to plead particularized allegations linking any of the Individual Defendants' positions to knowledge that any third party products contained picamilon or BMPEA.

## 4.    Stock Sales During the Class Period

Plaintiff claims that Fortunato's and Nuzzo's insider sales of GNC stock during the Class Period is probative of their motive to commit fraud. Am. Compl. ¶ 186. Plaintiff alleges that Fortunato sold 2,076,275 shares of GNC stock during the Class Period for proceeds of $77,895,035, while Nuzzo sold 260,000 shares for proceeds of $10,458,803. Id. ¶¶ 187, 188.

Although fraudulent intent will not be inferred from the mere fact that some executives sold stock, sales of stock by company insiders that are "unusual in scope or timing . . . may support an inference of scienter." Suprema Specialties, 438 F.3d at 277 (citing Advanta, 180 F.3d at 540)). Factors courts consider to determine whether a sale is unusual include the amount of profit made, the amount of stock traded, the portion of stock holdings sold, the number of insiders involved, whether the sales were normal and routine and whether the profits were substantial relative to the executive's normal compensation. Suprema Specialties, 438 F.3d at 277.

---

[20] Defendants contend Plaintiff has mischaracterized the proper segment of GNC's business germane to analysis of the core operations claim. See Defs.' Mem. at 16. According to Defendants, the relevant market is not all third-party products or even third-party sports nutrition products, but rather third-party products Plaintiff alleges contained picamilon or BMPEA. See id. at 16-17. As Defendants note, the Amended Complaint contains no allegations about the volume of sales or revenue generated by that segment of GNC's operations.

In view of these factors, Plaintiff's allegations of insider stock sales by two of the Individual Defendants do not lend support to a strong inference of scienter. Of the six Individual Defendants, Plaintiff only targets Fortunato's and Nuzzo's stock sales, but makes no allegations as to Archbold, Drexler, Fortune and Tolivar. See Am. Compl. ¶¶ 186-199. The fact that only two of the Individual Defendants are alleged to have made insider sales undermines Plaintiff's claim that there was a motive to commit fraud. See Advanta, 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported.").

The allegations as to Fortunato and Nuzzo otherwise are insufficient to support an inference of scienter, much less a strong one. The Amended Complaint lists 32 stock sales by Fortunato between February 8, 2012, and November 11, 2013, and indicates that 20 of those sales were made pursuant to a 10b5-1 trading plan.[21] Am. Compl. ¶ 187. The Amended Complaint also lists 10 stock sales by Nuzzo between November 28, 2011, and December 2, 2013, showing that 9 of those sales were made pursuant to a 10b5-1 plan. Id. ¶ 188. Plaintiff highlights that some of the sales were made outside of a 10b5-1 trading plan, id. ¶ 192, and claims that even those made pursuant to a plan were "irregular in terms of the number of shares sold and they occurred at irregular intervals," making the trade "inherently suspicious." Id. ¶ 194. Despite the conclusory allegation of irregularity, Plaintiff does not indicate why the timing of the sales or the number of shares sold were

---

[21] "A Rule 10b5-1 plan prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information." In re Nutri-System, Inc. Sec. Litig., 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009) (citing 17 C.F.R. § 240.10b5-1(c)). Here, Plaintiff alleges that Fortunato's and Nuzzo's 10b5-1 trading plans do not shield them from accusations of insider trading because "nearly all of the plans in question were entered into during the Class Period, well after [they] knew or should have known that GNC was selling products with unlawful dietary ingredients." Am. Compl. ¶¶ 189, 193. Regardless of whether Fortunato and Nuzzo could rely on their 10b5-1 plans as an affirmative defense, Plaintiff's allegations of insider sales do not support an inference of scienter for the reasons discussed herein.

29

irregular. For example, Plaintiff fails to connect the stock sales to any significant events that occurred during the Class Period that would suggest a fraudulent motive for the sales.

In addition, Plaintiff does not allege any information to indicate whether the amount of profit as a result of the stock sales was unusual relative to Fortunato's and Nuzzo's ordinary compensation at GNC, nor does Plaintiff allege the proportion of their overall stock holdings that the sales represented. Finally, the last alleged stock sale by Fortunato or Nuzzo was on December 2, 2013, which was approximately two years before the alleged corrective disclosures (the filing of the Oregon AG Complaint and GNC's announcement of lowered earning expectations) occurred in October 2015. Such "[a] broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (concluding sales of stock three, four and twelve months before the disclosure of bad news was too attenuated to infer scienter). In sum, Plaintiff's allegations of insider sales by Fortunato and Nuzzo do not support a strong inference of scienter at least as compelling as any opposing inference of non-fraudulent intent.

### 5. SOX Certifications

Finally, Plaintiff alleges that scienter may be inferred because Fortunato, Nuzzo and Archbold signed GNC's allegedly false and misleading SOX certifications[22] during the Class Period.

---

[22] Sarbanes–Oxley requires that the chief executive officer and chief financial officer certify "[e]ach periodic report containing financial statements filed by an issuer with the [SEC] . . ." and provides criminal penalties if one does so "knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in [the Exchange Act]. . . ." 18 U.S.C. §§ 1350(a), (c).

According to Plaintiff, the SOX certifications were materially false and misleading when executed because these Individual Defendants were aware of, or recklessly disregarded, severe deficiencies in GNC's controls from a financial and operational perspective, namely the promotion and sale of products containing picamilon and BMPEA. Am. Compl. ¶¶ 201, 206.

Courts have held that SOX certifications alone are not actionable, and that something more is needed to contribute to an inference of scienter. See Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (holding that a SOX certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements); City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 420 (D. Del. 2009) (SOX certifications do not support inference of scienter where the plaintiff fails to "plead with sufficient particularity that [the defendants were] aware or should have been aware of" the alleged falsity "at the time those certifications were made"); In re Radian Sec. Litig., 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) (SOX certifications do not support a strong inference of scienter unless the defendants actually knew or at a minimum turned a blind eye to information indicating that the certifications were erroneous).

To the extent that allegations regarding SOX certifications can support a strong inference of scienter, they do not do so here. This Court has concluded that the allegations in the Amended Complaint do not support an inference that the Individual Defendants knew or recklessly disregarded that certain third-party products contained picamilon or BMPEA. Therefore, the mere fact that Fortunato, Nuzzo and Archbold signed SOX certifications does not support Plaintiff's claim that the Individual Defendants acted with scienter.

31

## 6. Scienter Conclusion

Although the Court has discussed each category of Plaintiff's scienter allegations one at a time, the Court has heeded Tellab's directive to evaluate the allegations in the Amended Complaint collectively and holistically. Viewed in that manner, Plaintiff's claim that the Individual Defendants acted with scienter primarily hinges on the following: (1) statements from confidential witnesses who were former GNC employees suggesting that the Individual Defendants should have known certain third-party products contained picamilon and BMPEA because GNC was closely involved with its vendors, GNC had the technology to track the products it sold, and GNC executives were acutely attuned to all aspects of the business and they had access to relevant product information because Jakell, a Senior Project Manager, conveyed that material to appropriate recipients within the company; see Am. Compl. ¶¶ 36, 159, 161, 170-173; (2) Jakell maintained a file on picamilon in which she twice noted that no NDI had been tendered to the FDA, see id. ¶¶ 42, 72, thus the Individual Defendants should have known that picamilon was an unlawful substance; and (3) in November, 2013, Jakell received an email from a scientific research website with a link to the Acacia Rigidula Study, and then she later circulated the *USA Today* article discussing the Acacia Rigidula Study to 100 people at GNC's headquarters, including Nuzzo, so at a minimum he should have known that BMPEA was an unlawful substance. See id. ¶ 85. For these reasons, Plaintiff claims that the Individual Defendants knew or recklessly disregarded that GNC was selling third-party products containing picamilon and/or BMPEA, but nevertheless made statements to deceive the investing public that was not the case.

First, none of the allegations concerning the confidential witnesses indicate that they ever communicated directly with any of the Individual Defendants concerning picamilon or BMPEA. Accordingly, the Court discounts the confidential witness allegations steeply for the reasons already

32

discussed - - they are lacking in detail, reliability, corroboration and explanation as to the speaker's basis of knowledge. Therefore, those allegations do not establish that the Individual Defendants knew or should have known that certain third-party products contained picamilon or BMPEA.

Next, Plaintiff relies heavily on allegations that Jakell possessed and disseminated information on picamilon, BMPEA and acacia rigidula, thus the Individual Defendants knew or should have known that certain third-party products contained those potentially dangerous and unlawful ingredients. Contrary to Plaintiff's position, the Jakell allegations do not support a strong inference of scienter on the Individual Defendants' part because information possessed or known by Jakell, who was a senior project manager, cannot automatically be imputed to the Individual Defendants simply by virtue of their executive positions in GNC. See In re Bio-Technology, 380 F. Supp. 2d at 596 ("Mere allegations of knowledge on the part of subordinates do not provide a sufficient basis for imputing knowledge to executives."). Significantly, the Amended Complaint does not contain any allegations to indicate Jakell ever communicated with any of the Individual Defendants regarding picamilon or BMPEA.

Although Jakell maintained a file in which she noted that no NDI had been tendered to the FDA for picamilon, the Amended Complaint does not allege that Jakell relayed such information to the Individual Defendants. Also absent from the Amended Complaint is any allegation that the Individual Defendants had access to Jakell's file on picamilon or that they even knew it existed. Although Plaintiff would have the Court infer that the Individual Defendants knew or should have known that no NDI had been filed for picamilon, thus raising a question as to its lawfulness as a dietary ingredient, an opposing inference can be drawn that the Individual Defendants simply had no knowledge or reason to believe there was any issue with picamilon, until the FDA took a formal position declaring that picamilon did not qualify as a dietary ingredient in September 2015. See Am.

33

Compl. ¶ 76. As alleged in the Amended Complaint, GNC ceased selling products containing picamilon after that time. Id. ¶ 81.

Likewise, Plaintiff's reliance on allegations that Jakell disseminated relevant product information and emailed the *USA Today* article referencing the Acacia Rigidula Study to numerous GNC employees, including Nuzzo, is equally unavailing to support a strong inference that Nuzzo therefore knew that GNC was selling products with acacia rigidula (and BMPEA). Aside from the fact that the Amended Complaint does not allege Nuzzo actually read the article, even if he had, there is no allegation that GNC was mentioned in the *USA Today* article or that the FDA had taken any position regarding BMPEA or acacia rigidula when Jakell circulated the article in November 2013. However, as alleged in the Amended Complaint, when the FDA announced in April 2015, that BMPEA did not meet the definition of a dietary ingredient, GNC stopped selling products containing BMPEA and acacia rigidula. See Am. Compl. ¶ 95. Therefore, although Plaintiff would have the Court infer that Nuzzo knew or should have known in November 2013 that acacia rigidula and BMPEA were not lawful dietary ingredients, an opposing inference can be drawn that none of the Individual Defendants had knowledge or reason to believe there was any issue with those ingredients until the FDA made its announcement in April 2015.

In sum, considering the Amended Complaint holistically and in the light most favorable to Plaintiff, the Court concludes that the inference of scienter is not as strong as any opposing inference of non-fraudulent conduct by Defendants. Accordingly, the Court finds that Plaintiff has failed to adequately plead the element of scienter and has thus failed to state a claim under § 10(b) of the Exchange Act.

## C. The Amended Complaint Does Not Adequately Plead Loss Causation.

The PSLRA does not impose a heightened pleading requirement for loss causation. Thus, to survive a motion to dismiss challenging loss causation, a plaintiff need only satisfy the requirements of Federal Rule of Civil Procedure 8(a)(2) that the complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. See Dura, 544 U.S. at 346 ("neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss"). Even so, as to loss causation, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." Twombly, 550 U.S. at 555.

Loss causation is defined as "a causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 342. To plead the element of loss causation under § 10(b), the plaintiff must plead that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." Id. at 346. "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425-26 (3d Cir. 2007). "In other words, the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud." Nat'l Junior Baseball League, 720 F. Supp. 2d at 559. Plaintiff has failed to adequately plead loss causation in accordance with these standards.

According to Plaintiff, GNC common stock traded at artificially inflated levels because of Defendants' alleged material false and misleading statements and omissions during the Class Period, but the stock price declined when the falsity of the misstatements and the concealed information was revealed. Am. Compl. ¶¶ 209, 210. Plaintiff alleges that the corrective disclosures occurred when

35

the Oregon AG Complaint was filed on October 22, 2015, "[making] GNC's unlawful sales of picamilon and BMPEA products public for the first time," and on October 29, 2015, when GNC reported lower earnings expectations for 2015, which analysts purportedly attributed, in part, to the Oregon AG Complaint. Id. ¶¶ 212, 214. Following the Oregon AG Complaint, GNC's stock price dropped from $40.23 per share to close at $34.50 per share. Id. ¶ 213. Then, after GNC's earnings announcement, its stock price dropped from $38.64 per share to $28.24 per share. Id. ¶ 214. Plaintiff alleges that members of the Class suffered economic loss and damages as a result of their purchases of GNC common stock at artificially inflated prices during the Class Period. Id. ¶¶ 208, 211, 216.

First, Plaintiff's reliance on the Oregon AG Complaint to plead loss causation is misplaced. The Oregon AG Complaint contains allegations of unproven misconduct, thus it is not a corrective disclosure which revealed GNC's alleged fraudulent conduct to the market. See e.g., Loos v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014) (holding that "the announcement of an investigation, without more, is insufficient to establish loss causation"); Meyer v. Greene, 710 F.3d 1189, 1201 (11th Cir. 2013) (explaining that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure" and "investigations, in and of themselves, [do not] reveal to the market that a company's previous statements were false or fraudulent"); Sapssov v. Health Mgmt. Assocs., Inc., 22 F. Supp. 3d 1210, 1231 (M.D. Fla. 2014), aff'd, 608 F. App'x 855 (11th Cir. 2015) (finding that a complaint in another case does not constitute a corrective disclosure because "[t]he filing of a civil complaint certainly does not establish that the defendant committed or is liable for the conduct alleged").

To the extent the case law requires something "more" than an investigation to constitute a corrective disclosure, Plaintiff's reliance on GNC's announcement of lower earnings expectations,

and the allegation that analysts attributed that, in part, to the Oregon AG Complaint does not suffice. "[D]isclosure of disappointing earnings or other indications of the 'true financial condition' of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure." In re DVI, Inc. Sec. Litig., No. 2:03-cv-05336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010). The Amended Complaint does not allege that GNC's earnings announcement mentioned the Oregon AG Complaint, picamilon or BMPEA as the cause of lower earnings expectations, see Am. Compl. ¶¶ 109, 214, thus that announcement did not reveal any truth about the purported fraud. See Nat'l Junior Baseball League, 720 F. Supp. 2d at 561 (finding that the plaintiff failed to plead loss causation where "none of the announcements made by Defendants mention any alleged fraudulent practices"). Moreover, any comments by analysts attributing GNC's lower earnings expectations to the Oregon AG Complaint were nothing more than speculation, not a corrective disclosure which revealed any alleged fraud to the market. See e.g., In re Omnicom Group, Inc. Secs. Litig., 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud as required by Dura"). In sum, the Amended Complaint is devoid of allegations that either of the two purported "corrective disclosures" revealed any fraud or wrongdoing to the market. For that reason, the Amended Complaint fails to properly plead loss causation.

**D. Section 20(a) claim**

Section 20(a) of the Exchange Act creates a cause of action against one who controls a violator of § 10(b). 15 U.S.C. § 78t(a); Suprema Specialties, 438 F.3d at 284. Therefore, liability under § 20(a) is derivative of a primary violation of § 10(b) by the controlled person. See Avaya, 564 F.3d at 252. Here, Plaintiff alleges that the Individual Defendants are liable under § 20(a) for the purportedly misleading statements and omissions made by GNC, a "controlled person," during the Class Period. Because Plaintiff has failed to adequately plead a predicate § 10(b) violation, the § 20(a) claim also must be dismissed. See Rahman v. Kid Brands, Inc., 736 F.3d 237, 247 (3d Cir. 2013) (affirming dismissal of § 20(a) claim where the plaintiff failed to properly plead a predicate claim under § 10(b)).

**V. CONCLUSION**

Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2). However, "a court may deny leave to amend when such amendment would be futile"—i.e., "the amended complaint would not survive a motion to dismiss for failure to state a claim." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 259 (3d Cir. 2014) (citations omitted).

In view of the Amended Complaint's deficiencies identified herein, giving Plaintiff leave to amend may well be futile. However, in the interests of justice, if Plaintiff believes that amendment would not be futile, Plaintiff shall file a motion for leave to amend within 30 days. The motion shall precisely specify what new allegations Plaintiff would include in a second amended complaint to cure the deficiencies discussed in this Opinion, and shall also include a copy of a proposed second amended complaint which clearly identifies the new allegations against the current Amended

Complaint. Accordingly, the Motion to Dismiss filed by GNC and the Individual Defendants will be granted, and Plaintiff's Amended Complaint will be dismissed without prejudice at this time.

An appropriate order will be entered.

Mark R. Hornak
United States District Judge

Date: September 8, 2017

cc:   All counsel of record